**No. 25-50695**

# In the United States Court of Appeals for the Fifth Circuit

Mara Nathan, Rabbi, on behalf of herself and on behalf of her minor child, M.N.; Virginia Galaviz Eisenberg, on behalf of herself and on behalf of her minor child, R.E.; Ron Eisenberg, on behalf of himself and on behalf of his minor child, R.E.; Seth Ettinger, Cantor, on behalf of himself and on behalf of his minor child, R.E.; Sarah Ettinger, on behalf of herself and on behalf of her minor child, R.E.; Elizabeth Lemaster, on behalf of herself and on behalf of her minor children, K.L. & L.L.; Carah Helwig, on behalf of herself and on behalf of her minor children, J.P. & T.P.; Alyssa Martin, on behalf of herself and on behalf on her minor child, H.B.M.; Cody Barker, on behalf of himself and on behalf of his minor child, H.B.M.; Lauren Erwin, on behalf of herself and on behalf of her minor child, M.E.; Rebekah Lowe, on behalf of herself and on behalf of her minor children, E.R.L. & E.M.L.; Theodore Lowe, on behalf of himself and on behalf of his minor children, E.R.L. & E.M.L.; Marissa Norden, on behalf of herself and on behalf of her minor children, E.N. & A.N.; Wiley Norden, on behalf of himself and on behalf of his minor children, E.N. & A.N.; Joshua Fixler, Rabbi, on behalf of himself and on behalf on his minor children, D.F., E.F., & F.F.; Cynthia Mood, Reverend, on behalf of herself and on behalf of her minor children, L.M. & C.M.; Cheryl Rebecca Smith, on behalf of herself and on behalf of her minor child, L.P.J.; Arvind Chandrakantan, on behalf of himself and on behalf of his minor children, V.C., M.C. & A.C.; Allison Fitzpatrick, on behalf of herself and on behalf of her minor children, C.F. & H.F.; Mara Richards Bim, on behalf of herself and on behalf of her minor child, H.B.,

*Plaintiffs-Appellees,*

v.

Alamo Heights Independent School District; North East Independent School District; Lackland Independent School District; Northside Independent School District; Lake Travis Independent School District; Dripping Springs Independent School District; Fort Bend Independent School District; Cypress Fairbanks Independent School District; Plano Independent School District,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

———————

## BRIEF FOR APPELLANTS

———————

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

William F. Cole
Principal Deputy Solicitor General

Daniel M. Ortner
Assistant Solicitor General

Garrett C. Gray
Christopher J. Pavlinec
Assistant Attorneys General

*Counsel for Appellants*

# Certificate of Interested Persons

## No. 25-50695

———

Mara Nathan, Rabbi, on behalf of herself and on behalf of her minor child, M.N.; Virginia Galaviz Eisenberg, on behalf of herself and on behalf of her minor child, R.E.; Ron Eisenberg, on behalf of himself and on behalf of his minor child, R.E.; Seth Ettinger, Cantor, on behalf of himself and on behalf of his minor child, R.E.; Sarah Ettinger, on behalf of herself and on behalf of her minor child, R.E.; Elizabeth Lemaster, on behalf of herself and on behalf of her minor children, K.L. & L.L.; Carah Helwig, on behalf of herself and on behalf of her minor children, J.P. & T.P.; Alyssa Martin, on behalf of herself and on behalf on her minor child, H.B.M.; Cody Barker, on behalf of himself and on behalf of his minor child, H.B.M.; Lauren Erwin, on behalf of herself and on behalf of her minor child, M.E.; Rebekah Lowe, on behalf of herself and on behalf of her minor children, E.R.L. & E.M.L.; Theodore Lowe, on behalf of himself and on behalf of his minor children, E.R.L. & E.M.L.; Marissa Norden, on behalf of herself and on behalf of her minor children, E.N. & A.N.; Wiley Norden, on behalf of himself and on behalf of his minor children, E.N. & A.N.; Joshua Fixler, Rabbi, on behalf of himself and on behalf on his minor children, D.F., E.F., & F.F.; Cynthia Mood, Reverend, on behalf of herself and on behalf of her minor children, L.M. & C.M.; Cheryl Rebecca Smith, on behalf of herself and on behalf of her minor child, L.P.J.; Arvind Chandrakantan, on behalf of himself and on behalf of his minor children, V.C., M.C. & A.C.; Allison Fitzpatrick, on behalf of herself and on behalf of her minor children, C.F. & H.F.; Mara Richards Bim, on behalf of herself and on behalf of her minor child, H.B.,

*Plaintiffs–Appellees,*

v.

Alamo Heights Independent School District; North East Independent School District; Lackland Independent School District; Northside Independent School District; Lake Travis Independent School District; Dripping Springs Independent School District; Fort Bend Independent School District; Cypress Fairbanks Independent School District; Plano Independent School District,

*Defendants–Appellants.*

———

i

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William R. Peterson
WILLIAM R. PETERSON
*Counsel for Appellants*

## Statement Regarding Oral Argument

This Court has calendared this case for en banc oral argument January 20, 2026, consolidated with *Roake v. Brumley*, No. 24-30706.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ..................................................... iii

Table of Authorities ................................................................................. vi

Introduction ............................................................................................... 1

Statement of Jurisdiction ......................................................................... 3

Issues Presented ........................................................................................ 4

Statement of the Case ............................................................................... 5

    A.  The Ten Commandments Have Important Historical Meaning. ......... 5

    B.  The Texas Legislature enacts S.B.10 ................................................ 7

    C.  Plaintiffs challenge S.B.10 as facially unconstitutional under the First Amendment and seek a pre-enforcement injunction. ............... 12

    D.  The district court preliminarily enjoins Appellants from enforcing S.B.10. ............................................................................ 16

Summary of the Argument ...................................................................... 18

Standard of Review ................................................................................. 21

Argument .................................................................................................. 22

  I.  Plaintiffs Failed to Demonstrate a Likelihood of Success on Their Claims that S.B.10 Violates the Establishment Clause. ........................... 22

    A.  Displaying the Ten Commandments in the classroom bears none of the recognized hallmarks of an establishment of religion. .............. 23

    B.  The district court erred by holding to the contrary. .......................... 27

        1.  The district court erred by requiring Appellants to situate a practice within history and tradition to avoid a constitutional violation. .................................................................................. 27

        2.  *Stone v. Graham* does not control. ............................................. 33

        3.  Holding to the contrary would improperly disfavor religion and religious expression. ........................................................... 36

    C.  Under a correct understanding of the Establishment Clause, Plaintiffs lack standing. ................................................................ 38

  II.  Plaintiffs Failed to Establish a Likelihood of Success on Their Claims Under the Free Exercise Clause. ................................................. 40

A. Under *Mahmoud*, educational requirements and curricular features can impose an impermissible burden on religious exercise, requiring opportunities for parents to opt out. ....................40

B. Plaintiffs' Free Exercise claims fail under *Mahmoud*..........................43

C. Plaintiffs' theory rests on speculation about children's behavior. .......44

D. Extending *Mahmoud* to classroom posters would radically reshape public education. ...................................................45

III. Plaintiffs Failed to Demonstrate that S.B.10 Is Unconstitutional in Every Application. ...................................................46

IV. Plaintiffs Did Not Satisfy the Other Preliminary Injunction Factors, and the Injunction Is Overbroad................................49

Conclusion...................................................................................................50

Certificate of Compliance ...........................................................................51

# Table of Authorities

Page(s)

**Cases:**

*Alexander v. S.C. State Conf. of the NAACP,*
 602 U.S. 1 (2024) ................................................................. 35

*Am. Legion v. Am. Humanist Ass'n,*
 588 U.S. 29 (2019) ........................................................*passim*

*Arbaugh v. Y&H Corp.,*
 546 U.S. 500 (2006) ............................................................. 36

*Books v. City of Elkhart,*
 235 F.3d 292 (7th Cir. 2000) ................................................. 5

*Bowen v. Kendrick,*
 487 U.S. 589 (1988) ............................................................. 46

*Brnovich v. Democratic Nat'l Comm.,*
 594 U.S. 647 (2021) ............................................................. 35

*Bucklew v. Precythe,*
 587 U.S. 119 (2019) ............................................................. 32

*Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Review Comm'n,*
 605 U.S. 238 (2025) ............................................................. 24

*City of Grants Pass v. Johnson,*
 603 U.S. 520 (2024) ............................................................. 32

*Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter,*
 492 U.S. 573 (1989) ............................................................... 2

*Croft v. Governor of Tex.,*
 562 F.3d 735 (5th Cir. 2009) ...................................... 35, 38, 47, 48

*Denver v. N.Y. Tr. Co.,*
 229 U.S. 123 (1913) ............................................................. 39

*Dobbs v. Jackson Women's Health Org.,*
 597 U.S. 215 (2022) ............................................................. 24

*Doe v. Beaumont ISD,*
 240 F.3d 462 (5th Cir. 2001) ................................................. 38

*Elk Grove Unified Sch. Dist. v. Newdow,*
 542 U.S. 1 (2004) ............................................................... 24

*Espinoza v. Mont. Dept. of Revenue,*
 591 U.S. 464 (2020) ............................................................. 40

*Firewalker-Fields v. Lee,*
    58 F.4th 104 (4th Cir. 2023) ................................................ 26, 27, 29

*Freedom from Religion Foundation, Inc. v. Mack,*
    49 F.4th 941 (5th Cir. 2022) ....................................................... 29, 38

*Giles v. California,*
    554 U.S. 353 (2008) ......................................................................24

*Harrison v. Young,*
    48 F.4th 331 (5th Cir. 2022) ............................................................ 21

*Hilsenrath v. Sch. Dist. of Chathams,*
    136 F.4th 484 (3d Cir. 2025) .................................................... 26, 29

*Jackson v. City of Houston,*
    143 F.4th 640 (5th Cir. 2025) .......................................................... 39

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ............................................................... *passim*

*Lee v. Weisman,*
    505 U.S. 577 (1992) ................................................................ 18, 26

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ............................................................... *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...................................................................24-25

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) ...................................................................... 1

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ............................................................... *passim*

*Marsh v. Chambers,*
    463 U.S. 783 (1983) ......................................................................30

*Maryland v. King,*
    567 U.S. 1301 (2012) .................................................................... 49

*People of State of Ill. ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71,*
    *Champaign Cnty.,*
    333 U.S. 203 (1948) ......................................................................46

*Medina v. Planned Parenthood S. Atl.,*
    606 U.S. 357 (2025) ...................................................................... 27

*Moore v. Bryant,*
    853 F.3d 245 (5th Cir. 2017) .......................................................... 39

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ............................................................. 24, 27, 28

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,
  418 F.3d 535 (5th Cir. 2005) ................................................... 21

*Roake v. Brumley*,
  141 F.4th 614 (5th Cir. 2025) ........................................ 16, 28, 29, 35

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ............................................................. 37

*Satanic Temple, Inc. v. City of Boston*,
  111 F.4th 156 (1st Cir. 2024) .................................................. 47

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022) ................................................. 25, 27, 28, 29

*Stone v. Graham*,
  449 U.S. 39 (1980) ........................................................*passim*

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ......................................................*passim*

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ............................................................. 50

*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024) .............................................. 21, 39

*United States v. Rahimi*,
  602 U.S. 680 (2024) ......................................................... 28, 47

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................................. 36

*Van Orden v. Perry*,
  545 U.S. 677 (2005) ......................................................*passim*

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
  945 F.3d 206 (5th Cir. 2019) ................................................... 35

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) ............................................................. 32

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ............................................................. 47

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................. 2, 41, 44, 45

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ........................................................... 21, 49

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .......................................................... 2, 40, 42, 45
*Zorach v. Clauson*,
    343 U.S. 306 (1952)............................................................ 18, 26, 37

**Constitutional Provisions and Statutes:**

U.S. Const. amend. I.........................................................................*passim*

U.S. Const. amend. II .................................................................................29

28 U.S.C.
    § 1292(a)(1) ........................................................................................ 3
    § 1331 .................................................................................................. 3

42 U.S.C. § 1983 .................................................................................... 3, 27

Tex. Educ. Code
    § 1.0041 ..............................................................................................10
    § 1.0041(a) ......................................................................................... 11
    § 1.0041(b)(1) .................................................................................... 11
    § 1.0041(b)(1)-(2) ............................................................................. 11
    § 1.0041(c) ..........................................................................................10
    § 1.0041(d)(1) .................................................................................... 11
    § 1.0041(e) .......................................................................................... 11

**Other Authorities:**

Act of May 28, 2025, 89th Leg. R.S., ch. 955, § 1 .................................10

An Ordinance for the Government of the Territory of the United
    States Northwest of the River Ohio, Act of July 13, 1787, art. III ...... 31

*Calvin's Case*, (1608) 77 Eng. Rep. 377, 382, 391-92 .................................5

Debate on Tex. S.B.10 on the Floor of the House of Representatives,
    89th Leg. (May 24, 2025),...................................................................9

Debate on Tex. S.B.10 on the Floor of the Senate, 89th Leg. (Mar. 18,
    2025) ....................................................................................................8

H.R. Con. Res. 31, 105th Cong. (1997) ....................................................7

Hall & Picciotti-Bayer, Ten Commandments in the Public Square and
    Public Schools, 34 William & Mary Bill of Rights J. 1 (forthcoming
    November 2025) ................................................................................30

Harold J. Berman, *Religion and Law: The First Amendment in Historical
    Perspectiv*e, 35 Emory L.J. 777 (1986).................................................6

Hearing on Tex. S.B.10 Before the House Comm. of Pub. Educ., 89th Leg. (Apr. 29, 2025)................................................................................8

House Comm. on Public Educ., Bill Analysis, Tex. S.B.10, 89th Leg. (2025) ...............................................................................................8

John T. Noonan, Jr., *The Believer and the Powers That Are: Cases, History, and other Data Bearing on the Relation of Religion and Government* 4 (1987)........................................................................6

John W. Welch, *Biblical Law in America: Historical Perspectives and Potentials for Reform*, 2002 B.Y.U. L. Rev. 611 (2002) ........................6

Ken Starr, *Religious Liberty in Crisis: Exercising Your Faith in an Age of Uncertainty* 17 (2021) ........................................................................7

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003)....................................................................................25

Off. of the Curator, Sup. Ct. of the U.S., *Courtroom Friezes: South and North Walls* (Aug. 9, 2021)...........................................................5

Steven K. Green, *The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law*, 14 J.L. & Religion 525 (2000)................................................................................................6

Tex. Lt. Gov. Dan Patrick, Statement on the Passage of Senate Bill 10- Placing the Ten Commandments in Schools (Mar. 18, 2025)...........9

1 William Blackstone, *Commentaries*.......................................................5

## Introduction

The Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). "[T]he [Supreme] Court's opinions, like its building, have recognized the role the Decalogue plays in America's heritage. While the Commandments are religious, they have an undeniable historical meaning." *Van Orden v. Perry*, 545 U.S. 677, 678 (2005) (plurality op.) (citation omitted). Because of their importance to America's history and heritage, the Texas Legislature determined that schoolchildren should be familiar with the Ten Commandments and enacted Senate Bill 10 (S.B.10), requiring public schools to post copies, if donated, in each classroom.

The Legislature's requirement to post a deeply significant moral and historical document—important to America's heritage—on classroom walls violates neither the Establishment Clause nor the Free Exercise Clause of the First Amendment, even if that document includes religious content.

The Framers were very familiar with establishments of religion, including the Church of England and other state-established churches. ROA.1576, 1585-86. Posting the Ten Commandments on a classroom wall bears no resemblance to any historical aspect of a state-established church. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 n.5 (2022). It instead fits squarely within the "'unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.'" *Van Orden*, 545 U.S. at 686 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984)).

Indeed, now that the Supreme Court has held that the "the Establishment Clause must be interpreted by 'reference to historical practices and understandings,'" *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)), rather than whether an observer would take offense at "'endorsement' of religion," *Am. Legion*, 588 U.S at 49 (quoting *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989)), Plaintiffs' Establishment Clause claims also fails for lack of standing, *see Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring).

Nor does the mere presence of the Decalogue on the wall of a classroom constitute "coercive . . . classroom instruction" that would "impose upon children a set of values and beliefs that are 'hostile' to their parents' religious beliefs." *Mahmoud v. Taylor*, 606 U.S. 522, 554 (2025) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972)). Treating classroom posters as equivalent to coercive instruction by teachers would radically reshape public education, effectively requiring blank classroom walls to avoid offending any religious belief. That is not the law: Although students have a right not to salute the flag, *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), they have no right to demand removal of the flag from the classroom.

At a minimum, even if some displays of the Ten Commandments consistent with S.B.10 could be unconstitutional in some circumstances, Plaintiffs have failed to satisfy the high bar for facial challenges. S.B.10 does not prohibit incorporating the Ten Commandments into a display explaining their historical context. Whether any particular display will violate the rights of any Plaintiff is mere speculation at this point in time.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction over Plaintiffs' claims under 42 U.S.C. § 1983. 28 U.S.C. § 1331. This Court has appellate jurisdiction over this appeal of an interlocutory order granting a preliminary injunction. 28 U.S.C. § 1292(a)(1). The district court entered the order granting a preliminary injunction on August 20, 2025. ROA.1427. Appellants filed a timely notice of interlocutory appeal on August 21, 2025. ROA.1483.

## Issues Presented

1.  Whether posters displaying the Ten Commandments on the walls of public-school classrooms constitute an Establishment of Religion in violation of the First Amendment, including whether Plaintiffs have standing to bring claims under the Establishment Clause.

2.  Whether posters displaying the Ten Commandments on the walls of public-school classrooms substantially burden religious exercise in violation of the right to Free Exercise of Religion protected by the First Amendment.

3.  Whether Plaintiffs satisfied the stringent standards for a facial, pre-enforcement challenge to S.B.10.

4.  Whether Plaintiffs satisfied the other requirements for a preliminary injunction, including whether the injunction is overbroad.

## Statement of the Case

### A.  The Ten Commandments Have Important Historical Meaning.

"For believing Jews and Christians, the Ten Commandments are the word of God handed down to Moses on Mount Sinai, but the image of the Ten Commandments has also been used to convey other meanings." *Am. Legion*, 588 U.S. at 53. Far from only religious import, "the Ten Commandments . . . have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in [the Supreme Court's] courtroom and in other prominent public buildings in our Nation's capital." *Id.*

The Ten Commandments "served as a foundation for the formation of both English Common Law and the Napoleonic Code, which together laid the foundation for American jurisprudence." *Books v. City of Elkhart*, 235 F.3d 292, 312 (7th Cir. 2000) (Manion, C.J., concurring in part and dissenting in part). Blackstone, for example, explains that in proscribing *mala in se* crimes like murder, theft, and perjury, a legislature "acts only . . . in subordination to the great lawgiver, transcribing and publishing his precepts." 1 William Blackstone, *Commentaries* *54. And Lord Coke described Moses as "the first reporter or writer of law in the world." *Calvin's Case*, (1608) 77 Eng. Rep. 377, 382, 391-92. Echoing this historical pedigree, a depiction of Moses holding the Ten Commandments appears in the frieze of the U.S. Supreme Court. *See* Off. of the Curator, Sup. Ct. of the U.S., *Courtroom Friezes: South and North Walls* (Aug. 9, 2021), https://perma.cc/BJV5-3GLL (explaining Moses's role as one of the "great lawgivers of history").

Numerous scholars have noted the influence of the Ten Commandments on the American legal system. *See* Harold J. Berman, *Religion and Law: The First Amendment in Historical Perspectiv*e, 35 Emory L.J. 777, 789 (1986) (discussing the influence of the Ten Commandments and arguing that "our law is rooted in a common religious tradition"); John T. Noonan, Jr., *The Believer and the Powers That Are: Cases, History, and other Data Bearing on the Relation of Religion and Government* 4 (1987) ("Little doubt exists that, despite the great variety of views on the dating, numbering, and exact meaning of the Ten Commandments, they have been the most influential law code in history."); John W. Welch, *Biblical Law in America: Historical Perspectives and Potentials for Reform*, 2002 B.Y.U. L. Rev. 611, 636 (2002) (arguing that displaying the Ten Commandments "simultaneously presents several underlying policies deeply ingrained in the character of American Common Law"). Although he disagrees that the Ten Commandments are a source of American law, even Plaintiffs' expert has conceded that "[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition" and that by "inform[ing] our notions of right and wrong," they "have influenced the development of Western law of which the American legal system is part." Steven K. Green, *The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law*, 14 J.L. & Religion 525, 525 (2000).

The Ten Commandments have therefore come to symbolize the rule of law itself. In 1997, the United States House of Representatives recognized that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization" and "the Ten Commandments set forth

a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society." H.R. Con. Res. 31, 105th Cong. (1997); *see also* Ken Starr, *Religious Liberty in Crisis: Exercising Your Faith in an Age of Uncertainty* 17 (2021) (explaining that the Ten Commandments have "taken on historical significance to society in a more general, nonreligious sense" and that the Ten Commandments "stand not only as sacred text, but also as culture-shaping principles guiding the formation of laws that bind us all, regardless of our faith journey (or lack of one")).

## B.  The Texas Legislature enacts S.B.10

Recognizing this rich historical tradition, E.J. Ruegemer, a Minnesota judge responsible for many Ten Commandments displays around the country, including the display at the Texas Capitol in *Van Orden*, ROA.955, believed that "if troubled youths were exposed to one of mankind's earliest and long-lasting codes of conduct, those youths might be less inclined to break the law," ROA.955 (citing Declaration of Judge E.J. Ruegemer at 2, *Card v. City of Everett*, No. 2:03-cv-02385-RSL (W.D. Wash. June 25, 2003)). The 89th Texas Legislature likewise concluded that schoolchildren should be familiar with the Ten Commandments given their "historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. It thus enacted S.B.10—a law requiring public schools to post copies of the Ten Commandments on classroom walls if copies are donated (or if the school district decides to purchase them).

**1.**  S.B.10's author, Senator Phil King, explained in his Statement of Intent that the Ten Commandments have a lengthy history of being "displayed in public

7

buildings and classrooms across America." ROA.1901. S.B.10 is intended to "restore the history and tradition of the Ten Commandments in our state and our nation" and to "remind students all across Texas of the importance of a fundamental foundation of American and Texas law—the Ten Commandments." ROA.1901. Senator King elaborated on the Senate floor that "[v]ery few documents in the history of western civilization and even more so in American history have had a larger impact on our moral code and our legal code and . . . our culture than the Ten Commandments." Debate on Tex. S.B.10 on the Floor of the Senate, 89th Leg., R.S. at 3:07:33-3:07:51 (Mar. 18, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21349& lang=en (statement of Senator King).

The Texas House Committee on Public Education's bill analysis reflects the same intent, explaining that "S.B.10 seeks to remind students all across Texas of the importance of the Ten Commandments as a fundamental foundation of American and Texas law." House Comm. on Public Educ., Bill Analysis, Tex. S.B.10, 89th Leg., R.S. (2025). When asked about the "objective" of S.B.10, Representative Noble, who carried the bill in the Texas House of Representatives, stated that the objective is "educational" and to "return to our foundational heritage." Hearing on Tex. S.B.10 Before the House Comm. of Pub. Educ., 89th Leg., R.S. at 6:21:45-6:23 (Apr. 29, 2025), https://house.texas.gov/videos/21958 (statements of Rep. Noble). Representative Frank, in support of the educational objective of S.B.10, noted that a student "cannot be an intelligent understander of history in the United States" without understanding what was foundational and motivating to our forefathers. Hearing on Tex. S.B.10 Before the House Comm. of Pub. Educ., 89th Leg., R.S. at 6:50:35-

6:51:22 (Apr. 29, 2025), https://house.texas.gov/videos/21958 (statement of Rep. Frank).

S.B.10 was also enacted because of the Ten Commandments' moral influence. As Senator King explained, "[e]very child needs to walk in . . . every day they're in school and see on the wall that it's wrong to kill, it's wrong to steal, [and] that you're supposed to respect and honor your parents. It's part of our tradition and needs to be part of our education system again." Debate on Tex. S.B.10 on the Floor of the Senate, 89th Leg., R.S. at 3:14:52-3:15:07 (Mar. 18, 2025), https://www.sen-ate.texas.gov/videoplayer.php?vid=21349&lang=en (statement of Senator King). Or as Representative Noble put it, "[t]he very way we treat others as a society come[s] from the principles found in the Ten Commandments . . . .[I]t's time to return the truths to the fabric of our educational system: respect authority, respect others, don't steal, tell the truth, don't kill, keep your word." Debate on Tex. S.B.10 on the Floor of the House of Representatives, 89th Leg., R.S. at 5:01:57-5:02:15 (May 24, 2025), https://house.texas.gov/videos/22257 (statement of Rep. Noble).

Dan Patrick, the Lieutenant Governor and President of the Senate, agreed. After S.B.10 was passed, he stated that, "[b]y placing the Ten Commandments in our pub-lic school classrooms, we ensure our students receive the same foundational moral compass as our state and country's forefathers." Tex. Lt. Gov. Dan Patrick, State-ment on the Passage of Senate Bill 10—Placing the Ten Commandments in Schools (Mar. 18, 2025), https://www.ltgov.texas.gov/2025/03/18/t-gov-dan-patrick-state-ment-on-the-passage-of-senate-bill-10-placing-the-ten-commandments-in-schools/.

**2.** In June 2025, Texas Governor Greg Abbott signed into law S.B.10, which requires public elementary and secondary schools in Texas to display a poster or framed copy of the Ten Commandments. Act of May 28, 2025, 89th Leg. R.S., ch. 955, § 1 (codified at Tex. Educ. Code § 1.0041).

S.B.10 requires that each display include the same text as the monument at the Texas Capitol upheld as constitutional in *Van Orden v. Perry*:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

Tex. Educ. Code § 1.0041(c) (formatting in original); *see also Van Orden*, 545 U.S. at 707 (Stevens J., dissenting) (listing the version used in the Texas Capitol

monument). The text was developed by the "Fraternal Order of Eagles, a private civic (and primarily secular) organization," that "sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency." *Van Orden*, 545 U.S. at 701 (Breyer J., concurring in the judgment). The Order "consult[ed] with a committee composed of members of several faiths in order to find a nonsectarian text." *Id.*

The poster displaying the Ten Commandments must (1) be exhibited in a "conspicuous place" in the classroom, (2) "be at least 16 inches wide and 20 inches tall," and (3) contain font "in a size and typeface that is legible to a person with average vision from anywhere in the classroom." Tex. Educ. Code § 1.0041(a), (b)(1)-(2). Although the poster itself cannot include other content, *id.* § 1.0041(b)(1), S.B.10 does not prohibit teachers, schools, or school districts from including the poster within a larger display of historical or educational materials.

Public schools may, but are not required to, purchase posters using district funds. *Id.* § 1.0041(e). If a classroom does not have a poster, though, the school "must: (1) accept any offer of a privately donated poster or framed copy of the Ten Commandments" that meets S.B.10's requirements. *Id.* § 1.0041(d)(1).

S.B.10 does not require teachers to discuss the meaning and interpretation of the Ten Commandments with students or use the Ten Commandments in instruction.

### C. Plaintiffs challenge S.B.10 as facially unconstitutional under the First Amendment and seek a pre-enforcement injunction.

**1.**   Before S.B.10 took effect on September 1, Plaintiffs—Texas parents whose children attend public schools in eleven school districts[1] near San Antonio, Austin, Houston, and Dallas—filed suit on behalf of themselves and their minor children, contending that S.B.10 violates the Establishment Clause and the Free Exercise Clause. ROA.63-126. Plaintiffs sought preliminary and permanent injunctive relief preventing Appellants "from complying with S.B.10 by displaying the Ten Commandments in public elementary and secondary school classrooms." ROA.125.

Plaintiffs allege that displaying posters of the Ten Commandments will cause their children to "be unconstitutionally coerced into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture" and "be pressured to suppress expression of their personal religious and nonreligious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers." ROA.122. These posters, Plaintiffs contend, "prescrib[e] an official religious text for schoolchildren to venerate." ROA.122. Plaintiffs also assert that the posters "will burden the religious exercise of the minor-child Plaintiffs by pressing them into observance, meditation on, veneration, and adoption of the state's religious scripture . . . to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers." ROA.123.

---

[1] Only nine of those school districts are appellants here because two of the school districts, Austin Independent School District and Houston Independent School District, are not represented by the Texas Attorney General's Office in this case and are not parties to this appeal. ROA.1536. Austin ISD filed a stipulation of dismissal, ROA.1409, and was dismissed from the case, ROA.1424.

Because the suit was filed before S.B.10 took effect, none of Plaintiffs' children have been exposed to any display of the Ten Commandments because of S.B.10, ROA.909, much less any "disfavor, reproach, and/or disapproval of school officials and/or their peers," ROA.123. Plaintiffs did not allege that any defendant school district had used district funds to purchase posters or that posters meeting S.B.10's requirements had been donated to any defendant. ROA.909. It is unclear when or if the Ten Commandments would be displayed in any classrooms or what additional context would be displayed alongside a poster of the Ten Commandments. ROA.910.

**2.** The district court held a two-day preliminary injunction hearing on August 15 and August 18. ROA.1531-1812. In addition to individual affidavits discussing their objection and offense to the posting of the Ten Commandments, ROA.192-283, Plaintiffs presented the expert testimony of Dr. Steven Green, ROA.1568.

Dr. Green's testimony focused on divining the original intent of James Madison and Thomas Jefferson regarding the relationship of church and state. Although Jefferson was in Paris when the First Amendment was drafted, Dr. Green opined that his intent should be considered because Jefferson was "in my mind, . . . the moving force to convince James Madison . . . that we needed to have this First Amendment." ROA.1578. Dr. Green argues that Madison (influenced by Jefferson) strongly opposed any "government involvement in matters of faith" and believed that governments should not "promote religious fealty or any religious belief." ROA.296, 298.

Although Dr. Green recognized that public acknowledgements of religion were common at the Framing, he attempted to downplay their relevance to the meaning

of the First Amendment. For example, Jefferson and Madison both issued Thanksgiving Day proclamations referencing religious observance, but Dr. Green testified that "these were both solicited by the various legislative bodies" and "were wartime declarations." ROA.1580. Dr. Green also dismissed the use of the Capitol building for religious services because "neither Thomas Jefferson, nor James Madison ha[d] any control over the U.S. Capitol." ROA.1580-81. And while Dr. Green acknowledged that the Northwest Ordinance included language endorsing religious education, he opined that "when Thomas Jefferson wrote the initial draft," "it [made] no reference to religion." ROA.1582; *see also* ROA.1583 (opining that the Northwest Ordinance included a "perfunctory hortatory-type declaration about the importance of religion" that "[c]arries no real weight").

Appellants countered Dr. Green's presentation with the expert testimony of Professor Mark David Hall, who teaches a course entitled Law, Politics, and Religion in America and a course entitled American Political Thought. ROA.1642. Dr. Hall explained that the Ten Commandments "have had an enormous influence on Western civilization." ROA.1652. They "came to have an enormous influence, obviously in the teaching of religion, the teaching of morality and as a source of law." ROA.1653. This included the fact that "49 of 50 states banned at least some labor on Sunday" starting "from early colonial times to as late as 1961, 1962." ROA.1667. "Those laws were informed by the Ten Commandments and a particular understanding of the Ten Commandments that understood the sabbath to be Sunday." ROA.1667.

Disagreeing with Dr. Green, Dr. Hall opined that although Madison "had influence" in drafting the First Amendment, "he did not act alone." ROA.1650. Madison in fact "proposed a number of things that were rejected" or modified by others. ROA.1650. And Jefferson's influence on the drafting of the First Amendment, Dr. Hall explained, "has been exaggerated." ROA.1650. Ultimately, "the Bill of Rights, the First Amendment specifically, was crafted by a community," and "understand[ing] the original understanding" requires "look[ing] at a broader constellation of founders." ROA.1650.

That original understanding, Dr. Hall testified, confirms that the First Amendment was not intended "to remove religion from the public square." ROA.1658. For example, Thomas Jefferson proposed a national seal with religious imagery, showing the Exodus story with the Hebrew people fleeing the Pharoah. ROA.1658. And the Northwest Ordinance, "one of the most important documents in American history," ROA.1655, explained that schools would "play an important role in teaching religion and morality," and they did so for many years, ROA.1656.

With respect to public schools in particular, although they were not formally established until the 1820s, early education in New England focused on the Bible and catechisms. ROA.1670-72. The "capital laws," on which children were educated, were linked to seven of Ten Commandments. ROA.1673. And after public schools were established, children were educated using materials such as the New England Primer, McGuffey's Eclectic Reader, and Worcester's American Spelling Book, ROA.1674—all of which included lessons on the Ten Commandments, ROA.1674 (New England Primer); ROA.1676 (McGuffey's Eclectic Reader and Worcester's

Primary Spelling Book). "Horace Mann, the founder of public education, was a huge advocate of teaching the Bible to children in public schools." ROA.1679.

### D. The district court preliminarily enjoins Appellants from enforcing S.B.10.

The district court granted Plaintiffs' motion and preliminarily enjoined Appellants from enforcing S.B.10. Following a general discussion of religious history, ROA.1427-40, the district court turned to the "original intent of the Framers of the United States Constitution," ROA.1440, quoting writings from James Madison, Thomas Jefferson, John Adams, Benjamin Franklin, and Thomas Paine, ROA.1440-42.

In denying the motion to dismiss and granting the preliminary injunction, the district court's Establishment Clause analysis relied heavily on the now-vacated panel decision in *Roake v. Brumley*, 141 F.4th 614 (5th Cir. 2025). ROA.1465. The court also credited "Dr. Green's opinions concerning the intent of the Founders regarding the First Amendment," ROA.1471, and concluded there was insufficient evidence of a broader tradition of displaying the Ten Commandments in public-school classrooms either at the Founding or within the history of public education, ROA.1474. *See also* ROA.1475 ("[T]his Court finds there is insufficient evidence of a broad tradition in place at the time of the Founding, and within the history of public education, to justify S.B.10.").

With respect to the Free Exercise Clause, the court held that "[t]he displays are likely to send an exclusionary and spiritually burdensome message to the child-

Plaintiffs." ROA.1477. "Children can be cruel to their classmates perceived to be 'the other.'" ROA.1478.

Finally, the district court's opinion ends by suggesting a variety of alternative moral messages that the Texas Legislature could have mandated be displayed on classroom walls, including the Five Moral Precepts of Buddhism, the Golden Rule, and quotations from All I Really Need to Know I Learned in Kindergarten. ROA.1479-80.

Appellants appealed, and this Court granted their motion for initial hearing en banc alongside *Roake v. Brumley*, No. 24-30706. Dkt. 82.

17

## Summary of the Argument

The district court erred in enjoining S.B.10. Plaintiffs cannot demonstrate a likelihood of success on either their Establishment Clause or Free Exercise Clause claims.

I.    With regard to the Establishment Clause, the legality of S.B.10 must be determined with "reference to historical practices and understandings." *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576). The district court erred by requiring Appellants to affirmatively prove an established tradition of displaying the Ten Commandments in classrooms. Specifically, Plaintiffs have the burden to show that displaying posters with the Ten Commandments on the walls of public-school classrooms resembled one of the hallmarks of an establishment of religion from the time of the Framing. They have not done so. A poster displaying the Ten Commandments simply does not "make a religious observance compulsory" or force students "to engage in 'a formal religious exercise.'" *Kennedy*, 597 U.S. at 537 (citing *Zorach v. Clauson*, 343 U.S. 306, 314 (1952); *Lee v. Weisman*, 505 U.S. 577, 589 (1992)). Nor does it resemble any of the other hallmarks that the Supreme Court has identified.

Regardless, historical practices amply support Texas's decision to publicly display the Ten Commandments. Displays of the Ten Commandments are ubiquitous—including in the Supreme Court of the United States building and the Texas Capitol. And as Appellants' expert Dr. Hall explained, the Ten Commandments likewise played a prominent role in American education since the founding era. The district court erred by focusing on the secret intentions of a few founders (James

Madison and Thomas Jefferson in particular) rather than considering original public meaning and historical practice more broadly.

Nor was the district court's conclusion required by *Stone v. Graham*, 449 U.S. 39 (1980). Not only does *Stone* erroneously hold that a violation of the *Lemon* test violates the Establishment Clause, but *Stone* also depended on the finding that Kentucky's Ten Commandments law lacked any secular legislative purpose. *Id.* at 41. But that is not the case with S.B.10, in which the Texas Legislature intended to highlight the historic, legal, and moral significance of the Ten Commandments. *Stone* also contained no analysis regarding whether the plaintiffs satisfied the strict standards for a facial challenge and thus cannot control that issue.

If the district court's decision were correct, then the Establishment Clause compels "hostility toward religion that has no place in our Establishment Clause traditions." *Am. Legion*, 588 U.S. at 38 (quoting *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring in the judgment)). Under the logic of the district court's test, the Legislature could have mandated the posting of practically any other text or creed so long as it was not religious (and maybe even then for Buddhist texts). But this reasoning impermissibly places a thumb on the scale against religious beliefs and expression.

Under a correct test, Plaintiffs lack standing to bring their Establishment Clause challenge. Because requiring public schools to put up privately donated posters does not resemble one of the hallmarks of religious establishment, S.B.10 does not inflict a cognizable Establishment Clause injury. This provides another independent reason that the district court erred in granting a preliminary injunction.

**II.**  Plaintiffs' Free Exercise claim fares no better. In *Mahmoud v. Taylor*, the Supreme Court held that parents had a free exercise right to opt their children out of coercive classroom instruction that was intended to contradict their religious beliefs on sexuality and gender. 606 U.S. at 547. But the passive display of the Ten Commandments on classroom walls does not resemble *Mahmoud*'s coercive, active instruction in any way. The district court's speculation regarding how the Ten Commandments will affect how schoolchildren treat each other in the classroom does not demonstrate a violation of the Free Exercise Clause—and it certainly does not constitute the kind of coercion found in *Mahmoud*. Nor does *Mahmoud*, which allows parents to opt out of instruction, support the removal of materials from the classroom.

**III.**  Finally, Plaintiffs did not demonstrate a likelihood of success on their facial, pre-enforcement challenge because they did not show that S.B.10 is unconstitutional in every application. There are innumerable ways that teachers could integrate Ten Commandments posters into the classroom, including displaying them with material from other faiths or with contextualizing documents such as the Declaration of Independence and the Northwest Ordinance. As a result, even if some displays of the Ten Commandments that comply with S.B.10 could violate the Constitution, Plaintiffs do not satisfy the strict standards for a facial challenge because not every S.B.10-compliant display would be unconstitutional. This Court should reverse.

## Standard of Review

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022) (quoting *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024) (en banc) (quoting *Harrison*, 48 F.4th at 339).

**ARGUMENT**

## I. Plaintiffs Failed to Demonstrate a Likelihood of Success on Their Claims that S.B.10 Violates the Establishment Clause.

Like other provisions of the Constitution, the Establishment Clause must be interpreted with "reference to historical practices and understandings." *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576). To prevail on their claims under the Establishment Clause, Plaintiffs were required to show that the challenged practice—displaying posters with the Ten Commandments on the walls of public-school classrooms—resembled one of the hallmarks of establishment of religion from the time of the Framing. They failed to carry this burden. To the contrary, displaying the Ten Commandments fits squarely within the tradition of acknowledging religion in the public square as well as the use of the Ten Commandments in education. An alternative holding, which would (as the district court suggested) allow the government to place any conceivable secular moral code on classroom walls, would impermissibly disfavor religious speech and constitute "hostility toward religion that has no place in our Establishment Clause traditions." *Am. Legion*, 588 U.S. at 38 (quoting *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring in the judgment)).

*Stone v. Graham* does not compel a contrary result. *Stone*'s holding that a display of the Ten Commandments on public-school walls "violates the first part of the *Lemon v. Kurtzman*, test" and thus violates "the Establishment Clause of the Constitution," *Stone*, 449 U.S. at 42-43, was abandoned along with *Lemon*. Moreover, the Supreme Court has not "suggest[ed] that *Stone* would extend to displays of the Ten Commandments that lack a 'plainly religious,' 'pre-eminent purpose.'" *Van*

22

*Orden*, 545 U.S. at 691 n.11 (quoting *Stone*, 449 U.S. at 41). Here, the legislative history reveals that the Texas Legislature had a secular purpose in displaying the Ten Commandments. Finally, even if it were otherwise binding, *Stone* addresses neither the standard for a facial challenge nor standing to assert a claim under the Establishment Clause. On these issues, at the very least, *Stone* does not bind this Court.

### A. Displaying the Ten Commandments in the classroom bears none of the recognized hallmarks of an establishment of religion.

**1.**   "The Establishment Clause of the First Amendment provides that 'Congress shall make no law respecting an establishment of religion.'" *Am. Legion*, 588 U.S. at 48 (quoting U.S. Const. amend. I). "While the concept of a formally established church is straightforward, pinning down the meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem." *Id.*

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court "attempted a 'grand unified theory' for assessing Establishment Clause claims," which "called for an examination of a law's purposes, effects, and potential for entanglement with religion" and "estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion." *Kennedy*, 597 U.S. at 534 (citations omitted). But the failure of "this 'ambitious[],' abstract, and ahistorical approach to the Establishment Clause became so 'apparent' that th[e] Court long ago abandoned *Lemon* and its endorsement test offshoot." *Id.* (quoting *Am. Legion*, 588 U.S. at 48-49).[2]

---

[2] Although this Court cannot resolve the issue, the Supreme Court should reconsider whether the Establishment Clause should be incorporated against the States. *See*

*Kennedy* held that, like other provisions of the Constitution, the Establishment Clause must be interpreted with "reference to historical practices and understandings." 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022); *Giles v. California*, 554 U.S. 353, 358 (2008). Sometimes that historical inquiry is straightforward. "[L]ongstanding monuments, symbols, and practices" with "religious associations" that are "use[d] for ceremonial, celebratory, or commemorative purposes," for example, enjoy a "presumption of constitutionality." *Am. Legion*, 588 U.S. at 51-52; *see also id.* at 57-60 (longstanding monuments); *Town of Greece*, 572 U.S. at 576-77 (legislative prayer). But ultimately, because the Establishment Clause's "meaning is fixed according to the understandings of those who ratified it," assessing whether a modern practice constitutes an establishment of religion requires determining whether the challenged practice is "relevantly similar" to what the public understood to constitute an establishment of religion at the time of ratification. *Bruen*, 597 U.S. at 28, 29.

2.     The Framers were familiar with established churches. Not only were they familiar with the Church of England, but at the time of the "founding, at least six States had established religions." *Elk Grove Unified Sch. Dist*, 542 U.S. at 50 (Thomas J., concurring in the judgment), *abrogated on other grounds by Lexmark Int'l,*

---

*Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Review Comm'n*, 605 U.S. 238, 256 n.1 (2025) (Thomas, J., concurring) (questioning "whether the Establishment Clause, as 'a federalism provision intended to prevent Congress from interfering with state establishments,' applies to the States" (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 49 (2004) (Thomas, J., concurring in the judgment))).

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). There are six identified "hallmarks" of religious establishments that the Establishment Clause was adopted to prohibit:

1. [T]he government exerted control over the doctrine and personnel of the established church;

2. [T]he government mandated attendance in the established church and punished people for failing to participate;

3. [T]he government punished dissenting churches and individuals for their religious exercise;

4. [T]he government restricted political participation by dissenters;

5. [T]he government provided financial support for the established church, often in a way that preferred the established denomination over other churches; and,

6. [T]he government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function.

*Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131 (2003)); *see also Kennedy*, 597 U.S. at 537 & n.5 (citing this concurrence and article).

To make out an Establishment Clause violation, then, a plaintiff should be required to demonstrate that a challenged practice resembles the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537 & n.5 (citing *Shurtleff*, 596 U.S. at 285-86 (Gorsuch, J., concurring)); *see also Am. Legion*, 588 U.S. at 75-76 (Thomas J.,

concurring) ("[T]he plaintiff must demonstrate that he was actually coerced by government conduct that shares the characteristics of an establishment as understood at the founding."). As this Court's sister circuits have explained, "the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023); *see also Hilsenrath v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 & n.54 (3d Cir. 2025) (to prevail, a plaintiff must demonstrate that a challenged practice "resembles one of these hallmarks of religious establishment").

Plaintiffs did not present any such evidence. Nor could they have. A poster passively displaying the Ten Commandments does not control the doctrine or personnel of an established church, mandate church attendance, punish dissenters for religious exercise, restrict political participation, or provide an established church with a monopoly over civil functions. It hardly "make[s] a religious observance compulsory," such as "coerc[ing] anyone to attend church" or "forc[ing] citizens to engage in 'a formal religious exercise.'" *Kennedy*, 597 U.S. at 537 (citing *Zorach*, 343 U.S. at 314; *Lee*, 505 U.S. at 589). And it does not involve the government providing financial support for an established church.

In short, S.B.10's mandate that public-school classrooms display a poster depicting the Ten Commandments bears no relationship to any of the recognized hallmarks

of establishment and therefore would not "have historically been understood as an establishment of religion." *Firewalker-Fields*, 58 F.4th at 122 n.7.[3]

## B. The district court erred by holding to the contrary.

The district court offered two overarching reasons for concluding that S.B.10 violates the Establishment Clause. First, it held that there must be a "broader tradition of using the Ten Commandments in public education" for S.B.10 to pass constitutional muster. ROA.1468-69. And second, it concluded that *Stone v. Graham* compelled that holding. ROA.1465-68. Neither point should carry the day.

### 1. The district court erred by requiring Appellants to situate a practice within history and tradition to avoid a constitutional violation.

**a.** To start, the district court applied the wrong test and inverted the burden of proof. The court did not consider whether posting the Ten Commandments in public-school classrooms was "relevantly similar," *Bruen*, 597 U.S. at 29, to what would historically be considered an "establishment of religion" at the Founding or Reconstruction, *Kennedy*, 597 U.S. at 537 & n.5; *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring). Instead, the court looked for "evidence of a broader tradition of using the Ten Commandments in public education" and "of permanently displaying the Ten Commandments in public-school classrooms." ROA.1474. And after crediting Dr. Green's testimony about the intent of several Framers, ROA.1473, the court held

---

[3] For similar reasons, this Court should hold that the Establishment Clause does not convey "individual federal rights" enforceable under § 1983. *Cf. Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 376 (2025) (discussing the relationship between individual rights and § 1983 suits). The Free Exercise Clause, not the Establishment Clause, gives rise to individually enforceable rights protected under § 1983.

there was "insufficient evidence of a broad tradition in place at the time of the Founding, and within the history of public education, to justify S.B.10," ROA.1475.

The district court's analysis fundamentally misconstrues the inquiry. The Establishment Clause is not a "straightjacket" that freezes in place *only* the religious practices of the Framers. *Bruen*, 597 U.S. at 30. After all, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28; *cf. United States v. Rahimi*, 602 U.S. 680, 691 (2024) (explaining that the Court's interpretive methodology was not "meant to suggest a law trapped in amber"). Rather, it is the constitutional phrase "establishment of religion" whose "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28.

The historical inquiry is therefore properly focused on identifying a "historical *analogue*" to Founding-era establishments of religion—not on identifying "a historical *twin*" for the practice being challenged. *Id.* at 30 (emphasis in original). That means the key inquiry is determining whether a challenged practice is "relevantly similar," *id.* at 29, to the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment," *Kennedy*, 597 U.S. at 537.

The district court was led astray by the now-vacated panel opinion in *Brumley*, which held that "*Kennedy* did not adopt the[] [six] 'hallmarks' as the exclusive Establishment Clause test and the *Shurtleff* concurrence is nonbinding." 141 F.4th at 645-46. The panel overlooked that the majority opinion in *Kennedy* expressly states that the Establishment Clause was adopted to "prohibit" "hallmarks of religious establishments," and then points to the *Shurtleff* concurrence's discussion of those

hallmarks—and Professor McConnell's article that the *Shurtleff* concurrence relied upon—as evidence of what those hallmarks are. 597 U.S. at 537 & n5. That is why this Court's sister circuits read *Kennedy* as refocusing the Establishment Clause test around identifying hallmarks of historically established churches. *See Hilsenrath*, 136 F.4th at 491 & nn.53-54; *see also Firewalker-Fields*, 58 F.4th at 122 & n.7.

The district court also erred by requiring *Appellants* to prove that S.B.10 was justified by a historical tradition in order for the Ten Commandments display to be compatible with the Establishment Clause. ROA.1468-69 (citing *Brumley*). "[I]n Establishment Clause cases, the *plaintiff* has the burden of proving a set of facts that would have historically been understood as an establishment of religion." *Firewalker-Fields*, 58 F.4th at 122 n.7. And to prevail, those facts must "align with a historically disfavored establishmentarian practice." *Id.* This burden-of-proof allocation is "in contrast to those constitutional provisions," like the Second Amendment, where "historical tradition defines an exception, rather than the rule" and "the burden falls on the defendant to establish the exception." *Id.*

Moreover, in requiring "evidence of a broader tradition in place at the time of the founding" in order to justify S.B.10, the *Brumley* panel looked to the Supreme Court's decision in *Town of Greece* and this Court's decision in *Freedom from Religion Foundation, Inc. v. Mack*, 49 F.4th 941 (5th Cir. 2022). *See Brumley*, 141 F.4th at 645-47. But the *Town of Greece* and *Mack* line of cases answer a slightly different question: whether the Establishment Clause requires eradicating or "retaining established, religiously expressive monuments, symbols, and practices." *Am. Legion*, 588 U.S. at 57. These cases exemplify the principle that there is no need for further inquiry

29

"where history shows that the specific practice is permitted," *Town of Greece*, 572 U.S. at 577, and the monument, symbol, or practice is "presumpti[vely] constitutional," *Am. Legion*, 588 U.S. at 57. But this hardly means that any acknowledgment of religion is prohibited *unless* history shows that the specific practice is permitted. *See id.* at 61 (explaining that the Court's legislative prayer cases "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation" (citing *Marsh v. Chambers*, 463 U.S. 783 (1983))).

**b.**     Even if the relevant Establishment Clause test required situating the Ten Commandments within an established tradition, public displays of the Ten Commandments fit comfortably within the tradition of religious acknowledgment "deeply embedded in the history and tradition of this country." *Marsh*, 463 U.S. at 786. In upholding the constitutionality of the Ten Commandments monument at the Texas Capitol, for example, the Supreme Court noted that "acknowledgements of the role played by the Ten Commandments in our Nation's heritage are common throughout America." *Van Orden*, 545 U.S. at 688. The opinion lists numerous other displays of the Ten Commandments on public buildings in Washington, D.C., with some going as far back as 1897. *Id.* at 689; *see also*, Hall & Picciotti-Bayer, Ten Commandments in the Public Square and Public Schools, 34 William & Mary Bill of Rights J. 45-46 (forthcoming November 2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5694503. And Dr. Hall has identified more than 100 Ten Commandment monuments on public property as of 2019. ROA.956-57.

What is more, one of the organic documents of the United States, the Northwest Ordinance of 1787, encouraged the teaching of religion in schools: "Religion, morality and knowledge, being necessary to good government and happiness of mankind, schools and the means of education shall forever be encouraged." An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio, Act of July 13, 1787, art. III). And while government-run public schools did not exist until the 1820s, government-funded common schools in New England used various editions of the New England Primer, which included forty questions regarding the Ten Commandments. ROA.960-61. Dr. Hall identified numerous other pamphlets and primers directed at children or parents of school-age children that used the Ten Commandments. ROA.962-63. Even after the advent of public schools, some popular readers, including the New England Primer and McGuffey's Eclectic Reader, continued to feature the Ten Commandments. ROA.963.

**c.**    The district court independently erred by focusing its analysis on unearthing the "original intent" of the Framers rather than the original public meaning of the Constitution. *See, e.g.*, ROA.1440 ("Original Intent of the Framers of the United States Constitution"); ROA.1440 (questioning whether the Constitution should be interpreted "as the Framers originally intended"); ROA.1440 (questioning the relevance of the "intent of those authors" from "an agrarian slave holding nation"); ROA.1471 (crediting "Dr. Green's opinions concerning the intent of the Founders regarding the First Amendment"); ROA.1440-1442 (discussing the intent of various individuals).

The district court's analysis tracked the testimony of Dr. Green, who opined extensively about James Madison's intent in drafting the First Amendment—which he concluded can only be understood by consulting Thomas Jefferson's motivations. Dr. Green concluded that Jefferson and Madison's "long-standing relationship" and "significant correspondence," ROA.1577, indicated that Jefferson was "kind of the moving force to convince James Madison . . . that we needed to have this First Amendment," ROA.1578. *See also* ROA.1579 ("So even though Jefferson was in Paris, that doesn't mean he did not influence Madison."); ROA.1576 (discussing Jefferson as "somebody who had influence on the thought process behind the goals of the religion clauses"). According to Dr. Green, Madison's intent can thus be assumed to track Jefferson's intent, which in turn provides the meaning of the Establishment Clause. *See, e.g.*, ROA.2222 (relying on "the longstanding, consistent commitment of Jefferson and Madison to religious freedom and equality"). *But see Wallace v. Jaffree*, 472 U.S. 38, 92 (1985) (Rehnquist J., dissenting) (observing that Jefferson's "short note of courtesy, written 14 years after the Amendments were passed by Congress" by someone not involved with the drafting "would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the Religion Clauses of the First Amendment"); ROA.947-50 (discussing Jefferson's more nuanced views on religion in public life throughout his lengthy career).

But the Constitution is not interpreted according to the secret intent of the drafters. Courts must instead follow the Constitution's "original public meaning," *City of Grants Pass v. Johnson*, 603 U.S. 520, 559 n.8 (2024), *i.e.*, how "the people who ratified [it] would have understood it," *Bucklew v. Precythe*, 587 U.S. 119, 131 (2019).

What matters is how the ratifiers of the First Amendment understood "establishment of religion," not the private opinions of Madison, Jefferson, or anyone else concerning the proper relationship between church and state. It was error for the district court to look to original intent rather than original public meaning.

### 2. *Stone v. Graham* does not control.

The Supreme Court's decision in *Stone v. Graham*, holding unconstitutional a Kentucky law requiring the posting of the Decalogue in public-school classrooms, does not compel a contrary result. *Stone*'s holding is specifically tied to *Lemon v. Kurtzman*: "We conclude that [the law in question] violates the first part of the *Lemon v. Kurtzman*, test, and thus the Establishment Clause of the Constitution." 449 U.S. at 42-43. Even if the Court defers to conclusion that posting the Ten Commandments violates the *Lemon* test, the second half of this holding—that a violation of the *Lemon* test constitutes a violation of the Establishment Clause—has been squarely rejected by the Supreme Court. *Kennedy*, 597 U.S. at 534. With *Lemon* "long ago abandoned," *id.*, *Stone*'s holding that a violation of *Lemon* also violates the Establishment Clause has necessarily been abandoned as well.

Moreover, *Stone* did not hold as a matter of law that any posting of the Ten Commandments would violate *Lemon*. The decision turns on factual findings about the intent of a particular legislature in enacting a particular statute. *See* 449 U.S. at 41 ("Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose[.]"); *id.* ("The pre–eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature."). Then-Justice Rehnquist, in dissent, persuasively criticized the majority's

"summary rejection of a secular purpose articulated by the legislature and confirmed by the state court" in a "cavalier summary reversal, without benefit of oral argument or briefs on the merits." *Id.* at 43, 47 (Rehnquist, J., dissenting).

As the Supreme Court later acknowledged in *Van Orden*, *Stone*'s legal analysis would apply in this case only if the Texas Legislature "had no secular legislative purpose." *Id.* at 41; *see also Van Orden*, 545 U.S. at 691 n.11 (plurality op.) ("Nor does anything suggest that *Stone* would extend to displays of the Ten Commandments that lack a 'plainly religious,' 'pre-eminent purpose.'" (quoting *Stone*, 449 U.S. at 41)).

Here—to the extent such an inquiry is relevant—the legislative history demonstrates that the Texas Legislature had numerous secular purposes in passing S.B.10. The bill's key sponsors in both the Senate and House repeatedly emphasized that they were interested in posting the Ten Commandments because of their "impact on our moral code and our legal code and . . . our culture." Statement of Senator King, *supra* p. 8. Or as the Sponsor's Statement of Intent indicated, "S.B.10 will remind students all across Texas of the importance of a fundamental foundation of American and Texas law—the Ten Commandments." ROA.1901. Another stated goal was to ensure that each student could be "an intelligent understander of history in the United States" by being aware of a key influence on the founders. Statement of Rep. Frank, *supra* p. 8. Yet another goal was the moral development of students relating to "[t]he very way we treat others as a society," including such values as to "respect authority, respect others, don't steal, tell the truth, don't kill, keep your word." Statement of Rep. Noble, *supra* p. 9. In other words, the goal was to give "our

students the same foundational moral compass as our state and country's forefathers." Statement of Lt. Gov. Patrick, *supra* p. 9.

Although the district court cited statements from some legislators that it characterized as "addressing the religious purpose of S.B.10," ROA.1466-68, this Court has rejected reliance on the statements of a few legislators to impute improper intent to the legislature as a whole. *See Croft v. Governor of Tex.*, 562 F.3d 735, 749 (5th Cir. 2009) ("While there were references by some legislators to returning prayer to schools, the religious motives of some legislators should not deflect us from the secular purposes contained in the plain text of section 25.082(d) and espoused by the legislature to justify the 2003 Amendments."). Even if "[s]ome legislators may have religious motives," "that alone does not invalidate an act with an otherwise secular legislative purpose." *Id.* at 742-43; *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) (explaining that "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents" and demanding evidence regarding "the legislature as a whole" before it would attribute the motives of a sponsor to the whole legislature). And the district court failed to apply the "presumption of legislative good faith." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 216 (5th Cir. 2019); *see also Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024) ("[I]n assessing a legislature's work, we start with a presumption that the legislature acted in good faith."). Particularly in the light of the presumption of legislative good faith, the district court erred in finding "that a religious objective permeated the government's action." ROA.1468 (quoting *Brumley*, 141 F.4th at 644).

Without a finding that the Texas Legislature "had no secular legislative purpose," *Stone*, 449 U.S. at 41, *Stone* does not "extend to [these] displays of the Ten Commandments," *Van Orden*, 545 U.S. at 691 n.11.

*Stone* also predates the Supreme Court's explication of the distinction between facial and as-applied challenges in *United States v. Salerno*, 481 U.S. 739 (1987). *Stone* certainly did not address *Salerno*'s requirement that "the challenger must establish that no set of circumstances exists under which the Act would be valid" to prevail on a facial challenge to a law. *Id.* at 745. The crucial question—whether Plaintiffs have demonstrated a likelihood of success on their pre-enforcement, facial challenge to S.B.10—was not addressed in *Stone* and thus cannot bind this Court.

Nor did *Stone* consider whether the plaintiff had Article III standing, and its "drive-by jurisdictional rulin[g]" is not entitled to any "precedential effect" before this Court. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006).

### 3. Holding to the contrary would improperly disfavor religion and religious expression.

The district court's Establishment Clause analysis should be rejected for an additional reason: Under its holding that government speech on classroom walls may concern any topic other than religion, ROA.1479-80, the Establishment Clause would require "hostility toward religion that has no place in our Establishment Clause traditions," *Am. Legion*, 588 U.S. at 38 (quoting *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring in the judgment)).

The Supreme Court has long held that the Establishment Clause contains "no constitutional requirement which makes it necessary for government to be hostile to

36

religion and to throw its weight against efforts to widen the effective scope of religious influence." *Zorach*, 343 U.S. at 314. Interpreting the Establishment Clause in this manner "risk[s] fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845-46 (1995).

Yet that is the consequence of the district court's Establishment Clause analysis. Although posting the Ten Commandments on the wall of a classroom would improperly establish a religion in violation of the First Amendment, it suggested that the Legislature could have mandated the posting of several other non-religious texts or creeds. ROA.1479-80. That included: (1) "[m]ultiple versions of lessons of behavior from many cultures melded into the American motto of 'E pluribus unum[;]'" (2) exhortations to "[d]o unto others as you would have them do unto you," "[b]e kind[,]" and "[b]e respectful[;]" or (3) lessons from a book entitled "All I Really Need to Know I Learned in Kindergarten." ROA.1479-80.

Under the test applied by the district court, government speech regarding religion is uniquely disfavored. Texas could require schools to put up any posters or displays—including any conceivable statement of morality—so long as the content was not religious. The Establishment Clause does not disfavor religious speech by the government in this manner.

\*    \*    \*

The Supreme Court has correctly refocused the Establishment Clause on history and tradition, the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537 & n.5.

The practice at issue—posting the Ten Commandments in a classroom without any accompanying classroom use or instruction—does not resemble any historical aspect of an established religion and does not violate the Establishment Clause.

## C. Under a correct understanding of the Establishment Clause, Plaintiffs lack standing.

The Supreme Court's abandonment of *Lemon* and adoption of a test focused on "historical practices and understandings," *Kennedy*, 597 U.S. at 535, not only forecloses Plaintiffs' Establishment Clause claims on the merits but also demonstrates that they lack standing.

Although the Supreme Court has cautioned against conflating standing and the merits, the two have overlapped in the context of the Establishment Clause. This Court has recognized, for example, "a personal loss of First Amendment freedoms" as an Article III injury giving rise to standing. *Croft*, 562 F.3d at 745; *Doe v. Beaumont ISD*, 240 F.3d 462, 467 (5th Cir. 2001) (recognizing an injury to "the right of children and their parents to receive public education that is compliant with the First Amendment's Establishment Clause").

This arises from the Establishment Clause receiving "special treatment when it comes to standing." *Mack*, 49 F.4th at 949. As Justice Gorsuch explained in his concurrence in *American Legion*, the theory of "offended observer" standing was adopted to enforce *Lemon*'s view of the Establishment Clause: "[L]ower courts reasoned that, if the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue." 588 U.S. at 84 (Gorsuch, J., concurring). But this theory of injury falls along with

*Lemon*'s theory of rights: "With *Lemon* now shelved, little excuse will remain for the anomaly of offended observer standing, and the gaping hole it tore in standing doctrine in the courts of appeals should now begin to close." *Id.* at 87.

"Standing 'often turns on the nature and source of the claim asserted.'" *Jackson v. City of Houston*, 143 F.4th 640, 645-46 (5th Cir. 2025) (quoting *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017)). To evaluate standing, a court must consider "the injuries protected against under" the Establishment Clause, *id.*, and *Kennedy* makes clear that those injuries do not include offense at government speech regarding religion but are limited to injuries arising from the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment," 597 U.S. at 537 & n.5, such as coercion to attend church and engage in formal religious exercise. As detailed above, Plaintiffs do not contend that they or their children will be exposed to one of these hallmarks of religious establishment. *Supra* Section I.A.1. Their alleged injury—offense that their children might be exposed to a poster displaying the Ten Commandments on a classroom—is not a cognizable injury under the Establishment Clause and thus does not give rise to standing.

Plaintiffs' lack of standing provides a second reason that the district erred in granting a preliminary injunction based on their claims of a violation of the Establishment Clause. *See Denver v. N.Y. Tr. Co.*, 229 U.S. 123, 136 (1913) (requiring reversal of an injunction where there is an "insuperable objection, in point of jurisdiction or merits"). To the extent that this Court must consider the district court's jurisdiction in reversing the preliminary injunction, it should hold that Plaintiffs lack standing. *But see Abbott*, 110 F.4th at 723 (Oldham, J., concurring) (concluding that "reversing

a preliminary injunction prevents the exercise of judicial power over the defendant" and thus that an appellate court need not address jurisdictional issues first in reversing a preliminary injunction).

## II. Plaintiffs Failed to Establish a Likelihood of Success on Their Claims Under the Free Exercise Clause.

Nor have Plaintiffs shown a likelihood of success on their claims that exposure to posters displaying the Ten Commandments would violate their rights under the Free Exercise Clause "by pressuring [children] into observance, meditation on, veneration, and adoption of the state's favored religious scripture." ROA.123. The passive display of the Ten Commandments on classroom walls does not burden Plaintiffs religious exercise.

### A. Under *Mahmoud*, educational requirements and curricular features can impose an impermissible burden on religious exercise, requiring opportunities for parents to opt out.

In *Mahmoud v. Taylor*, the Supreme Court reaffirmed the right of parents to "direct 'the religious upbringing' of their children." 606 U.S. at 546 (citing *Espinoza v. Mont. Dept. of Revenue*, 591 U.S. 464, 486 (2020)). A law that "substantially interfere[s] with the religious development" of their children violates those rights because it "carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent." *Id.* at 546 (quoting *Yoder*, 406 U.S. at 218).

This interference may be direct or indirect. A state policy requiring students to salute the American flag and recite the pledge of allegiance was "an egregious kind of direct coercion" because it forced students to make "an affirmation contrary to

40

their parents' religious beliefs." *Id.* at 548 (citing *Barnette*, 319 U.S. at 642). But "the Free Exercise Clause" also "protects against policies that impose more subtle forms of interference with the religious upbringing of children." *Id.* at 548.

*Mahmoud* illustrates the sort of coercive educational practices that violate the free exercise rights of parents. The Board of Education of Montgomery County introduced selected books that were "designed to 'disrupt' children's thinking about sexuality and gender." *Id.* at 529; *see also id.* at 533 (indicating an intent to disrupt "heteronormativity," "cisnormativity," and "power hierarchies that uphold the dominant culture"). Teachers were "expect[ed]" to "use the LGBTQ-Inclusive Books as part of instruction." *Id.* at 535. The Board's guidance for classroom discussions following instruction on these books "encouraged teachers to '[d]isrupt the either/or thinking' of their students." *Id.* at 536. And when parents expressed concerns about this content, Board members expressed hostility to their religious beliefs. *See id.* at 537 ("[S]ome of the testimony today was disturbing to me personally."); *id.* at 539 (noting a Board member's comparison of objecting parents to "white supremacists").

The Supreme Court held that these facts—direct instruction by teachers with the purpose and effect of changing children's beliefs about sexuality—demonstrated a likelihood of success on the parents' Free Exercise claims. Determining whether a law substantially interferes with the religious development of a child requires considering "the specific nature of the educational requirement or curricular feature at issue" and "the specific context in which the instruction or materials at issue are presented." *Id.* at 550.

The books in question were "designed to present [a viewpoint in favor of same-sex marriage] to young, impressionable children who are likely to accept without question any moral messages conveyed by their teachers' instruction." *Id.* at 550-51. One book characterized "a contrary view [regarding gender transition] as something to be reprimanded." *Id.* at 553. Additionally, "the books will be presented to young children by authority figures in elementary school classrooms." *Id.* at 554. And the "instruction related to the storybooks will 'substantially interfer[e]' with the parents' ability to direct the 'religious development' of their children." *Id.* (quoting *Yoder*, 406 U.S. at 218).

The Court recognized "the potentially coercive nature of classroom instruction of this kind." *Id.* "[T]he Board requires teachers to instruct young children using storybooks that explicitly contradict their parents' religious views, and it encourages the teachers to correct the children and accuse them of being 'hurtful' when they express a degree of religious confusion." *Id.* at 555. This instruction represented precisely the danger to free exercise of religion that the First Amendment protects against. *Id.*

Critically, the parents did not assert "the right to micromanage the public-school curriculum, but rather to have their children opt out of a particular educational requirement." *Id.* at 568. Given the Board's allowance of opt-outs in other circumstances, the failure to provide them for this instruction could not survive strict scrutiny. The Supreme Court thus ordered the Board "to notify [plaintiffs] in advance whenever one of the books in question or any other similar book is to be used

in any way and to allow them to have their children excused from that instruction."
*Id.* at 569.

## B.  Plaintiffs' Free Exercise claims fail under *Mahmoud*.

Plaintiffs' Free Exercise claims fall far short of satisfying the standard set by *Mahmoud*. S.B.10 merely requires the display of posters with the Ten Commandments. It does not involve "educational requirements," "curricular feature[s]," or any presentation by teachers of instruction or materials. *Id.* at 550. The involvement of teachers—and the use of the books in instruction—were crucial to *Mahmoud*'s holding. Teachers were "to correct the children and accuse them of being 'hurtful' when they express [disagreement on religious grounds]." *Id.* at 555. The books would be presented "by authority figures," *id.* at 554, who would seek to "disrupt" children's thinking, *id.* at 536.

S.B.10, in contrast, does not require teachers to discuss or even acknowledge the Ten Commandments, much less to instruct students on them. The concern expressed in *Mahmoud*—that young children will "likely to accept without question any moral messages conveyed by their teachers' instruction," *id.* at 550-51—simply does not exist with respect to S.B.10 and posters on classroom walls.

Nor do the posters required by S.B.10 remotely resemble the books in *Mahmoud*. Unlike the books in *Mahmoud*, nothing in the record indicates that the Ten Commandments were selected with the intent of "disrupting" students' contrary religious beliefs. *Id.* at 553.

Every fact that led the Supreme Court to conclude that the books and instruction in *Mahmoud* presented an "objective danger to the free exercise of religion," *id.* at

555, is absent in this case. As a result, there is no violation of the right to free exercise of religion.

### C. Plaintiffs' theory rests on speculation about children's behavior.

Recognizing that S.B.10 does not involve instruction or compulsion by teachers, Plaintiffs instead ground their theory of interference on speculation about the reaction of children to the presence of the posters. The district court found, for example, "[c]hildren can be cruel to their classmates perceived to be 'the other.'" ROA.1478; *see also* ROA.2018 (suggesting that the displays will "lea[d] to peer-to-peer harassment and proselytization"); ROA.2025 ("I fear H.B.M. may feel pressured to take part in prayer in school with H.B.M.'s peers and teacher.").

But whether—and how—students will react to displays of the Ten Commandments is speculative. There is no reason to believe that the mere presence of a poster in the classroom (without any accompanying classroom instruction or discussion) would lead to students being interrogated about their beliefs regarding the Ten Commandments or bullied because of their views.

S.B.10's impact on students with minority religious views would be far less than in *Barnette*, where objecting students had the right to remain still and silent while other students saluted and pledged allegiance to the flag. 319 U.S. at 642. Such a visible demonstration of minority beliefs separates a student from his classmates far more than exposure to a classroom poster. Similarly, in *Mahmoud*, students who opted out would be visibly divided from other students based on their religious belief, potentially resulting in "social stigma and isolation." 606 U.S. at 567. S.B.10, in

contrast, does not require students who disagree with the Ten Commandments to do anything at all.

Even if some stigma could result if students voice their views on the Ten Commandments, the potential for students to stand out or feel excluded from their peers is inevitable in public-school classrooms in which students may act differently based on their religious beliefs or other viewpoints, as the First Amendment permits. And the same First Amendment also protects the right of other students to voice their disagreement. To the extent that students are harassed for their religious beliefs, the issue should be addressed as a matter of classroom discipline by teachers, not relied on as a basis to censor posters on classroom walls. Speculation about how students might discuss a classroom poster surely cannot rise to a cognizable violation of First Amendment rights.

## D. Extending *Mahmoud* to classroom posters would radically reshape public education.

If this Court accepts Plaintiffs' arguments and extends *Mahmoud* from classroom instruction by teachers to materials passively displayed on classroom walls, then public education would be radically reshaped.

Plaintiffs assert precisely "the right to micromanage the public school curriculum" disclaimed by the plaintiffs in *Mahmoud*, 606 U.S. at 568. There, as in *Barnette* and *Yoder*, plaintiffs sought to "opt out of a particular educational requirement that burdens their well-established right[s]." *Id.* The *Mahmoud* plaintiffs did not seek removal of the offending books from the classroom. The *Barnette* plaintiffs did not seek to remove the flag or prevent other students from reciting the pledge of allegiance.

45

Here, in contrast, Plaintiffs do not assert the right to opt out from particular instruction or a particular educational requirement that interferes with their free exercise rights, but rather to censor what materials teachers may display on classroom walls by "enjoining the Defendants . . . from complying with S.B.10 by displaying the Ten Commandments in public elementary and secondary school classrooms." ROA.125.

Such an approach—"eliminat[ing] everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines"—would "leave public education in shreds." *People of State of Ill. ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign Cnty.,* 333 U.S. 203, 235 (1948) (Jackson, J., concurring).

Although the Free Exercise Clause provides parents with the right to opt out of "moral messages conveyed by their teachers' instruction" that would substantially burden religious exercise, 606 U.S. at 550-51, it does not provide parents with the right to censor classroom displays or posters to ensure consistency with parents' religious beliefs. There is no right to avoid learning information about important historical and legal documents, even when those documents include religious content.

*Mahmoud* forecloses Plaintiffs' Free Exercise claims, and they have not demonstrated a likelihood of success on the merits.

## III. Plaintiffs Failed to Demonstrate that S.B.10 Is Unconstitutional in Every Application.

As with other areas of constitutional law, in the context of the Religion Clause, courts must distinguish between "the validity of the statute on its face and its validity in particular applications." *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988). "'Facial

challenges are disfavored for several reasons': they 'often rest on speculation' and '[a]s a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168-69 (1st Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). "[T]hey 'run contrary to the fundamental principle of judicial restraint'" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* (quoting *Wash. State Grange*, 552 U.S. at 450, 451).

A facial challenge is also "the 'most difficult challenge to mount successfully'": "[S]uch a challenge 'fails if the law is constitutional in at least some of its applications.'" *Id.* (quoting *Rahimi*, 602 U.S. at 693, 701 n.2). In other words, Plaintiffs' pre-enforcement, facial challenge to S.B.10 requires them to satisfy the heavy burden to show "that there is no set of circumstances in which [S.B.10] is constitutional." *Croft*, 624 F.3d at 164. Plaintiffs must demonstrate that posting the Ten Commandments is "unconstitutional in every application." *Id.*

They have not shown a likelihood that they will be able to satisfy this burden. Plaintiffs filed suit before the School Districts posted a copy of the Ten Commandments in any classroom. No Plaintiff has actually been exposed to any display, and any argument about how those displays will appear—with what, if any, additional materials they might be surrounded by—is speculation. S.B.10 does not require specific documents to be posted alongside the Ten Commandments but neither does it prohibit other materials. Some schools and teachers might choose to incorporate the

Ten Commandments into a broader display regarding sources of law, much like the displays on the friezes of Supreme Court. Others might incorporate the Ten Commandments into a broader display of religious materials—perhaps including material from other faiths that is similar to the Ten Commandments like the Five Moral Precepts of Buddhism.

It is, of course, also possible that an individual teacher might incorporate the Ten Commandments into a display that somehow coerces students into religious exercise or belief. But although these "speculative possibilities may be fertile ground for as-applied challenges [to the statute] if they occur," they are "inappropriate on facial review." *Croft*, 624 F.3d at 163-64 (citation omitted)).

And Plaintiffs' suggestion that teachers will instruct their children regarding the Ten Commandments rests on even further speculation. *See* ROA.2017 ("We are concerned with how the mandated Ten Commandments displays will be interpreted and explained to our children[.]"); ROA.2018 ("I believe that the Ten Commandments displays required by S.B.10 will create a structure for teachers and school administrators to inject other religious beliefs into the classroom[.]"); ROA.2022 (same); ROA.2079 (same); ROA.2026 (suggesting that teachers may "single [a student] our for being nonreligious"); ROA.2054 ("I do not want my young children's elementary and middle school teachers to explain [adultery] to them.").

The same is true of Plaintiffs' speculation about how other children will react. *See, e.g.*, ROA.1996 ("[T]he displays will pressure [a student] to suppress expression of this religious identity at school to avoid potential disfavor from school officials or peers."); ROA.2009 ("[A student] will feel isolated at school and pressured to

suppress expression of [his] Jewish identity."); ROA.2018 ("[My children] will likely ask their teachers and fellow students about those questions [about the Ten Commandments] instead of asking me, and I believe they may then be subjected to religious indoctrination or misinformation from teachers or peers.").

If these events come to pass, Plaintiffs could challenge S.B.10 as applied, but their arguments are premature at this time, and they have not carried their burden to show a likelihood of success in this facial, pre-enforcement posture.

## IV. Plaintiffs Did Not Satisfy the Other Preliminary Injunction Factors, and the Injunction Is Overbroad.

In addition to failing to demonstrate a likelihood of success on the merits, Plaintiffs did not show that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

Because a display of the Ten Commandments on classroom walls neither establishes a state religion nor burdens the sincerely held religious beliefs of Plaintiffs and their parents, S.B.10 inflicts no constitutionally cognizable injury, let alone an irreparable one. Nor do the balance of equities and public interest favor a preliminary injunction. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration in original). And in particular the balance of equities and public interest do not favor *facially* enjoining S.B.10 given the many potentially constitutional applications.

Finally, in any event, the injunctions entered by the district court are overbroad under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), because they do more than "provide complete relief to each plaintiff." *Id.* at 861. Instead, the injunctions prevent Defendants from complying with S.B.10 with respect to any classroom at any time, regardless of whether Plaintiffs will be exposed to any poster. At a minimum, the preliminary injunctions must be narrowed to orders providing complete relief to Plaintiffs, not to others not before the court.

## Conclusion

For these reasons, this Court should reverse the order granting a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ William R. Peterson
William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

William F. Cole
Principal Deputy Solicitor General

Daniel M. Ortner
Assistant Solicitor General

Garrett C. Gray
Christopher J. Pavlinec
Assistant Attorneys General

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,390 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William R. Peterson
WILLIAM R. PETERSON