# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2026

Lyle W. Cayce
Clerk

No. 25-50695

MARA NATHAN, RABBI, *on behalf of herself and on behalf of her minor child*, M.N.; VIRGINIA GALAVIZ EISENBERG, *on behalf of herself and on behalf of her minor child*, R.E.; RON EISENBERG, *on behalf of himself and on behalf of his minor child*, R.E.; SETH ETTINGER, CANTOR, *on behalf of himself and on behalf of his minor child*, R.E.; SARAH ETTINGER, *on behalf of herself and on behalf of her minor child*, R.E.; ELIZABETH LEMASTER, *on behalf of herself and on behalf of her minor children*, K.L. & L.L.; CARAH HELWIG, *on behalf of herself and on behalf of her minor children*, J.P. & T.P.; ALYSSA MARTIN, *on behalf of herself and on behalf on her minor child*, H.B.M.; CODY BARKER, *on behalf of himself and on behalf of his minor child*, H.B.M.; LAUREN ERWIN, *on behalf of herself and on behalf of her minor child*, M.E.; REBEKAH LOWE, *on behalf of herself and on behalf of her minor children*, E.R.L. & E.M.L.; THEODORE LOWE, *on behalf of himself and on behalf of his minor children*, E.R.L. & E.M.L.; MARISSA NORDEN, *on behalf of herself and on behalf of her minor children*, E.N. & A.N.; WILEY NORDEN, *on behalf of himself and on behalf of his minor children*, E.N. & A.N.; JOSHUA FIXLER, RABBI, *on behalf of himself and on behalf on his minor children*, D.F., E.F., & F.F.; CYNTHIA MOOD, REVEREND, *on behalf of herself and on behalf of her minor children*, L.M. & C.M.; CHERYL REBECCA SMITH, *on behalf of herself and on behalf of her minor child*, L.P.J.; ARVIND CHANDRAKANTAN, *on behalf of himself and on behalf of his minor children*, V.C., M.C. & A.C.; ALLISON FITZPATRICK, *on behalf of herself and on behalf of her minor children*, C.F. & H.F.; MARA RICHARDS BIM, *on behalf of herself and on behalf of her minor child*, H.B.,

*Plaintiffs—Appellees*,

*versus*

ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT; NORTH
EAST INDEPENDENT SCHOOL DISTRICT; LACKLAND
INDEPENDENT SCHOOL DISTRICT; NORTHSIDE INDEPENDENT
SCHOOL DISTRICT; LAKE TRAVIS INDEPENDENT SCHOOL
DISTRICT; DRIPPING SPRINGS INDEPENDENT SCHOOL
DISTRICT; FORT BEND INDEPENDENT SCHOOL DISTRICT;
CYPRESS FAIRBANKS INDEPENDENT SCHOOL DISTRICT; PLANO
INDEPENDENT SCHOOL DISTRICT,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:25-CV-756

_____

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART,
RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON,
WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON,
DOUGLAS, and RAMIREZ, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*, joined by ELROD, *Chief Judge*,
and JONES, SMITH, WILLETT, HO, ENGELHARDT, OLDHAM, and
WILSON, *Circuit Judges*:[*]

## INTRODUCTION

A Texas law (S.B. 10) requires public schools to display a copy of the
Ten Commandments in classrooms. We consider whether that law violates
the Establishment or Free Exercise Clause of the First Amendment.

Plaintiffs are Texans of various religious backgrounds with minor
schoolchildren. They sue on two grounds. First, they claim the law is an
"establishment of religion." Second, they claim the law burdens religious
exercise by coercing their children to reverence the Commandments. A

_____

[*] JUDGES WILLETT, HO, and OLDHAM join all except Part III of this opinion.

2

district court agreed with both claims and enjoined the law, relying on our decision in a similar Louisiana case. *See Roake v. Brumley* (*Roake Panel*), 141 F.4th 614 (5th Cir.), *vacated*, 154 F.4th 329 (5th Cir. 2025) (mem.).

We agreed to hear the Louisiana case en banc and the Texas case alongside it. We have since dismissed the Louisiana case as unripe. *See Roake v. Brumley* (*Roake En Banc*), 170 F.4th 292, 300 (5th Cir. 2026) (en banc) (per curiam). Because of differences between the statutes, however, the Texas case is ripe and we can decide it.

We conclude the Texas law does not violate either the Establishment Clause or the Free Exercise Clause. Here is a summary of our reasons.

*First*, the Establishment Clause. Plaintiffs primarily claim we are bound by *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), which invalidated a similar Kentucky law decades ago. We disagree. *Stone* applied an analysis—the "*Lemon* test"—which confounded courts for decades. *See Lemon v. Kurtzman*, 403 U.S. 602 (1971). Mercifully, the Supreme Court jettisoned *Lemon* and its offspring some years ago. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (recognizing the Court has "abandoned *Lemon*"). With *Lemon* extracted, there is nothing left of *Stone*.

In place of *Lemon*, courts now ask a question rooted in the past: does the law at issue resemble a founding-era religious establishment? Answering that question requires delving into historical sources and scholarship. These show that, in the late 18th century, an "establishment of religion" was a familiar institution: a polity's official church or religion. The paradigm was the Church of England. Over half the states had establishments when the First Amendment was adopted, and the remnants of those establishments persisted for decades.

Establishments were formed by a web of laws. Typical elements were laws compelling attendance at the official church; laws controlling doctrine,

No. 25-50695

worship, and governance; laws punishing dissenters; laws exacting religious taxes; and laws deploying churches for public functions. Establishments in the colonies and states took various forms, but all shared at least some of these hallmarks. And when the states dismantled their establishments—the last falling in 1833—they repealed the laws that had created them.

S.B. 10 looks nothing like a historical religious establishment. It does not tell churches or synagogues or mosques what to believe or how to worship or whom to employ as priests, rabbis, or imams. It punishes no one who rejects the Ten Commandments, no matter the reason. It levies no taxes to support any clergy. It does not co-opt churches to perform civic functions. These are the kinds of things "establishments of religion" did at the founding. S.B. 10 does none of them.

Plaintiffs counter that, like historical establishments, S.B. 10 is "coercive" because it pressures children to honor the Ten Commandments. Not so. S.B. 10 requires no religious exercise or observance. Students are neither catechized on the Commandments nor taught to adopt them. Nor are teachers commanded to proselytize students who ask about the displays or contradict students who disagree with them.

Most importantly, the "coercion" characteristic of religious establishments was government pressure to engage in religious worship. That's why establishments prescribed liturgies and punished those who skipped them. S.B. 10 is far from that. It puts a poster on a classroom wall. Yes, Plaintiffs have sincere religious disagreements with its content. But that does not transform the poster into a summons to prayer.

Because the Texas law has none of the elements of a founding-era establishment of religion, the district court erred in ruling that the law violates the Establishment Clause.

No. 25-50695

*Second*, the Free Exercise Clause. Plaintiffs rely heavily on the Supreme Court's decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025). But, instead of supporting Plaintiffs, that decision shows why their claims fail.

In *Mahmoud*, a school district designed a compulsory curriculum to "disrupt" students' beliefs about sexuality and gender. *Id.* at 528–29. Teachers were to inform students that their religious views on these topics were "hurtful, perhaps even hateful" and that their parents' views were wrong. *Id.* at 553. No opt outs were permitted. *Id.* at 543. The Supreme Court ruled the school violated the parents' right to direct their children's religious upbringing. *See id.* at 529–30.

S.B. 10 bears no resemblance to the oppressive curriculum in *Mahmoud*. As noted, S.B. 10 authorizes no religious instruction and gives teachers no license to contradict children's religious beliefs (or their parents'). No child is made to recite the Commandments, believe them, or affirm their divine origin. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

To Plaintiffs, merely exposing children to religious language is enough to make the displays engines of coercive indoctrination. We disagree. The curriculum in *Mahmoud* went far beyond books sitting silently on classroom shelves. Those materials were deployed by teachers with lesson plans designed to subvert children's religiously grounded views on marriage and gender. S.B. 10 authorizes nothing of the sort.

Because Plaintiffs fail to show that S.B. 10 substantially burdens their right to religious exercise, their Free Exercise claims must be dismissed.

Accordingly, we REVERSE the district court's judgment, VACATE the preliminary injunction, and RENDER judgment dismissing Plaintiffs' Establishment and Free Exercise claims.

No. 25-50695

## I. Background

In June 2025, the Texas Legislature enacted S.B. 10, which requires public elementary and secondary schools to display in each classroom a "durable poster or framed copy of the Ten Commandments." Tex. Educ. Code Ann. § 1.0041(a) (West 2025). The poster or copy must measure "at least 16 inches wide and 20 inches tall," use an easily readable typeface, and be "display[ed] in a conspicuous place." *Id.* § 1.0041(a), (b)(1)–(2). The display must include only the following text:

> The Ten Commandments
>
> I AM the LORD thy God.
>
> Thou shalt have no other gods before me.
>
> Thou shalt not make to thyself any graven images.
>
> Thou shalt not take the Name of the Lord thy God in vain.
>
> Remember the Sabbath day, to keep it holy.
>
> Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
>
> Thou shalt not kill.
>
> Thou shalt not commit adultery.
>
> Thou shalt not steal.
>
> Thou shalt not bear false witness against thy neighbor.
>
> Thou shalt not covet thy neighbor's house.
>
> Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

*Id.* § 1.0041(c).

Texas schools can acquire the displays in two ways. First, they must accept compliant, privately donated displays that "do[] not contain any additional content." *Id.* § 1.0041(d)(1), (d)(1)(B). Second, they "may, but

6

No. 25-50695

[are] not required to," purchase compliant displays "using district funds." *Id.* § 1.0041(e). S.B. 10 was set to go into effect on September 1, 2025.

Shortly after S.B. 10's passage, parents of various religious backgrounds ("Plaintiffs") sued several Texas school districts ("Defendants") on behalf of themselves and their minor children. Plaintiffs claimed S.B. 10 facially violated the Establishment and Free Exercise Clauses and sought a preliminary injunction. Defendants moved to dismiss based on lack of ripeness and standing and for failure to state a claim.

Following a two-day hearing, the district court issued a creative[1] opinion denying Defendants' motion to dismiss and granting a preliminary injunction. *See Nathan*, 795 F. Supp. 3d at 948–49.

As to the Establishment claim, the district court followed our court's since-vacated panel decision, *Roake Panel*, 141 F.4th 614, which ruled that a Louisiana law requiring Ten Commandments displays in public classrooms constituted a religious establishment. *See Nathan*, 795 F. Supp. 3d at 939–48; *Roake Panel*, 141 F.4th at 639–46. Specifically, the court held that the Texas law lacked a secular purpose and therefore ran afoul of *Stone v. Graham*. *See Nathan*, 795 F. Supp. 3d at 939–42. Alternatively, the court held the law was invalid under *Kennedy*, because the court discerned no "broader tradition of

---

[1] For example, the opinion contains section headings such as "Eternity Is a Long Time," "Diversity of Homo Sapiens Religious and Life After Death Beliefs," and "Grace and Torture," *Nathan v. Alamo Heights Indep. Sch. Dist.*, 795 F. Supp. 3d 910, 917–18 (W.D. Tex. 2025); quotations from musicians Kenny Chesney and Sonny and Cher, *id.* at 917 & n.7, 920 & n.22; photographs of Adolf Hitler and Charlton Heston, *id.* at 922, 928; and the finding that "Children can be cruel," *id.* at 948. The opinion concludes with a prayer: "For those who disagree with the Court's decision and who would do so with threats, vulgarities[,] and violence, Grace and Peace unto you. May humankind of all faiths, beliefs[,] and non-beliefs be reconciled one to another. Amen." *Id.* at 949.

using the Ten Commandments in public education." *Nathan*, 795 F. Supp. 3d at 942.

As to the Free Exercise claim, the court held the law likely undermined Plaintiffs' parental rights and coerced their children into religious observance. *Id.* at 947–48.

After finding Plaintiffs met the preliminary-injunction standard, the court enjoined S.B. 10's implementation. *Id.* at 948–49. In its conclusion, the court suggested Texas could instead require the posting of "lessons of behavior," such as the "Five Moral Precepts of Buddhism" or sayings from the book *All I Really Need to Know I Learned in Kindergarten*. *Id.* at 948; *see* Robert Fulghum, All I Really Need to Know I Learned in Kindergarten (1986).

Defendants appealed and sought initial en banc hearing. Our court subsequently granted en banc rehearing in *Roake* and, soon after, granted Defendants' motion for initial en banc hearing. *See Roake*, 154 F.4th at 332; *Nathan v. Alamo Heights Indep. Sch. Dist.*, 157 F.4th 713, 714 (5th Cir. 2025) (mem.) (per curiam). The two cases were consolidated for argument.

## II. Standard of Review

We review the district court's ruling on the motion to dismiss *de novo*. *Norsworthy v. Hou. Indep. Sch. Dist.*, 70 F.4th 332, 336 (5th Cir. 2023). We accept all well-pled facts as true and construe the complaint in the light most favorable to the plaintiff. *Ibid.* "However, we do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ibid.* (quotation omitted).

"We review the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions *de novo*." *United States v. Abbott*, 110 F.4th 700, 708 (5th

Cir. 2024) (en banc) (alteration in original) (quotation omitted); *see also* 28 U.S.C. § 1292(a)(1). "When a district court applies incorrect legal principles, it abuses its discretion." *Little v. Llano County*, 138 F.4th 834, 841 (5th Cir. 2025) (en banc) (quotation omitted), *cert. denied*, 146 S. Ct. 886 (2025) (mem.).

## III. JUSTICIABILITY

The district court ruled that Plaintiffs had standing to bring a pre-enforcement facial challenge to S.B. 10 and that the challenge was ripe. *Nathan*, 795 F. Supp. 3d at 931–32, 943. On appeal, Defendants contest standing but not ripeness. We consider both issues because they are jurisdictional. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction . . . ." (alteration in original) (quotation omitted)).

### A. Standing

"To have standing to sue in federal court, a plaintiff must show he has suffered an injury traceable to the defendant which the court's judgment would likely redress." *Deanda v. Becerra*, 96 F.4th 750, 755 (5th Cir. 2024). In pre-enforcement challenges, "a plaintiff must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Mahmoud*, 606 U.S. at 560 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Because "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Plaintiffs must show standing for each claim.

#### 1. Establishment Clause Standing

The concept of harm in Establishment Clause cases is "particularly elusive." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)). Direct harm and offense

are the two competing theories. Direct harm occurs when the government allegedly coerces religious practice, such as requiring public-school students to pray. *See Engel v. Vitale*, 370 U.S. 421 (1962). Offended-observer standing, by contrast, finds injury in the offense a plaintiff perceives from the religious content of government action. *See Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 37 (2019) (plaintiffs claiming "they [were] offended by the sight of the memorial [cross] on public land").

Plaintiffs have standing under the first theory, so we need not consider the second. They allege direct harm because Texas requires their children to attend school in classrooms where the Ten Commandments will be posted, which Plaintiffs claim coerces religious observance. Future encounters between their children and the displays are thus "likely, if not certain." *Lee v. Weisman*, 505 U.S. 577, 584 (1992).[2] We conclude Plaintiffs have standing to pursue their Establishment Clause claims.

### 2. Free Exercise Clause Standing

To pursue a Free Exercise claim, "a plaintiff must allege that his or her own 'particular religious freedoms are infringed.'" *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th Cir. 2001) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)). Parents may assert that the government has undermined their right to direct their children's "religious upbringing" by "substantially interfering with the[ir] religious development." *Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 218 (1972). And students, of course, may assert that their own right to religious exercise has been infringed. *See Mahmoud*, 606 U.S. at 546 (government violates children's free-exercise rights by abridging their ability to "hold religious

---

[2] We therefore need not address Defendants' argument that the concept of offended-observer standing is no longer valid.

beliefs of all kinds" (quoting *Kennedy*, 597 U.S. at 524)). Accordingly, "[s]tudents and parents may challenge unconstitutional actions in the public schools that directly affect the students." *Littlefield*, 268 F.3d at 283 n.7.

Under these principles, Plaintiffs have standing to pursue their Free Exercise claims. On the parents' part, they allege that they disagree with the religious content of the displays and that the law will therefore burden their right to direct their children's religious upbringing. *See Mahmoud*, 606 U.S. at 546–47; *Yoder*, 406 U.S. at 213–14. On the children's part, Plaintiffs allege children may feel pressured to adopt or reverence the Commandments to avoid disfavor from peers or school officials. *See Schempp*, 374 U.S. at 224 n.9.

In sum, Plaintiffs have standing to pursue both their Establishment and Free Exercise Clause challenges.

## B. Ripeness

"[W]e 'must be convinced that the claim in question is ripe, even if neither party has raised the issue.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012) (quoting *Urban Devs. LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006)); *see also, e.g.*, *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) ("[T]he case must be 'ripe'—not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotation omitted)). Ripeness turns on "(1) the fitness of the issues for judicial decision[,] and (2) the hardship to the parties of withholding court consideration." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023) (quotations omitted).

First, fitness. Plaintiffs' facial challenge is fit for decision because "it presents a pure question of law that needs no further factual development." *Ibid.* Everything needed to resolve their claims is in the statutory text. S.B. 10 mandates the displays' "only" content, Tex. Educ. Code Ann.

§ 1.0041(a)–(c) (West 2025), prescribes their size, *id.* § 1.0041(b)(2), and requires they be posted "in a conspicuous place" where they can be read "from anywhere in the classroom," *id.* § 1.0041(a), (b)(1). So, if S.B. 10 went into effect, students would encounter the same display, of the same size, with the same words, in a conspicuous classroom location. Plaintiffs' challenge thus presents a "pure question of law" needing no "further factual development" because the displays' nature, style, and effect will be the same wherever a student encounters them. *Braidwood Mgmt.*, 70 F.4th at 930.

Second, hardship. "[T]here is a fair amount of overlap between Article III standing requirements and the ripeness analysis." *Ibid.* A concrete and impending injury usually satisfies ripeness's hardship prong. *See, e.g.*, *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993) ("[T]he ripeness inquiry focuses on whether *an injury that has not yet occurred is sufficiently likely to happen* to justify judicial intervention." (emphasis added)). It does here: Plaintiffs have adequately alleged injury, and thus hardship, because Texas requires both school attendance and the Commandments' display, which their children are likely to encounter.

This conclusion is consistent with our en banc decision in *Roake*, which held that a facial challenge to Louisiana's Ten Commandments statute was unripe. *Roake En Banc*, 170 F.4th at 298–300. Louisiana's statute differs from Texas's in three key ways. First, Louisiana requires the "nature of the display" to "be determined by each governing authority." La. Stat. Ann. § 17:2124(B)(1) (2024). Texas, by contrast, delegates no local discretion for any of the display's components. Second, Louisiana specifies that local displays may (or may not) incorporate other historical documents, such as "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." *Id.* § 17:2124(B)(4). Texas, by contrast, mandates that displays "include only" the provided text of the Commandments. Tex. Educ. Code Ann. § 1.0041(b)(1) (West 2025); *see also id.*

§ 1.0041(d)(1)(B) (privately donated displays must "not contain any additional content"). Third, the Louisiana law does not specify where displays must appear, *see Roake Panel*, 141 F.4th at 630 & n.6, whereas Texas requires posting them in "a conspicuous place" so they can be easily read. Tᴇx. Eᴅᴜᴄ. Cᴏᴅᴇ Aɴɴ. § 1.0041(a) (West 2025). So, while the Louisiana law lets local governing authorities shape the displays' critical contextual details, the Texas law settles those details in the statute.

In sum, unlike Louisiana's law, S.B. 10 establishes a uniform display requirement we can evaluate as a matter of law without further factual development. Plaintiffs' challenge is therefore ripe.

## IV. Eꜱᴛᴀʙʟɪꜱʜᴍᴇɴᴛ

Defendants argue that, in ruling S.B. 10 violates the Establishment Clause, the district court erred in two main respects. First, they contend the court applied a test from *Stone v. Graham* and *Lemon v. Kurtzman*—whether the law has a "secular purpose"—which the Supreme Court has since abrogated. Second, they contend the court's backup analysis was flawed. The court asked whether S.B. 10 fits within a tradition of posting the Commandments in public schools. Wrong question, Defendants argue. Following more recent precedent, the court should have asked whether the Texas law has any elements of a founding-era religious establishment.

Our analysis proceeds as follows. First, we address whether the secular-purpose test from *Stone* and *Lemon* remains good law. The answer is no: The Supreme Court has explicitly abandoned that test, along with the rest of *Lemon* and its offshoots, such that *Stone* is now an empty vessel. Indeed, to say we must keep applying *Stone* (as do Plaintiffs and our dissenting colleagues) would be to ignore *Lemon*'s abrogation. Second, we consider what the proper Establishment Clause analysis is today. The answer is that courts now ask whether a challenged law bears hallmarks of a founding-era

establishment of religion. Finally, we apply that analysis and conclude that displaying the Ten Commandments in public-school classrooms bears no resemblance to a historical establishment.

### A. The Supreme Court has abrogated *Lemon*.

By targeting S.B. 10's lack of a "secular purpose," Defendants contend the district court applied an analysis that has been overruled by the Supreme Court. Not so, counter Plaintiffs: The district court applied *Stone*, which also involved a Ten Commandments display and which the Supreme Court has not overruled by name. We agree with Defendants. Explaining why requires briefly discussing the evolution of Establishment Clause jurisprudence.

### 1. Lemon*'s Demise*

In 1971, the Supreme Court decided *Lemon v. Kurtzman*, which for decades would provide a framework for analyzing the Establishment Clause. What came to be known as the "*Lemon* test" asked (1) whether a law has "a secular legislative purpose," (2) whether its "principal or primary effect . . . neither advances nor inhibits religion," and (3) whether it "foster[s] an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13 (quotation omitted).

*Lemon*'s career was not a success. "'[I]nstead of bringing clarity to' the Supreme Court's Establishment Clause jurisprudence, '*Lemon* produced only chaos.'" *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 490 (3d Cir. 2025) (alteration in original) (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 277 (2022) (GORSUCH, J., concurring in the judgment)), *cert. denied*, 146 S. Ct. 885 (2025) (mem.). The test led to a "garble" of results, with courts reaching conflicting decisions on whether, for instance, governments could display nativity scenes and menorahs, or whether a city

seal could include a religious symbol.[3] Famously, dueling Supreme Court decisions allowed states to supply religious schools with books but not maps, leading then-Senator Daniel Moynihan to quip, "What about atlases?"[4]

Indeed, whether *Lemon* was still the law was a mystery for years. The Court would deploy it in some cases, while seeming to forget it in others. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398–400 (1993) (SCALIA, J., concurring in the judgment).[5] In 2022, the Court finally buried the hatchet: it announced it had "long ago abandoned *Lemon*." *Kennedy*, 597 U.S. at 534. Also "abandoned," the Court explained, was *Lemon*'s "offshoot," known as the "endorsement test." *Ibid.* A year later, the Court confirmed *Lemon* had been "abrogated." *Groff v. DeJoy*, 600 U.S. 447, 460 (2023).

---

[3] *Shurtleff*, 596 U.S. at 278 & nn.1–3 (GORSUCH, J., concurring in the judgment) (discussing *Lynch v. Donnelly*, 465 U.S. 668, 671–72 (1984) and *County of Allegheny v. ACLU*, 492 U.S. 573, 578–79 (1989) (nativity scenes); *Skoros v. New York*, 437 F.3d 1, 3–4 (2d Cir. 2006) and *Kaplan v. Burlington*, 891 F.2d 1024, 1025–26, 1030–31 (2d Cir. 1989) (menorahs); *Murray*, 947 F.2d at 149 and *Harris v. Zion*, 927 F.2d 1401, 1402 (7th Cir. 1991) (city seals)).

[4] *Compare Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968), *with Meek v. Pittenger*, 421 U.S. 349 (1975), *overruled by Mitchell v. Helms*, 530 U.S. 793 (2000). *See also* Jeffrey Rosen, *Lemon Law*, THE NEW REPUBLIC (Mar. 28, 1993), https://newrepublic.com/article/73764/lemon-law [https://perma.cc/WU7M-E5RC].

[5] *See also Am. Legion*, 588 U.S. at 49 ("In many cases, this Court has either expressly declined to apply the test or has simply ignored it."). Others, including this court, have observed the same thing. *See Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 (5th Cir. 2017) (SMITH, J.); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 n.7 (5th Cir. 1993) (SMITH, J.) (criticizing the "confusing and confused Establishment Clause jurisprudence" under the "tripartite *Lemon* analysis"); *see also* Gerard V. Bradley, *The Death and Resurrection of Establishment Doctrine*, 61 DUQ. L. REV. 1, 1 (2023) ("[Secularism] is (was) the beating heart of *Lemon* and the ground-norm of the church-state corpus it animated for decades. It was incompatible with our history and traditions and current practices."); Carl H. Esbeck, *The* Lemon *Test: Should It Be Retained, Reformulated or Rejected?*, 4 NOTRE DAME J.L. ETHICS & PUB. POL'Y 513, 515–31 (1990).

Our court has likewise recognized *Lemon*'s demise. Following the Supreme Court's direction, we held that "[w]e do not . . . consider the *Lemon* test" because "[i]ts long Night of the Living Dead is now over." *Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941, 954 n.20 (5th Cir. 2022) (citations omitted).

To sum up: "*Lemon* and its progeny," *Kennedy*, 597 U.S. at 534, have been "abandoned," *ibid.*, "abrogated," *Groff*, 600 U.S. at 460, and their reign "is now over," *Mack*, 49 F.4th at 954 n.20. This means that, when analyzing Establishment Clause claims, courts do not consider any of the three *Lemon* prongs—whether a law has a secular purpose, whether it advances or inhibits religion, and whether it excessively entangles government and religion. *See Lemon*, 403 U.S. at 612–13.

### 2. *Without* **Lemon,** **Stone** *disappears.*

How, then, did the district court justify applying *Lemon*'s defunct secular-purpose test? Answer: it claimed to apply not *Lemon* but *Stone*. *See Nathan*, 795 F. Supp. 3d at 939, 942–43. The *Roake* district court and the now-vacated *Roake* panel took the same view. *See Roake v. Brumley*, 756 F. Supp. 3d 93, 116, 160–70 (M.D. La. 2024), *vacated*, 170 F.4th 292 (5th Cir. 2026); *Roake Panel*, 141 F.4th at 643–45. Plaintiffs continue to insist on this distinction: "*Stone*, not *Lemon*." *See also Roake En Banc*, 170 F.4th at 302–07 (Dennis, J., dissenting). They are mistaken.

To see why, just read *Stone*. It was a seven-paragraph opinion issued in 1980, nine years after *Lemon*. Here's the entire second paragraph:

> This Court has announced a three-part test for determining whether a challenged state statute is permissible under the Establishment Clause of the United States Constitution:
>
> > "First, the statute must have a secular legislative purpose; second, its principal or primary effect

> must be one that neither advances nor inhibits religion . . . ; finally the statute must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S. Ct. 2105, 2111, 29 L. Ed. 2d 745 (1971) (citations omitted).

> If a statute violates any of these three principles, it must be struck down under the Establishment Clause. We conclude that Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose, and is therefore unconstitutional.

*Stone*, 449 U.S. at 40–41. Unmistakably, *Stone* depended entirely on *Lemon* and nothing but *Lemon*. Remove the three-part *Lemon* test, and *Stone*'s reasoning vanishes. It follows that *Stone* is one of *Lemon*'s "progeny" that has been "abrogated." *Kennedy*, 597 U.S. at 534; *Groff*, 600 U.S. at 460.

Evidently sensing this problem, the now-vacated *Roake* panel tried to distance itself from *Lemon* by dropping this cryptic footnote: "We do not undertake this [secular-purpose] analysis to revive *Lemon*, but only for the limited purpose of deciding whether *Stone*'s facts and reasoning control." 141 F.4th at 643 n.21. That makes no sense. The panel applied *Lemon*'s first prong—if that does not "revive *Lemon*," what would? And *Stone*'s "reasoning" *is* the *Lemon* test, full stop. So, what the *Roake* panel denied it was doing ("reviving *Lemon*") and what it admitted it was doing ("deciding whether *Stone*'s facts and reasoning control") are the same thing.

The *Roake* panel also suggested that *Stone* relied on other precedents besides *Lemon*—specifically, *Abington Township v. Schempp* and *Engel v. Vitale*—and so, for that reason, *Stone* somehow survives *Lemon*'s abrogation. *Roake Panel*, 141 F.4th at 642; *see also id.* at 652–53 (DENNIS, J., concurring) (similar). Not so. Again, read *Stone*. It relied on *Schempp* only to support its secular-purpose holding (*Lemon*'s first prong), *see Stone*, 449 U.S. at 41, and

No. 25-50695

on *Engel* only to support the pedestrian point that there was state action, *id.* at 42 & n.4. Those passing cites cannot alter the fact that *Stone* was *Lemon* all the way down. If there were any doubt, here is *Stone*'s concluding sentence: "We conclude that § 158.178 (1980) violates the first part of the *Lemon v. Kurtzman*, test, and thus the Establishment Clause of the Constitution." *Id.* at 42–43.

### 3. Courts cannot apply Stone without applying bad law.

Plaintiffs contend *Stone* and its secular-purpose test are still good law, notwithstanding *Lemon*'s abrogation. We disagree.

First, Plaintiffs argue the Supreme Court has not overruled *Stone* by name. The Supreme Court's prerogative to overrule its own precedent, *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989), is a principle we scrupulously honor.[6] But Plaintiffs misunderstand how the principle applies here. *Stone* does not merely "rest on reasons rejected in *some other line of decisions*," *ibid.* (emphasis added); instead, it is part of *Lemon*'s "progeny" that the Supreme Court has affirmatively "abandoned" and "abrogated." *Kennedy*, 597 U.S. at 534; *Groff*, 600 U.S. at 460. With *Lemon* gone, there is nothing left of *Stone* to apply.

Plaintiffs miss the sea change caused by *Lemon*'s abrogation. Over fifty years ago, *Lemon* unveiled "a grand unified theory" for the Establishment Clause that would cut across all kinds of cases. *See Kennedy*, 597 U.S. at 534 (quotation omitted).[7] For that reason, the Court did not merely overrule

---

[6] *See, e.g.*, *United States v. Vargas*, 74 F.4th 673, 683 (5th Cir. 2023) (en banc) ("Our job, as an inferior court, is to adhere strictly to Supreme Court precedent, whether or not we think a precedent's best days are behind it."); *Ass'n of Club Execs. of Dall., Inc. v. City of Dallas*, 83 F.4th 958, 965 (5th Cir. 2023) ("[W]hether to overrule or modify [a case] is the High Court's business, not ours.").

[7] *See, e.g.*, *Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373 (1985) (publicly

*Lemon*, but also its "progeny" and its "offshoot[s]" such as the reasonable-observer test. *Ibid.* And, to make its intentions perfectly clear, the Court confirmed that a strikingly different historical approach would govern all Establishment Clause cases going forward. *See id.* at 535–36; *see also infra* Part IV.B. (discussing historical approach). The notion that we must nonetheless continue to apply any part of *Lemon* flies in the face of those explicit directives.

If Plaintiffs' view prevailed, we would be applying *Lemon*'s dead letter far into the future. For instance, *Kennedy* involved a coach's prayer after a football game. *Id.* at 514–15. Presumably, all would concede that *Lemon* no longer applies in football-game-prayer cases. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (addressing prayer broadcast before high-school football games). What about other cases? *Lemon* applied far and wide.[8] *Kennedy* did not tick off every one of those cases and denounce their use of *Lemon*. Must we keep applying the abrogated *Lemon* test in each one until the Supreme Court tells us not to? To ask the question is to answer it.

Furthermore, *Kennedy*'s treatment of Establishment Clause precedent shows no intent to preserve *Lemon*. Quite the contrary. For instance, *Kennedy* discussed *Santa Fe*, 530 U.S. 290, the football-game-prayer case. 597 U.S. at 541–42. Although *Santa Fe* cited

---

funded remedial instruction in religious schools), *overruled by Agostini v. Felton*, 521 U.S. 203 (1997); *Meek*, 421 U.S. 349 (publicly provided guidance, speech, and hearing services at parochial schools); *Edwards v. Aguillard*, 482 U.S. 578 (1987) (teaching of creationism in public schools).

[8] *See, e.g.*, *County of Allegheny*, 492 U.S. 573 (nativity scene on public property); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (moment of silence in public schools); *Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736 (1976) (nonsectarian subsidy program to higher learning institutions); *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973) (maintenance and repair grants for religious schools).

*Lemon*, *Kennedy* explicitly frames it as a coercion case and says nothing about *Lemon*. *Kennedy*, 597 U.S. at 541–42; *see also id.* at 570 n.4 (SOTOMAYOR, J., dissenting) (noting majority "recast[s] . . . *Santa Fe* as solely concerning coercion"). *Kennedy* also discussed *Lee v. Weisman*, which cited *Lemon* but did not apply it. *See Lee*, 505 U.S. at 644 (SCALIA, J., dissenting) (explaining the majority "demonstrate[d] the irrelevance of *Lemon* by essentially ignoring it"). And, like *Santa Fe*, *Kennedy* discussed *Lee* as a case about "problematically coercive" school prayer. *Kennedy*, 597 U.S. at 541.[9]

In short, there is no plausible way to read *Kennedy* as somehow preserving *Lemon* for certain cases. As discussed, *Kennedy* definitively announced the *Lemon* test had been "abandoned." *Id.* at 534. That was the last nail in *Lemon*'s coffin. Because we do not have the option of ignoring the Supreme Court's express directives, we cannot continue applying *Lemon*.

Finally, Plaintiffs argue that *Lemon*'s abrogation does not affect *Stone* because the Supreme Court separately reaffirmed *Stone* in two 2005 decisions, *McCreary County v. ACLU* and *Van Orden v. Perry*. *See McCreary County v. ACLU*, 545 U.S. 844 (2005); *Van Orden v. Perry*, 545 U.S. 677 (2005). We again disagree.

Those cases addressed Establishment Clause challenges to a Ten Commandments display in a Kentucky courthouse (*McCreary*) and a Ten Commandments monument at the Texas Capitol (*Van Orden*). A splintered Court invalidated the Kentucky display, *McCreary*, 545 U.S. at 881, but upheld the Texas monument, *Van Orden*, 545 U.S. at 692. *McCreary* merely

---

[9] Even less can be said for *Lamb's Chapel* and *Widmar v. Vincent*, which *Kennedy* cited in passing for points unrelated to *Lemon*. *See Kennedy*, 597 U.S. at 523 (citing *Widmar* to show that free speech provides "overlapping protection" for religious expression); *id.* at 543 (citing *Lamb's Chapel* and *Widmar* for proposition that "phantom constitutional violations" do not justify infringing free speech).

No. 25-50695

rehearsed *Stone*'s application of *Lemon*'s secular-purpose prong, *see* 545 U.S. at 859–69, and declined to abandon that test, *see id.* at 861–63. The controlling *Van Orden* opinion distinguished *Stone* because the display there was in a public school, not at a state capitol. *See Van Orden*, 545 U.S. at 703 (Breyer, J., concurring in the judgment).[10]

Neither decision has any effect on our analysis here. *McCreary* confirmed that *Stone* applied *Lemon*'s secular-purpose prong, and neither *McCreary* nor *Van Orden* suggested that *Stone* had any other basis. *See McCreary*, 545 U.S. at 859 (explaining "*Stone* found a predominantly religious purpose in the government's posting of the Commandments"). And, most importantly, both cases were decided years before *Kennedy* announced that the *Lemon* test was abrogated.[11]

* * *

After decades of confusion, the Supreme Court finally confirmed *Lemon*'s demise. Plaintiffs ignore the obituary. Under the guise of applying *Stone*, they would have us exhume *Lemon* and parade its corpse around the Federal Reporter. That we cannot do.

We agree with Defendants that the district court erred in applying *Lemon*'s abrogated secular-purpose test.

---

[10] "Justice Breyer's concurrence is the controlling opinion in *Van Orden*." *Staley v. Harris County*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) (en banc).

[11] Nor did Chief Justice Rehnquist's plurality opinion in *Van Orden* somehow reimagine *Stone* as a "coercion" decision. To the contrary, Rehnquist's separate opinion confirms that *Stone* was based on *Lemon*'s purpose prong. *See* 545 U.S. at 690 (Rehnquist, C.J.) (plurality opinion) ("In the classroom context, we found that the Kentucky statute had an improper and plainly religious purpose." (citing *Stone*, 449 U.S. at 41)). In any event, a nonprecedential four-Justice plurality cannot somehow transform *Stone* from a *Lemon*-based decision into a coercion case.

### B. Courts now analyze Establishment Clause challenges in light of founding-era religious establishments.

In addition to discarding the *Lemon* test, *Kennedy* instructed courts how to analyze Establishment Clause claims going forward.

The Clause "must be interpreted by reference to historical practices and understandings," using an interpretation that "faithfully reflects the understanding of the Founding Fathers" and "focuses on original meaning and history." *Kennedy*, 597 U.S. at 535–36 (citation modified). The analysis looks to the historical "hallmarks of religious establishments," such as legal compulsion to "'attend church'" or "engage in 'a formal religious exercise.'" *Id.* at 537 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952); *Lee*, 505 U.S. at 589).[12] As two sister circuits have explained, *Kennedy*'s analysis distills to this inquiry: Have plaintiffs "prov[en] a set of facts that would have historically been understood as an establishment of religion"? *Hilsenrath*, 136 F.4th at 491 n.54 (quoting *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023)).

In the following sections, we flesh out the historical analysis *Kennedy* demands. We then apply it to S.B. 10.

### 1. The Text of the Establishment Clause

The First Amendment states in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I.

---

[12] *See also Kennedy*, 597 U.S. at 537 & n.5 (discussing "coercion along these lines," *id.* at 537, and noting "certain other historical hallmarks of an established religion," *id.* at 537 n.5); *Shurtleff*, 596 U.S. at 277 (GORSUCH, J., concurring in the judgment); 1 ANNALS OF CONG. 730–31 (1789) (Madison); Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2144–46 (2003) [hereinafter McConnell, *Establishment*].

No. 25-50695

The key phrase—"an establishment of religion"—was readily understandable to founding-era citizens. *See District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008) (relying on a phrase's "[n]ormal meaning . . . known to ordinary citizens in the founding generation"). The reason is simple. At the time, establishments were "a familiar institution." McConnell, *Establishment*, *supra* note 12, at 2107.[13] Someone on the streets of 1789 Boston, reading that phrase, would have instantly thought of the Church of England, the colonial established churches, or the current state establishments—in other words, a polity's official church or religion. *Ibid.*

This is what founding-era Americans meant by "establishments of religion." That meaning is reflected in contemporary dictionaries. For instance, Samuel Johnson referred to a church's being "*established* in all its forms by an ordinance of the lords and commons." *Establish*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) [https://johnsonsdictionaryonline.com/1773/establish_va].[14] It is also how people used the term. For instance, John Leland, the 18th century Baptist preacher—pondering "[w]hat were, and still are the causes that ever there should be a state establishment of religion"—answered: "over-fondness for a particular system or sect. . . . gave rise to the first human establishment of religion, by Constantine the Great." JOHN LELAND, THE

---

[13] *See generally* JOHN WITTE, JR., JOEL A. NICHOLS & RICHARD W. GARNETT, RELIGION AND THE AMERICAN CONSTITUTIONAL EXPERIMENT 9–34 (5th ed. 2022) [hereinafter WITTE, RELIGION]; AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 32–33 (1998) [hereinafter AMAR, BILL OF RIGHTS]; LEONARD W. LEVY, THE ESTABLISHMENT CLAUSE: RELIGION AND THE FIRST AMENDMENT 5, 11 (2d ed. 1994) [hereinafter LEVY, ESTABLISHMENT CLAUSE].

[14] *See also Establishment*, NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 594 (1828) [https://heinonline.org/HOL/P?h=hein.lbr/adeniex0001&i=684] ("The episcopal form of religion, so called in England.").

No. 25-50695

Rights of Conscience Inalienable, and Therefore Religious Opinions Not Cognizable by Law 16 (New-London, T. Green & Son 1791).[15]

At one level, then, the Clause's text is straightforward. It bars Congress[16] from enacting laws regarding[17] a legal[18] institution well known in

---

[15] *See generally* Stephanie H. Barclay, Brady Earley & Annika Boone, *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 539–45 (2019) (discussing founding-era uses of "establishment of religion") [hereinafter Barclay, *Original Meaning*]; *see also, e.g.*, Henry J. Caner, A Candid Examination of Dr. Mayhew's Observations on the Charter and Conduct of the Society for the Propagation of the Gospel in Foreign Parts 38 (1763) ("[T]he Church of England is beyond controversy established in all his Majesty's colonies and plantations . . . .").

[16] The Supreme Court has held that the Clause also applies to the States. *See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947); *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943). We therefore need not enter the long-running debate on whether incorporating the Clause made sense considering its central purpose of preventing federal interference with state establishments. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 49–51 (2004) (Thomas, J., concurring in the judgment); *Zelman v. Simmons-Harris*, 536 U.S. 639, 679 & n.4 (2002) (Thomas, J., concurring); *see also* Amar, Bill of Rights, *supra* note 13, at 32–42; Steven D. Smith, Foreordained Failure: The Quest for a Constitutional Principle of Religious Freedom 17–27 (1995).

[17] That is the most straightforward reading of the term "respecting." *See Respecting*, Noah Webster, American Dictionary of the English Language 697 (1830) ("[r]egarding; having regard to; relating to"). Scholars disagree about how to read "respecting." *See, e.g.*, Carl H. Esbeck, *The Establishment Clause: Its Original Public Meaning and What We Can Learn from the Plain Text*, 22 Federalist Soc'y Rev. 26, 31–39 & n.42 (2021) [hereinafter Esbeck, *Establishment Clause*]; Witte, Religion, *supra* note 13, at 114–21. We need not pick sides in those somewhat esoteric debates. Even if "respecting" means something slightly broader than "regarding" (which we do not decide), it would not affect the outcome. *See infra* Part IV.C (concluding Ten Commandments display has no element of a historical establishment).

[18] When the Constitution elsewhere uses "establish" or "establishment," the term refers to creating an institution by law. *See* U.S. Const. pmbl. ("We the People . . . in Order to . . . *establish* Justice . . . do ordain and *establish* this Constitution for the United States of America."); *id.* art. II, § 2 ("Appointments . . . which shall be *established* by

---

the founding era. That sets the parameters of our inquiry. If a modern law is challenged under the Establishment Clause, courts must test that law against what the founding generation would have regarded as an establishment of religion. *See Kennedy*, 597 U.S. at 537; *Hilsenrath*, 136 F.4th at 491 n.54; *Firewalker-Fields*, 58 F.4th at 122 n.7. That is a familiar task. Courts often decide whether modern practices fall within the original public meaning of constitutional phrases—for instance, "search and seizure," "keep and bear arms," "Recess of the Senate," or "Officers of the United States."[19]

Admittedly, though, our task in this case has added complexity. Like certain phrases in the Constitution,[20] an "establishment of religion" denotes a relic of the past: the last state establishment was dismantled in 1833. McConnell, *Establishment*, *supra* note 12, at 2126 (discussing Massachusetts disestablishment). "It has been so long—about [190] years—since any state in the United States has had an established church that we have almost

---

Law"); *id.* art. III, § 1 ("such inferior courts as the Congress may . . . ordain and *establish*"); *id.* art. VII ("The Ratification of the Conventions of nine States, shall be sufficient for the *Establishment* of this Constitution between the States so ratifying the Same." (emphases added)); *see also* Marc O. DeGirolami, *Establishment As Tradition*, 133 Yale L.J.F. 372, 377–82 (2023) (discussing Constitution's uses of "establishment" and stating that "'an establishment' refers to a concrete legal or political institution and the laws and practices appurtenant to it").

[19] *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404–05 (2012) (asking whether police's "physically occup[ying] private property for the purpose of obtaining information. . . . would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted"); *Heller*, 554 U.S. at 573, 576–620 (asking whether "prohibition on the possession of usable handguns in the home" violated the "individual right to keep and bear arms" as understood by "ordinary citizens in the founding generation"); *NLRB v. Noel Canning*, 573 U.S. 513, 526–38, 57 (2014) (original meaning of "Recess of the Senate"); *Buckley v. Valeo*, 424 U.S. 1, 124–31 (1976) (original meaning of "Officers of the United States").

[20] *See, e.g.*, U.S. Const. art. I, § 8, cl. 11 (empowering Congress to "grant Letters of Marque and Reprisal"); *id.* art. I, § 9, cl. 3 (prohibiting "Bill[s] of Attainder"); *id.* art. III, § 3, cl. 2 (providing "no Attainder of Treason shall work Corruption of Blood").

forgotten what it is." *Id.* at 2107.[21] Accordingly, in the following sections we consider historical evidence from the founding era to fill out the contours of the phrase "establishment of religion." *See, e.g.*, *Heller*, 554 U.S. at 579–605.

### 2. The Church of England

For the founding era, the paradigm religious establishment was the Church of England. While only a sketch is possible here, the founding generation well understood the components of this establishment.

The "Anglican establishment" emerged in the early sixteenth century when Parliament renounced papal authority and declared King Henry VIII "the only supreme head in earth of the Church of England." Act of Supremacy 1534, 26 Hen. 8, c. 1 (Eng.). As part of his "spiritual authority," the king was empowered to reform and redress all "errors, heresies, [and] abuses" to increase "virtue in Christ's religion" for the "pleasure of Almighty God." *Ibid.* In effect, the Crown gained absolute civil authority over ecclesiastical governance.

At the king's direction, Parliament wielded this authority to control all aspects of the Anglican establishment and the religious practices of its people. For example, Parliament prescribed official forms of worship and attendance at Anglican services, on pain of fines for parishioners and loss of church office for clergy.[22] Dissenters—Catholics and dissenting

---

[21] *See also* NATHAN S. CHAPMAN & MICHAEL W. MCCONNELL, AGREEING TO DISAGREE: HOW THE ESTABLISHMENT CLAUSE PROTECTS RELIGIOUS DIVERSITY AND FREEDOM OF CONSCIENCE 2 (2023) [hereinafter CHAPMAN & MCCONNELL, AGREEING TO DISAGREE]. *See generally* DISESTABLISHMENT AND RELIGIOUS DISSENT: CHURCH-STATE RELATIONS IN THE NEW AMERICAN STATES (1776–1833) (Carl H. Esbeck & Jonathan J. Den Hartog eds. 2019) [hereinafter STATE DISESTABLISHMENTS].

[22] Act of Uniformity 1559, 1 Eliz., c. 2 (Eng.); Act of Uniformity 1662, 14 Car. 2, c. 4 (Eng.). *See generally* 1 WILLIAM BLACKSTONE, COMMENTARIES *364–83;

No. 25-50695

Protestants—were barred from holding civil and military offices.[23] Churches and clergy were funded by compulsory exactions.[24] And churches performed public functions such as recordkeeping and poor relief, with ecclesiastical courts exercising jurisdiction over matters such as marriages and burials.[25]

By the eighteenth century, English law recognized the Church of England as a legally established institution of civil government. According to Blackstone, the church had become an integral part of the public legal system, whose rights, privileges, and authority were established by statute and enforced by civil authority. *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *364–83. The result was state control over religious belief and practice, with dissent punished financially, politically, and criminally. In the minds of founding-era Americans, this was a paradigm religious establishment.

### *3. Colonial and Early State Constitutions*

Two types of religious establishments emerged concurrently in the colonies. The Anglican establishment captured the south, while a Congregationalist or Puritan establishment pervaded the north.[26]

---

NORMAN DOE, THE LEGAL FRAMEWORK OF THE CHURCH OF ENGLAND: A CRITICAL STUDY IN A COMPARATIVE CONTEXT 161–66 (1996).

[23] Corporation Act 1661, 13 Car. 2, c. 1 (Eng.); Test Act 1673, 25 Car. 2, c. 2 (Eng.); Test Act 1678, 30 Car. 2, c. 1 (Eng.).

[24] Easter Offerings and Tithes Act 1548, 2 & 3 Edw. 6, c. 13 (Eng.); 1 WILLIAM BLACKSTONE, COMMENTARIES *380–82.

[25] Poor Relief Act 1601, 43 Eliz., c. 2 (Eng.); 3 WILLIAM BLACKSTONE, COMMENTARIES *86–103 (describing jurisdiction of ecclesiastical courts).

[26] To be clear, the colonial establishments were not monolithic. Pennsylvania, Delaware, New Jersey, and Rhode Island never had a formal establishment. *See* McConnell, *Establishment*, *supra* note 12, at 2110–11. And Pennsylvania and Rhode Island specifically protected religious dissenters. *See* Plantation Agreement at Providence (1640), *reprinted in*

No. 25-50695

In the southern colonies (Virginia, Maryland, South Carolina, North Carolina, and Georgia), the Church of England was established by law under the English model.[27] These colonial establishments thus wielded similar power over religion as the Anglican establishment did in the motherland.

Consider the Virginia colony. Its 1606 charter instructed the colony to "provide that the Word and Science of God be preached, planted, and used . . . according to the rites and doctrine of the Church of England." Sanford H. Cobb, The Rise of Religious Liberty in America: A History 75 (1902) [hereinafter Cobb, Religious Liberty]. And for the next "179 years . . . the Anglican (or Episcopal) Church was the Established Church of Virginia." Pierce Middleton, Anglican Virginia: The Established Church of the Old Dominion 1607–1786, at 6 (1954).

What resulted would have been familiar from the English experience: government control over religious practice and belief. For example, the local vestry governed "the levyes and assessments for building and repayring the churches, and chappells, provision for the poore, maintenance of the minister, and such other necessary duties for the more orderly manageing of all parociall affaires . . . ." *Id.* at 32–33 (discussing Vestry Act of 1661–1662). The Church of England governed doctrine and liturgy. *Id.* at 147 ("In the seventeenth century after 1643, it was unlawful for persons to assemble

---

8 Sources and Documents of U.S. Constitutions 353, 354 (William F. Swindler ed., 1979); William Penn, Frame of Government of Pennsylvania (1683), *reprinted in* 8 Sources and Documents of U.S. Constitutions, *supra*, at 261. Even so, they still "had religious tests for office, blasphemy laws, and the like." McConnell, *Establishment*, *supra* note 12, at 2111.

[27] *See* State Disestablishments, *supra* note 21, at 97–105 (North Carolina), 139–43 (Virginia), 181–88 (South Carolina), 227–33 (Georgia), 309–13 (Maryland); *see also* McConnell, *Establishment*, *supra* note 12, at 2115.

publicly for worship except according to the *Prayer Book* and liturgy of the Established Church."). Laws also required "church attendance under penalty of a fine, and . . . parents to bring their children to the parish priest for baptism." *Ibid.* Dissenters were not tolerated. In response to an influx of Quakers, the colony passed legislation barring them from office, from having their children baptized, and from holding religious meetings. *Id.* at 145–46.

The same was true in other southern colonies. For instance, in 1704, South Carolina formally established the Church of England, mandated the Book of Common Prayer in worship, barred dissenters from serving in the legislature, and paid clergy out of public funds.[28] Maryland established the Church of England in 1692, imposing a coercive regime similar to Virginia's. Cobb, Religious Liberty, *supra*, at 386–87. And while Georgia was more tolerant than other southern colonies, it still established the Church of England in 1758 and taxed parishioners to support it. State Disestablishments, *supra* note 21, at 230–31. All colonies with establishments—including those in the North—commissioned their churches for various civil functions, including education and poor relief.[29]

Although the northern colonies refused to establish Anglicanism, their localized Puritan (or Congregationalist) establishments retained many of the same features as the southern Anglican establishments.

---

[28] McConnell, *Establishment*, *supra* note 12, at 2177; *see also* John Wesley Brinsfield, Religion and Politics in Colonial South Carolina 23–24 (1983); Act for the Establishment of Religious Worship in this Province, According to the Church of England, and for the Erecting of Churches for the Publick Worship of God, and also for the Maintenance of Ministers and the Building Convenient Houses for Them (1704), *reprinted in* 1 The Earliest Printed Laws of South Carolina 1692–1734 (John D. Cushing ed., 1978); Church Act of 1706, 2 S.C. Stat. 284–89.

[29] McConnell, *Establishment*, *supra* note 12, at 2169.

Religious uniformity was achieved through civil power.[30] When Connecticut established its General Court, for example, its "Duty" was resolved as follows: "1st, To provide for the maintenance of the purity of religion, and to suppress the contrary; 2d, To declare, publish, and establish . . . the laws for holiness and righteousness which God had made and given to us in the Scriptures." COBB, RELIGIOUS LIBERTY, *supra*, at 283. Under such authority, dissenters faced severe punishments, ranging from limits on voting or legislative service[31] to whatever a magistrate decided—be it "fine, banishment, or 'otherwise.'"[32] In some colonies, Quakers were not even permitted.[33]

Parishioners faced similar, albeit milder coercion. Each northern colony required local parishioners to support the church through compulsory taxation.[34] And parishioners who failed to attend religious services were

---

[30] *E.g.*, COBB, RELIGIOUS LIBERTY, *supra*, at 173 (observing that, in 1635, the Massachusetts General Court gave "the magistrates power over the Churches themselves" to ensure "uniformity and prevent all diversities in ecclesiastical polity"), 282–85 (similar in Connecticut).

[31] ALBERT EDWARD MCKINLEY, THE SUFFRAGE FRANCHISE IN THE THIRTEEN ENGLISH COLONIES IN AMERICA 304–07 (1905) (discussing Massachusetts's limiting the vote to publicly testifying members of official church).

[32] COBB, RELIGIOUS LIBERTY, *supra*, at 285 (Connecticut).

[33] *E.g.*, *id.* at 287 (Connecticut law stating that "Quakers shall not be suffered in this jurisdiction").

[34] McConnell, *Establishment*, *supra* note 12, at 2152–53; STATE DISESTABLISHMENTS, *supra* note 21, at 120 (discussing how New York's Ministry Act of 1693 imposed taxes "for the support of 'a good sufficient Protestant ministry'"), 330 (noting, as of 1717, "each [Connecticut] parish was 'to grant and levy such rates and taxes on the inhabitants for the support of ministry and schools'"), 353 (similar for New Hampshire); COBB, RELIGIOUS LIBERTY, *supra*, at 169–70 (similar for Massachusetts).

fined.[35] Taken together, even northern colonists with no direct exposure to the Church of England would have experienced many of its defining features.

Although the colonial establishments became more tolerant of dissenters as independence approached, their essence remained unchanged. The original state constitutions reflect as much. Far from rejecting establishments, many states preserved the core components of their establishments, such as public financial support for the official church, regulation of religious institutions, and religious qualifications for civic participation.[36] Most explicit was South Carolina, whose 1778 Constitution declared that "the Christian Protestant religion" was "the established religion," requiring religious societies to subscribe to enumerated articles of faith to receive legal recognition. S.C. CONST. of 1778, art. XXXVIII, *reprinted in* POORE, STATE CONSTITUTIONS, *supra* note 36, at 1626.

All told, "nine of the thirteen colonies had established churches on the eve of the Revolution, and about half the states continued to have some form of official religious establishment when the First Amendment was

---

[35] *E.g.*, COBB, RELIGIOUS LIBERTY, *supra*, at 177 (Massachusetts), 284–85 (Connecticut).

[36] *See, e.g.*, MD. CONST. of 1776, art. XXXIII, *reprinted in* BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE UNITED STATES 819 (2d ed. 1878) [hereinafter POORE, STATE CONSTITUTIONS] (empowering legislature to levy taxes "for the support of the Christian religion"); MASS. CONST. of 1780, pt. I, art. III, *reprinted in* POORE, STATE CONSTITUTIONS, *supra*, at 957 (requiring towns to financially support "public Protestant teachers of piety, religion, and morality"); PA. CONST. of 1776, § 10 (requiring legislators to affirm belief in God and to "acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration"); DEL. CONST. of 1776, art. 22, *reprinted in* POORE, STATE CONSTITUTIONS, *supra*, at 276 (similar); N.C. CONST. of 1776, art. XXXII, *reprinted in* POORE, STATE CONSTITUTIONS, *supra*, at 1413 (similar); S.C. CONST. of 1778, art. XXXVIII (requiring established churches to affirm five state-sanctioned articles of faith).

adopted." McConnell, *Establishment*, *supra* note 12, at 2107 (first citing Levy, Establishment Clause, *supra* note 13, at 5, 11; then citing Amar, Bill of Rights, *supra* note 13, at 32–33).

### 4. Disestablishment

The First Amendment did not touch any of the existing state establishments. It was commonly understood that the new federal government's powers did not include interfering with those establishments.[37] Nevertheless, over the course of about 60 years (1773–1833), the nine state establishments were legally dismantled—"disestablished"—by the states themselves. This process sheds considerable light on the founding-era understanding of establishment. *See generally* Chapman & McConnell, Agreeing to Disagree, *supra* note 21, at 42–73; State Disestablishments, *supra* note 21, at 97–202, 225–48, 309–72, 399–424.

During this period, states enacted constitutional provisions that repealed laws compelling church attendance, prescribing modes of worship, and exacting religious taxes. North Carolina's new 1776 Constitution was illustrative:

> That there shall be *no Establishment of any one Religious Church in this State* in Preference to any other; neither shall any Person, on any Pretence whatsoever, be *compelled to attend any*

---

[37] *See, e.g.* Witte, Religion, *supra* note 13, at 99 ("It was commonly assumed at the convention that questions of religion and of religious liberty were for the states and the people to resolve, not the budding federal government. . . . Federal power over religion was simply not considered part of this new constitutional calculus."); Amar, Bill of Rights, *supra* note 13, at 32 ("The Establishment Clause did more than prohibit Congress from establishing a national church. Its mandate . . . prohibited the national legislature from interfering with, or trying to *dis*establish, churches established by state and local governments."); Philip Hamburger, Separation of Church and State 106 n.40 (2002) (concluding the same).

No. 25-50695

> *Place of Worship*, contrary to his own Faith or Judgment; nor be *obliged to pay for the Purchase of any Glebe, or the building of any House of Worship or for the Maintenance of any Minister or Ministry*, contrary to what he believes right, or has voluntarily and personally engaged to Perform; but all Persons shall be at *Liberty to exercise their own Mode of Worship.* . . .

N.C. CONST. of 1776, art. XXXIV (emphases added).[38] Other state constitutions simply declared the former establishment repealed (New York, 1776)[39] or omitted the establishmentarian elements in a previous constitution (South Carolina, 1790).[40]

Other states (New Hampshire, 1819; Virginia, 1779, 1786–87; Maryland, 1810) disestablished via statute or a combination of constitutional and statutory measures.[41] Most famous of these efforts was in Virginia, where George Mason's 1779 bill repealed the Church of England's authority to collect taxes, followed by passage of Thomas Jefferson's 1786 Statute for Religious Freedom. Jefferson's statute provided that

> We the General Assembly of Virginia do enact, that *no man shall be compelled to frequent or support any religious Worship place*

---

[38] Georgia (1798), Connecticut (1818), and Massachusetts (1833) enacted similar provisions in their constitutions. *See* GA. CONST. of 1798, art. IV, § 10; CONN. CONST. of 1818, art. VII §§ 1–2; MASS. CONST. of 1833, amend. XI.

[39] *See* N.Y. CONST. of 1776, art. XXXV (declaring "all such parts of the said common law, and all such of the said statutes and acts aforesaid . . . as may be construed to establish or maintain any particular denomination of Christians or their ministers . . . hereby are, abrogated and rejected").

[40] *Compare* S.C. CONST. of 1790, art. VIII, §§ 1-2, *with* S.C. CONST. of 1778, art. XXXVIII.

[41] *See* STATE DISESTABLISHMENTS, *supra* note 21, at 139–80 (Virginia), 309–26 (Maryland), 351–72 (New Hampshire); *id.* at 354 ("In 1819 dissenters won perhaps their greatest victory when the legislature of New Hampshire passed the Act of Toleration, removing the authority of towns to compel citizens to contribute tax dollars to a religious organization.").

33

*or Ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief*, but that all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.

*A Bill for Establishing Religious Freedom, 18 June 1779, in* 2 The Papers of Thomas Jefferson 545–47 (Julian P. Boyd ed., 1950) (emphasis added). The next year, Virginia rescinded the General Assembly's authority over the Episcopal Church.[42]

This evidence of disestablishment powerfully illuminates what the founding generation understood establishments to be. The states knew what laws comprised their establishments, and they knew how to repeal them. Accordingly, "[s]tate disestablishment provisions clarify the sort of laws the Establishment Clause prohibited the federal government from enacting." Chapman & McConnell, Agreeing to Disagree, *supra* note 21, at 73. Namely, those were "laws conditioning civil or political privileges on religious belief or affiliation; laws compelling church attendance or tithes; laws interfering with church doctrine, governance, or administration; and laws authorizing a religious group to perform vital civic functions for the state." *Id.* at 73–74.

### 5. Summary

Returning to where we began, the Supreme Court has now confirmed that courts must interpret the Establishment Clause with reference to its

---

[42] *See* State Disestablishments, *supra* note 21, at 146, 164, 170. Finally, the four states that never had formal establishments (New Jersey, Delaware, Rhode Island, and Pennsylvania) either did nothing in this period, or else they codified provisions along the lines of the disestablishing states. *See id.* at 25–96; *see also, e.g.*, N.J. Const. of 1776, arts. 18–19.

original public meaning and our Nation's historical practices. *See Kennedy*, 597 U.S. at 535–36 (citing *Town of Greece v. Galloway*, 572 U.S. 565, 575–77 (2014)) (explaining Clause "must be interpreted by reference to historical practices and understandings," "the understanding of the Founding Fathers," and "original meaning and history" (internal quotations omitted)). The foregoing historical sketch[43] discusses evidence relevant to delineating the Clause's central focus—the institution known to the founding generation as an "establishment of religion."

The leading scholar in the area—whose work on this precise point the Supreme Court has relied on, *see Kennedy*, 597 U.S. at 537 n.5—has categorized the evidence into elements or "hallmarks" of founding-era establishments. Those include (1) government control over religious doctrine, governance, and church personnel; (2) compulsory church attendance; (3) compelled financial support, especially in the form of land grants and religious taxes; (4) prohibitions on worship in dissenting churches; (5) use of church institutions for civil functions; and (6) restriction of political participation to members of the established church. *See* McConnell, *Establishment*, *supra* note 12, at 2131–81. Other scholars have

---

[43] It is necessarily only a sketch. It would be impossible to canvass the entire historical record in a judicial opinion. That is why books, law-review articles, and original sources exist, which we have cited throughout.

No. 25-50695

drawn similar conclusions from the historical record,[44] and Supreme Court decisions have relied on such indicia to define an establishment.[45]

To be sure, these elements are only helpful analytical signposts. The lodestar for applying the Clause remains what the Supreme Court held in *Kennedy*—namely, that a challenged law must be measured against the standard of founding-era religious establishments.

### C. Application: Texas's law bears none of the hallmarks of a founding-era religious establishment.

Defendants argue Plaintiffs failed to show that S.B. 10's displays would have historically been understood as an establishment of religion. We agree.

#### *1. S.B. 10 looks nothing like a founding-era establishment.*

At the outset, we note that S.B. 10 plainly lacks the features of founding-era establishments. For example, whereas establishments

---

[44] *See* Esbeck, *Establishment Clause*, *supra* note 17, at 35 (identifying five overlapping characteristics of founding-era establishments); Barclay, *Original Meaning*, *supra* note 15, at 535–36, 538, 541, 548, 556 (identifying four overlapping characteristics). *See generally* Stephanie H. Barclay, *The Religion Clauses After* Kennedy v. Bremerton School District, 108 Iowa L. Rev. 2097, 2103–09 (2023); Vincent Phillip Muñoz, *The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation*, 8 U. Pa. J. Const. L. 585, 605–23 (2006); Patrick M. Garry, *The Myth of Separation: America's Historical Experience with Church and State*, 33 Hofstra L. Rev. 475, 481–90 (2004); Carl H. Esbeck, *Church Autonomy, Textualism, and Originalism: SCOTUS's Use of History to Give Definition to Church Autonomy Doctrine*, 108 Marq. L. Rev. 705, 725–49 (2025); Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. Pa. L. Rev. 111 (2020).

[45] *See, e.g.*, *Kennedy*, 597 U.S. at 537 (coercion); *Torcaso v. Watkins*, 367 U.S. 488, 490 (1961) (restricting political participation by dissenters and requiring religious proclamations from public officials); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) (coercing church attendance); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127 (1982) (granting churches monopolistic control over civil functions).

commonly punished dissenters through fines, taxes, and legal disabilities, *see supra* Part IV.B., S.B. 10 does none of those things. If students disagree with the Commandments or ignore them or laugh at them, S.B. 10 imposes neither penalty nor sanction, formal or informal. And S.B. 10 obviously does not regulate what any religious institution teaches, how it worships, or whom it employs—as establishments often did. *See supra* Part IV.B.

Nor does S.B. 10 compel financial support for religious institutions. True, S.B. 10 permits using public funds to procure displays. TEX. EDUC. CODE ANN. § 1.0041(e) (West 2025). But it neither requires such funding nor compels anyone to pay for the displays. This is again a far cry from historic religious establishments, which typically relied on forced exaction of religious taxes to support churches and clergy. *See Everson*, 330 U.S. at 10 n.8 ("Almost every colony exacted some kind of tax for church support."). For their part, Plaintiffs rely on none of these features of establishments to attack S.B. 10.

### 2. S.B. 10 does not coerce religious exercise or observance.

Plaintiffs' principal argument is that S.B. 10 resembles historic establishments because it is coercive. Specifically, they claim that displaying scripture in a classroom—especially scripture phrased as "commandments"—is inherently coercive to children who are required by law to attend school. While we do not doubt the sincerity of Plaintiffs' objections to the displays, we disagree that merely displaying religious text in a classroom coerces students in the way that founding-era establishments coerced dissenters. The two are worlds apart.[46]

---

[46] In a separate section below, we address the analytically distinct argument that the displays coerce schoolchildren in violation of the Free Exercise Clause. *See infra* Part V.

*Kennedy* explained that the "coercion" characteristic of establishments consisted of forcing people to "attend church" or "engage in 'a formal religious exercise.'" 597 U.S. at 537 (quoting *Lee*, 505 U.S. at 589); *see also ibid.* ("[T]his Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make religious observance compulsory.'" (quoting *Zorach*, 343 U.S. at 314)). Today, the state would erect something like an establishment if, for example, it mandated schoolchildren recite scripted prayers or join in corporate worship. *See Hilsenrath*, 136 F.4th at 492–93 (explaining "[h]istory and precedent . . . make clear that schools may not 'force [students] to engage in a formal religious exercise'" (quoting *Kennedy*, 597 U.S. at 537)).

The problem for Plaintiffs' coercion argument, however, is that S.B. 10 does not compel any student to engage in formal religious exercise. The law does not require students to "recite the Ten Commandments as an act of worship," or to affirm them at all. *Hilsenrath*, 136 F.4th at 492. Nor does it mandate students pray, adopt any faith, or engage in any other "unmistakably religious exercises" like "devotional reading and recitation of the Holy Bible." *Abington*, 374 U.S. at 307 (GOLDBERG, J., concurring). The law requires only that the Commandments be displayed on the classroom wall. The mere fact that the displays use religious language does not convert them into a call to prayer. "[N]ot all school activities touching on religion amount to 'formal religious exercise.'" *Hilsenrath*, 136 F.4th at 492 (quoting *Kennedy*, 597 U.S. at 537).

Moreover, Plaintiffs have not identified a shred of founding-era evidence equating the government's use of religious text, displays, or symbols with an establishment of religion. To the contrary, it appears that no one "ever claimed at the founding that the display of religious symbols was a form of religious establishment." CHAPMAN & MCCONNELL,

No. 25-50695

Agreeing to Disagree, *supra* note 21, at 159.[47] Indeed, it would be a shock to discover that the Establishment Clause is implicated merely by the government's use of religious language, imagery, or symbols.

In our country, religious placenames dot the landscape and religious mottos, symbols, and flags adorn countless public buildings.[48] Our national anthem contains the line, "In God is our trust," a version of which is our national motto and appears on our currency.[49] The Ten Commandments themselves feature in displays in the Supreme Court, the Capitol, the Jefferson Building, the National Archives, the Department of Justice, the Ronald Reagan Building, the House of Representatives, and the courthouse housing the D.C. Circuit and the District Court for the District of Columbia. *Van Orden*, 545 U.S. at 688 (Rehnquist, C.J.) (plurality opinion). The

---

[47] *See also* Barclay, *Original Meaning*, *supra* note 15, at 509–10 (finding no evidence that "government display of religious symbols" was a concern with respect to founding-era establishments).

[48] One study found over 800 cities with biblical placenames. John Leighly, *Biblical Place-Names in the United States*, 27 Names: A J. on Onomastics 46, 47 (1979). A more recent article counted over 1,000. Rafael Medoff, *Why American Towns Take Biblical Names*, Jewish News Syndicate (Feb. 20, 2023), https://www.jns.org/why-american-towns-take-biblical-names/ [https://perma.cc/GJ8C-RJE5]. Moreover, six state seals and seven state flags include religious sayings or imagery. *See* Seals, State Symbols USA, https://statesymbolsusa.org/categories/state-seal [https://perma.cc/PL8H-SHLJ] (Arizona, Colorado, Connecticut, Florida, Mississippi, South Dakota); Flags, State Symbols USA, https://statesymbolsusa.org/categories/state-flag [https://perma.cc/3JK4-ST5F] (Alabama, Connecticut, Florida, Georgia, Maryland, Mississippi, South Dakota).

[49] *See* 36 U.S.C. § 301 (making "the Star-Spangled Banner . . . the national anthem"); *id.* § 302 ("'In God We Trust' is the national motto."); 31 U.S.C. § 5112(d)(1) (requiring coins to have the inscriptions "In God We Trust" and "E Pluribus Unum"); An Act To Provide for the Safe-Keeping of the Acts, Records, and Seal of the United States, and for Other Purposes, ch. 14, § 2, 1 Stat. 68, 68 (1789) (conveying to State Department right to use the Great Seal—featuring the phrase "Annuit Coeptis" or "God Favors Our Undertakings"—which appears on passports and the one-dollar bill).

fanciful notion that these uses of public religious language or symbolism have anything to do with a founding-era establishment cannot be taken seriously.[50]

Plaintiffs bore the burden of showing that the S.B. 10 displays would have been understood as a founding-era establishment. *See Hilsenrath*, 136 F.4th at 491 & n.54 (citing *Firewalker-Fields*, 58 F.4th at 122 n.7). They failed to do so. Plaintiffs' doubtlessly sincere objections to the displays do not equate to the "coercion" characteristic of historic religious establishments. While they contain religious text, the displays do not pressure anyone to engage in religious exercise or observance.

### 3. S.B. 10 does not commit "denominational discrimination."

Alternatively, Plaintiffs argue that S.B. 10 violates the Establishment Clause because it engages in "denominational discrimination" by adopting what they call the "Protestant version" of the Ten Commandments. We reject this argument for several reasons.

To begin with, S.B. 10 adopts the same text of the Ten Commandments as in *Van Orden. Compare* TEX. EDUC. CODE ANN. § 1.0041(c) (West 2025), *with Van Orden*, 545 U.S. at 707, 736 (STEVENS, J., dissenting) (text of Commandments). As discussed, *Van Orden* upheld the constitutionality of a Ten Commandments monument outside the Texas Capitol. *See id.* at 698–705 (BREYER, J., concurring). In fact, the *Van Orden* challengers made precisely the same argument as today's Plaintiffs: namely, that the Texas monument "adopt[ed] the Protestant version of the Ten Commandments." Petitioner's Reply Brief at 8–10, *Van Orden*, 545 U.S. 677

---

[50] *See, e.g.*, 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1874 (1833) ("An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation.").

(No. 03-1500), 2005 WL 429975, at *8–10. Yet this argument had no impact on the decision, and a majority of the Court did not even mention it.

The four-Justice plurality referred only to "the Ten Commandments," taking no note of which version appeared on the monument. *See Van Orden*, 545 U.S. at 681, 688–91 (Rehnquist, C.J.) (plurality opinion). Justice Breyer's controlling opinion described the version only as a "nonsectarian text" created after "consultation with a committee composed of members of several faiths." *Id.* at 701 (Breyer, J., concurring). Plaintiffs dismiss this as dicta that does not analyze the monument's text. Dicta or not, it shows that neither the plurality nor the controlling opinion took up the same argument Plaintiffs make here.

Ironically, only Justice Stevens's dissent (joined by Justice Ginsburg) accepted the denominational argument. Noting the "many distinctive versions of the Decalogue" whose "differences may be of enormous religious significance," he argued that, "[i]n choosing to display this version . . . Texas tells the observer that the State supports this side of the doctrinal religious debate." *Id.* at 717–18 (Stevens, J., dissenting). So, when Plaintiffs' argument was last proposed to the Supreme Court regarding the identical text of the Ten Commandments, only two dissenting Justices referenced it; the other seven ignored it.

Second, Plaintiffs misunderstand the line of decisions that forbid the government from "officially prefer[ring] one religious denomination over another." *Cath. Charities Bureau Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). Under those cases, the government cannot privilege certain religions over others when imposing burdens or granting benefits. *See id.* at 248–49 (discussing doctrine). The principle comes into play when, for instance, the government allows Catholics and Protestants, but not Jehovah's Witnesses,

to worship in a park. *See Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953). Or when a state grants a charitable tax exemption to some religious groups, but not others, based on theological criteria. *See Cath. Charities*, 605 U.S. at 249 (invalidating exemption available only to religious groups that "engaged in proselytization or limited their services to fellow [co-religionists]").

But this principle has no application to government use of religious language or symbolism. *See Lynch*, 465 U.S. at 687 n.13 (declining to apply denominational preference cases to city crèche). Nor could it. Consider the cities of Corpus Christi, San Francisco, Los Angeles, San Diego, Santa Fe, San Jose, St. Augustine, and Sacramento, to name just a few. Do those names represent "denominational discrimination"? Or take our national motto. *See* 36 U.S.C. § 302 ("In God We Trust"). Does it show "favoritism" for monotheism over polytheism?

You get the point. If the rule against "denominational favoritism" applies in this area, all religious language and symbolism will have to be scoured from public life. While some constitutions have achieved this feat, ours is not one of them.[51]

---

[51] *Compare* CONSTITUTION (FUNDAMENTAL LAW) OF THE UNION OF SOVIET SOCIALIST REPUBLICS art. 124 (1936) ("In order to ensure to citizens freedom of conscience, the church in the U.S.S.R. is separated from the state, and the school from the church. Freedom of religious worship and freedom of anti-religious propaganda is recognized for all citizens."), *and* CONSTITUTION OF OCTOBER 4, 1958 art. 1 (Fr.) ("France shall be an indivisible, secular, democratic and social Republic."), *with* Letter from John Adams to the Officers of the First Brigade of the Third Division of the Militia of Massachusetts (Oct. 11, 1798), *in* 9 THE WORKS OF JOHN ADAMS 228, 229 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1854) ("Our Constitution was made only for a moral and religious People. It is wholly inadequate to the government of any other."), *and* Abraham Lincoln, Address at the Dedication of the Gettysburg National Cemetery (Nov. 19, 1863), *in* 9 COMPLETE WORKS OF ABRAHAM LINCOLN 209, 209 (John G. Nicolay & John Hay eds., Francis D. Tandy Co. 1905) (1894) ("[T]hat this nation, under God, shall have a new birth of freedom, and that government of the people, by the people,

No. 25-50695

Finally, Plaintiffs' argument would require us to make a theological judgment wholly unsuited to a federal court. The parties and their *amici* make detailed scriptural arguments for why S.B. 10's version of the Commandments aligns better with Protestant, Catholic, or Jewish traditions. Not being a court of ministers, bishops, or rabbis, we have no business opining on these matters and no competence to do so.

For instance, Plaintiffs assert "S.B. 10's rendition of scripture . . . conflicts with Jewish and Catholic articulations of the Decalogue." One *amicus* argues the text omits a "critical and recurring theme in Judaism" concerning the "Jewish understanding of the Commandments as God's Covenant with the Israelites." Br. of National Council of Jewish Women at 17. These differences, they claim, also affect Christian debates because S.B. 10's version "would prohibit the veneration of icons, a practice which is common in Catholic and Eastern Orthodox traditions." *Id.* at 18. For their part, Defendants draw different theological lessons from the text. They cite Catholic and Jewish translations to show that S.B. 10's alleged "reliance on the King James Bible is demonstrably false." And they argue any icon-veneration conflict is illusory because the Catholic Douay-Rheims translation "contains the same prohibition on making a graven image" as the King James.[52]

These matters of theology and scriptural interpretation lie beyond our ken. Federal courts are not competent to decide questions of "ecclesiastical

---

for the people, shall not perish from the earth.").

[52] Similarly, one *amicus* in *Roake* (which was argued with this case and concerns the same issues) argues S.B. 10's text is not a Protestant version because "there is little disagreement among Jewish and Christian traditions as to the overall substance of the Ten Commandments" despite differences in the "placement of textual pauses and thought-breaks." Br. for Director for the Conscience Project and Professor Mark David Hall at 13.

law and religious faith," *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1871), nor to settle "controversies over religious doctrine," *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hall Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *see also McRaney v. N. Am. Mission Bd.*, 157 F.4th 627, 638 (5th Cir. 2025) ("[C]ourts must take care to avoid resolving underlying controversies over religious doctrine.") (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 751 n.10 (2020)) (quotation omitted). Nor can courts act as "arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

Yet that is the role Plaintiffs would have us assume here—adjudicating the theological *bona fides* of S.B. 10's version of the Commandments. We would have to decide, for example, whether the text wrongly omits Jewish understandings of God's covenant or picks a side in the Catholic and Protestant debate over icons. While this case does not present an internal dispute over religious matters, *cf. McRaney*, 157 F.4th at 647–54, resolving the disagreement would strand us in the same dangerous waters. If we were so foolish as to accept this invitation, our very decision would ironically violate the Establishment Clause by presuming to decide a religious question.[53] Plaintiffs, in other words, have made us an offer we can only refuse.

In sum, we reject Plaintiffs' argument that S.B. 10 engages in "denominational discrimination" in violation of the Establishment Clause.

---

[53] *See Presbyterian Church in U.S.*, 393 U.S. at 449 ("First Amendment values are plainly jeopardized" if courts decide "controversies over religious doctrine and practice"); *Our Lady of Guadalupe*, 591 U.S. at 737 (explaining that the First Amendment allows religious adherents "to decide for themselves, free from state interference, matters of . . . faith and doctrine"); *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) (explaining that "religious controversies are not the proper subject of civil court inquiry").

No. 25-50695

### *4. Plaintiffs' "tradition" argument is meritless.*

Finally, Plaintiffs offer their own historical argument. They contend S.B. 10 violates the Establishment Clause because there is insufficient evidence of a tradition of public schools using the Ten Commandments or displaying them in a classroom. In support, they largely rely on the conclusions of their "expert" witness. We reject this argument.

Plaintiffs derive this tradition argument from cases about "legislative prayer"—*i.e.*, prayers by chaplains or ministers before government bodies. *See Marsh v. Chambers*, 463 U.S. 783 (1983); *Town of Greece*, 572 U.S. 565. As those cases explain, such prayer "has long been understood as compatible with the Establishment Clause" because it was "practiced by Congress since the framing of the Constitution." *Town of Greece*, 572 U.S. at 575 (citing *Marsh*, 463 U.S. 783). If a modern prayer "fits within" that venerable tradition, it does not violate the Clause. *Id.* at 577.

From those cases, Plaintiffs would distill a broad test: if a practice does not fit within some historical tradition, it violates the Establishment Clause. That does not follow. The legislative prayer cases teach only that the Establishment Clause cannot be read to sweep away a longstanding religious practice publicly approved by those who wrote the First Amendment. *See id.* at 576 (observing "the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment").[54] They do not stand for the *opposite* proposition—namely, that any modern

---

[54] *See also Town of Greece*, 572 U.S. at 577 ("*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted."); *id.* at 602 (ALITO, J., concurring) (explaining "[t]his Court has often noted that actions taken by the First Congress are presumptively consistent with the Bill of Rights, and this principle has special force when it comes to the interpretation of the Establishment Clause" (citation omitted)).

45

practice *not* supported by a founding-era tradition *does* violate the Establishment Clause. No precedent supports that bizarre view.

The correct analysis, as the Supreme Court has explained, is to ask whether a challenged law shares the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537; *see also Hilsenrath*, 136 F.4th at 491 n.54 (asking whether plaintiffs have "prov[en] a set of facts that would have historically been understood as an establishment of religion"). That analysis—in sharp contrast to Plaintiffs' vague appeal to "tradition"—involves sifting the historical record to discern the original public meaning of "an establishment of religion." That is what we have done here.

One final note. In resolving this claim, the district court engaged in a practice one seldom sees in constitutional adjudication. It allowed "experts" in religion and legal history to opine whether there was a tradition of using the Commandments in American schools. The *Roake* district court did the same, and the now-vacated *Roake* panel approved the practice, affirming as "not clearly erroneous" the "findings" based on "expert" testimony. *Roake Panel*, 141 F.4th at 648 & n.26.

This practice is mistaken. "[A]n expert may never render conclusions of law." *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009). Yet that appears to be what the district court let happen here. Those experts are law professors who write books and law-review articles.[55] But so do other law

---

[55] *See, e.g.*, Steven K. Green, Inventing a Christian America: The Myth of the Religious Founding (Oxford Univ. Press 2015); Steven K. Green, *The Supreme Court's Ahistorical Religion Clause Historicism*, 73 Baylor L. Rev. 505 (2021); The Forgotten Founders on Religion and Public Life (Daniel L. Driesbach, Mark David Hall & Jeffrey H. Morrison eds., 2009); Mark David Hall, *America's Founders, Religious Liberty, and the Common Good*, 15 U. St. Thomas L.J. 642 (2019); Mark David Hall & Andrea Picciotti-Bayer, *Ten Commandments in the Public Square*

No. 25-50695

professors. As judges, we read their work and may find it helpful. We also review the historical sources ourselves. What we cannot do, however, is outsource to "experts" our Article III duty to decide questions of law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).[56]

What the founding generation understood as an establishment of religion is a legal question to be decided by a court, not a "fact" question to be decided by experts, no matter how credentialed. To be sure, courts must make a determined effort to grasp the relevant history bearing on that legal question. *Hilsenrath*, 136 F.4th at 491 ("This kind of historical inquiry requires serious work." (citation omitted)); *McDonald v. City of Chicago*, 561 U.S. 742, 803 (2010) (THOMAS, J., concurring) (noting "[h]istorical analysis can be difficult"). *See generally Heller*, 554 U.S. at 592–95, 600–03, 605–19. They do so by consulting articles, books, and historical sources and bringing their own independent judgment to bear on them—not by appointing an "expert," whose "findings" are insulated by clear-error review on appeal.[57]

---

*and Public Schools*, 34 WM. & MARY BILL RTS. J. 175 (2025).

[56] Plaintiffs' expert, Dr. Steven Green, provides an example of the risk of appointing someone as an expert in "legal history," as opposed to simply assessing his scholarly work on its own merits. For instance, in *Roake*, Dr. Green asserted in an affidavit that the "historical record" contradicts the claim that "the Ten Commandments 'have historical significance as one of the foundations of our legal system.'" Yet, years earlier, he wrote in a law journal that "[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition." Steven Green, *The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law*, 14 J.L. & RELIGION 525, 525 (2000).

[57] Plaintiffs would rely on this practice to resolve "fact issues" about the Ten Commandments' role in American history. But they confuse the kind of facts experts can help determine (so-called "adjudicative facts") from facts that are decided by courts (so-called "legislative facts"). *See, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (distinguishing "'legislative facts,' which . . . bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case ('adjudicative

No. 25-50695

\*   \*   \*

In sum, we conclude that S.B. 10 bears none of the hallmarks of a founding-era establishment of religion and therefore does not facially violate the Establishment Clause.

## V. Free Exercise

We turn to the district court's ruling that S.B. 10 facially violates the Free Exercise Clause. *See Nathan*, 795 F. Supp. 3d at 943, 947–48.

Defending that ruling, Plaintiffs contend the Ten Commandments displays coerce students to venerate "state-imposed and state-selected scripture" and undermine parents' rights to form their children's religious views. Defendants take the opposite view. They contend the displays do not coerce students to do or believe anything and do not authorize teachers to subvert their parents' religious teaching.

The right to freely exercise religion is not "shed . . . at the schoolhouse gate." *Mahmoud*, 606 U.S. at 545 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506–07 (1969)). A public school may violate that right by "plac[ing] unconstitutional burdens on [a student's] religious exercise," *ibid.*, or by "substantially interfer[ing] with the [student's] religious development," *id.* at 546 (quoting *Yoder*, 406 U.S. at 218). The

---

facts')" (citing Fed. R. Evid. 201(a))). As Judge Posner has explained, "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of [a challenged law]." *Ibid. See also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022) ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies."); *United States v. Skrmetti*, 605 U.S. 495, 530–31 (2025) (Thomas, J., concurring) ("The views of self-proclaimed experts do not 'shed light on the meaning of the Constitution.'" (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 272–73 (2022))).

question before us is whether S.B. 10 represents such an imposition on the consciences of Texas students or parents. The answer is no.

The parties agree that a key precedent is the recent decision in *Mahmoud v. Taylor*. In that case, a school district introduced into elementary curricula "'LGBTQ+-inclusive' storybooks . . . . designed to 'disrupt' children's thinking about sexuality and gender." *Id.* at 528–29. The books taught, for instance, that "same-sex marriage should be accepted by all as a cause for celebration," *id.* at 551, and "encourage[d] children" to abandon the view that "sex and gender are inseparable," *id.* at 552. To think otherwise, students were warned, would be "hurtful, perhaps even hateful." *Id.* at 553.

Nor did the books sit silently on school shelves. Teachers "incorporate[d] the new texts into the curriculum" and led "classroom discussion[s]" about them. *Id.* at 535. Teachers were also trained to respond to student questions. If asked about same-sex unions, they were to say: "Two men who love each other can decide they want to get married." *Id.* at 536. If students expressed views linking sex to biology, teachers were to respond: "That comment is hurtful." *Ibid.* If students asked about "transgenderism," teachers were to explain: "When we're born, people make a guess about our gender and label us boy or girl based on our body parts. Sometimes they're right and sometimes they're wrong." *Ibid.* (internal quotations omitted). Parents objecting to these lessons could not opt their children out. *Id.* at 543.

The Supreme Court held the curriculum violated parents' Free Exercise rights because it was designed to subvert children's religiously formed beliefs about sexuality and gender. *Id.* at 529–30. The lessons were coercive, the Court explained, because they "correct[ed]" children against "their parents' religious views" while also accusing "them of being 'hurtful' when they express[ed] a degree of religious confusion." *Id.* at 555. "Such

instruction 'carrie[d] with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent.'" *Ibid.* (quoting *Yoder*, 406 U.S. at 218).

Measured against *Mahmoud*, S.B. 10 falls far short of transgressing the Free Exercise Clause. The Texas law creates no religious curriculum designed to shape children's beliefs or subvert their parents' teaching. Teachers are not required or encouraged to offer religious reflections on the Ten Commandments. Nor are they told to proselytize students who ask about the displays or disagree with the Commandments. Nor are they given lesson plans instructing that certain students (say, atheist, nontheist, polytheist, or agnostic students) are to be told their beliefs are "hurtful" or "hateful." *Id.* at 553.

This means the core of a free-exercise violation—a substantial burden on religious belief or practice—is missing. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 555–58 (2021) (ALITO, J., concurring in the judgment) (surveying history of free-exercise jurisprudence). In *Mahmoud*, that burden was glaring: "instruction" challenging religiously formed beliefs about sex was "presented to young children by authority figures in elementary school classrooms." 606 U.S. at 554. S.B. 10 does nothing like that. No religious curriculum, no theistic lesson plans. All the law requires is a poster on a classroom wall. To be sure, Plaintiffs disagree with the poster's content, but that disagreement alone does not transform S.B. 10 into religious coercion—and certainly not into the compulsory sex re-education program invalidated in *Mahmoud*.

Plaintiffs nonetheless insist S.B. 10 is *worse* than the regime in *Mahmoud* because it supposedly subjects children to "scripture nearly every hour they are in school." We disagree. Plaintiffs' hyperbolic argument ignores *Mahmoud*. The Court emphasized that the indoctrination there went

"far beyond mere 'exposure'" to objectionable ideas—the school board "specifically encouraged teachers to reinforce th[e] [books'] viewpoint and to reprimand any children who disagree." *Id.* at 556. Again, we have nothing like that here. S.B. 10 neither requires nor authorizes the correction of anyone's beliefs.

Plaintiffs' premise appears to be that any "religious" or "scriptural" content in the display is, by definition, coercive for free exercise purposes. That is not the law. The proper inquiry is whether the display religiously coerces a child or undermines parental rights to direct a child's religious upbringing. *See id.* at 546–47; *see also Yoder*, 406 U.S. at 218; *Barnette*, 319 U.S. at 626–33; *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 532–36 (1925). But no case suggests that the mere presence of religious language in a school display is *ipso facto* religious coercion.

At oral argument, Plaintiffs' counsel seemed to retreat from the implications of that position. When asked whether a public school could display the Declaration of Independence—with its appeals to "Nature's God," "Creator," the "Supreme Judge of the world," and "divine Providence"—counsel agreed it could. O.A. Rec. at 48:35–49:25. Counsel gave the same answer as to Lincoln's Second Inaugural, whose overtly religious conclusion quotes Psalm 19. O.A. Rec. at 49:25–50:19. *See* Abraham Lincoln, *Second Inaugural Address*, NATIONAL CONSTITUTION CENTER (Mar. 4, 1865), https://constitutioncenter.org/the-constitution/historic-document-library/detail/abraham-lincoln-second-inaugural-address-1865 [https://perma.cc/X746-85BF] ("[A]s was said three thousand years ago, so still it must be said 'the judgments of the Lord are true and righteous altogether'" (quoting *Psalm* 19:9 (King James))).

But Plaintiffs' counsel avoided taking a position on perhaps the most dramatic consequence of their argument: its impact on the Pledge of

Allegiance. Countless public schools—including Texas's—open the day with students' reciting the Pledge. O.A. Rec. at 51:50–52:10; *see* TEX. EDUC. CODE ANN. § 25.082(b)(1)-(2) (West 2017). On Plaintiffs' view, though, how could the Pledge continue? If students are coerced merely by seeing scripture in a classroom poster, as Plaintiffs claim, what about witnessing their classmates daily recite, "one Nation, under God"? To be sure, no student can be made to recite the Pledge. *See Barnette*, 319 U.S. at 642. But Plaintiffs' view would plainly require abolishing the Pledge for everyone. In response to this, counsel could only say, "that's obviously not this case." O.A. Rec. 52:10–22; *see also id.* 53:39–53:46 ("I don't think deciding this case consistent with *Stone* controls that result.").

That leads us to the final anomaly of Plaintiffs' free exercise argument—the remedy. Plaintiffs want the displays removed altogether. *Mahmoud* did not do that, however. Parents were permitted only to opt their children out of the lessons. To abolish the lessons altogether, the Court underscored, would be to "micromanage the public school curriculum." *Mahmoud*, 606 U.S. at 568. The same was true for the Court's famous *Barnette* ruling: students were allowed to opt out of the flag salute, but the Court did not order West Virginia to strip all classrooms of the American flag. *See* 319 U.S. at 642.

Plaintiffs here ask us to go beyond *Mahmoud* and *Barnette*. They seek the "right to micromanage" what Texas schools hang on classroom walls. But neither *Mahmood* nor *Barnette* supports, let alone compels, that remedy, and Plaintiffs point to no other support.

In sum, Plaintiffs have failed to show that S.B. 10 imposes a substantial burden on their free exercise rights.

No. 25-50695

## Conclusion

We REVERSE the district court's judgment, VACATE the preliminary injunction, and RENDER judgment dismissing Plaintiffs' Establishment and Free Exercise claims.

JAMES C. HO, *Circuit Judge*, concurring:

I join in all but Part III, for the reasons stated earlier this year in *Roake v. Brumley*, 170 F.4th 292, 300 (5th Cir. 2026) (en banc) (Ho, J., concurring in the judgment). In sum, we can vacate the preliminary injunction on the merits—and uphold Ten Commandments displays in public schools under the Constitution—without addressing Plaintiffs' theory of standing or requiring any factual context to affirm the displays. No challenge to either Texas or Louisiana law could possibly succeed, because neither law comes close to imposing either an establishment of religion or a prohibition on the free exercise thereof, as originally understood by the Founders or articulated by any governing Supreme Court precedent.

Our Founders didn't just permit religion in education—they presumed that there would be religion in education. Indeed, they firmly believed that our Constitution wouldn't work without a religious people. *See*, *e.g.*, *id.* at 303–4 (collecting quotes). As President George Washington observed in his farewell address to the nation:

> Of all the dispositions and habits which lead to political prosperity, religion and morality are indispensable supports. In vain would that man claim the tribute of patriotism, who should labor to subvert these great pillars of human happiness, these firmest props of the duties of men and citizens. The mere politician, equally with the pious man, ought to respect and to cherish them. . . . Let it simply be asked: Where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths which are the instruments of investigation in courts of justice? And let us with caution indulge the supposition that morality can be maintained without religion. Whatever may be conceded to the influence of refined education on minds of peculiar structure, reason and experience both forbid us to expect that national morality can prevail in exclusion of religious principle.

It is substantially true that virtue or morality is a necessary spring of popular government.  The rule, indeed, extends with more or less force to every species of free government.  Who that is a sincere friend to it can look with indifference upon attempts to shake the foundation of the fabric?  Promote then, as an object of primary importance, institutions for the general diffusion of knowledge.  In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened.

George Washington, *Farewell Address*, Sep. 17, 1796, *in* 1 MESSAGES AND PAPERS OF THE PRESIDENTS 205, 212 (1897).

I'm pleased that the court today upholds Texas law and delighted to concur in all but Part III.

No. 25-50695

Andrew S. Oldham, *Circuit Judge*, joined by Willett, *Circuit Judge*, concurring in part:

I agree with the majority that the district court's injunction must be reversed. I further agree that, if the case is justiciable, Texas's Ten Commandments law does not violate the Constitution. Fourteen members of the court find that the case is justiciable, so the merits are before the en banc court. On the merits, I agree with the majority opinion in full.

I nevertheless write separately to express my reservations about justiciability. It is not obvious to me that these plaintiffs have standing. Their claims hinge on the mistaken premise that individuals can sue because they are offended—a proposition that is wrong as a matter of Constitutional structure and Supreme Court precedent. What's more, the plaintiffs chose to bring a facial, pre-enforcement challenge against Texas's law. That's the hardest challenge to make out. And plaintiffs fell far short of carrying their burden here.

I

This case is a textbook offended observer case. The plaintiffs' complaint objects to the fact that "the Act [is] designed to, and will, ensure that students are more likely to **observe**, absorb, accept, follow, and live by the religious directives in the Ten Commandments." ROA.78 (emphasis added). It alleges the displays will "send a marginalizing message" and pressure school children to "**observe**, mediate on, venerate, and follow the state's favored religious text." ROA.82 (emphasis added). Various plaintiffs call the text "deeply **offensive**." ROA.86 (emphasis added); ROA.89 (same). From top to bottom, the idea is that the plaintiffs (1) worry that they will one day see a poster; (2) worry that they might find that poster offensive; so (3) they invoke federal jurisdiction for protection from potential, hypothetical future offenses.

That is wrong. Article III limits the "judicial Power" to the resolution of "Cases" and "Controversies." U.S. Const. art. III. This power is a limited one. Article III authorizes courts only to "adjudge the legal rights of litigants in actual controversies." *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885). A court may not offer freestanding proclamations about the Constitution, principles of law, or the rights of parties not before the court. Instead, courts may only answer questions of law "as a necessity in the determination of [a] real, earnest and vital controversy." *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). If a court does anything else, it is exercising a power that "is not judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *United States v. Ferreira*, 54 U.S. (13 How.) 40, 48 (1851). Thus, the judicial power is limited to actual disputes between parties.

An actual dispute means plaintiffs must have a "personal stake" in an underlying case. *Raines v. Byrd*, 521 U.S. 811, 819 (1997). This personal stake means plaintiff must have a concrete, particularized, and actual or imminent injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). That requirement, the Court has explained, protects the separation of powers in our constitutional system. *Id.* at 559–60.

The plaintiffs in this suit lack that personal stake. For one, Article III requires that courts assess whether the alleged injury to the plaintiff has a "close relationship" to a harm traditionally recognized as providing a basis for suit in American courts. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). And there is no historical comparator to offended-observer standing. *See American Legion v. American Humanists Ass'n*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment); *TransUnion*, 594 U.S. at 425 (listing historic harms). Indeed, the opposite is true: "[t]he presence of a disagreement, however sharp and

acrimonious it may be, is insufficient by itself to meet Art[icle] III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

What's more, offended-observer standing cannot be reconciled with the separation of powers. Legislatures take action when citizens are offended; courts do not. Legislatures respond to social trends and political campaigns; courts do not. Courts, by contrast, are limited by the case-or-controversy requirement. *See Lujan*, 504 U.S. at 560–61. And "Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Without standing, "courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

Precedent also forecloses the plaintiffs' claims. The only Supreme Court case considering a similar claim found that there was no standing. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982). In *Valley Forge*, the plaintiffs protested the government's decision to transfer property to a religious college. *Id.* at 468. So they sued, based on information they obtained through a news release. *Id.* at 469. But the Court rejected that claim, reasoning that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury-in-fact sufficient to confer standing. *Id.* at 485.

Thus, it is little surprise that a chorus of judges from across the country have rejected offended-observer standing. *See American Legion*, 588 U. S. at 80–83 (2019) (GORSUCH, J., concurring in the judgment) (noting that the doctrine "has no basis in law," and is "deeply inconsistent . . . with many longstanding principles and precedents."); *City of Ocala v. Rojas*, 143

No. 25-50695

S. Ct. 764, 766 (2023) (THOMAS, J., dissenting from denial of certiorari); *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1335 (11th Cir. 2020) (NEWSOM, J., concurring); *Kondrat'yev v. City of Pensacola*, 903 F.3d 1169, 1175 (11th Cir. 2018) (NEWSOM, J., concurring), *cert. granted, judgment vacated*, 588 U.S. 917 (2019); *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 949 (5th Cir. 2022) (SMITH, J.); *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) (EASTERBROOK, C.J.); *Barnes-Wallace v. San Diego*, 530 F.3d 776, 795 (9th Cir. 2008) (KLEINFELD, J., dissenting); *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 497 (6th Cir. 2004) (BATCHELDER, J., dissenting); *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 231 (D.D.C. 2020) (MCFADDEN, J.). These judges recognize that the Supreme Court has never blessed the theory of standing that the plaintiffs today present.

*

At bottom, offended-observer standing contravenes our constitutional structure, Supreme Court precedent, and common sense.

II

But that is not the only problem with the plaintiffs' claims. Plaintiffs sought facial, pre-enforcement relief. Achieving success in that posture is the legal equivalent of converting a 7–10 split.[1]

Facial challenges are an uphill battle. They require a plaintiff to show that there is no set of circumstances under which a law can be validly applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is a difficult task, since a "statute may be invalid as applied to one state of facts and yet valid as

---

[1] For those affected by the decline of civic activities like bowling, *cf.* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000), a 7–10 split is the hardest spare to make.

applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). That's one reason why the Supreme Court has instructed that facial challenges are "disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 445, 450 (2008*); see also United States v. Texas*, 97 F.4th 268, 313–14 (5th Cir. 2024) (OLDHAM, J., dissenting) (making the same point).

One reason facial challenges are disfavored is that they require courts to engage in a guessing game about possible valid applications, which is a tricky task. *United States v. Raines*, 362 U.S. 17, 22 (1960). A court could mistakenly "strike down" duly-enacted legislation just because a judge could not think of every hypothetical scenario to which the statute could apply. *See ibid.*; *but see* Jonathan F. Mitchell, *The Writ of Erasure Fallacy*, 104 VA. L. REV. 933, 935–36 (2018) (explaining federal courts cannot "strike down" statutes as unconstitutional). And adjudicating hypothetical cases can be tough to reconcile with both the prohibition on hypothetical jurisdiction, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998), and also the prohibition on advisory opinions, *see Correspondence of the Justices*, *in* WILLIAM BAUDE, ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 67–69 (8th ed. 2025). These problems explain the Supreme Court's caution that facial challenges "carr[y] too much promise of premature interpretatio[n] of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004) (citation modified).

But the plaintiffs here add to the difficulty because they bring a pre-enforcement challenge. Historically, that was also hard to do. It was not until *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), that pre-enforcement challenges became something other than the exception, STEPHEN G. BREYER & RICHARD B. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 1136–37 (2d ed. 1985). But even in more recent

years, the Court has made it difficult to bring a challenge before States have even attempted to enforce the law. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497–504 (1982) (disallowing a pre-enforcement facial challenge because there was insufficient evidence about how the challenged law would be enforced). That's because adjudicating these hypothetical situations "run[s] the risk of embroiling the federal courts in the adjudication of an abstract controversy with untold numbers of hypothetical and unforeseen permutations." *Texas*, 97 F.4th at 314 (OLDHAM, J., dissenting). So, any plaintiff's pre-enforcement challenge faces a hard road.

These plaintiffs ask us to *combine* a facial and pre-enforcement challenge. Doing so requires us to consider whether these plaintiffs with a hypothetical injury about a hypothetical sign might ever face a hypothetical situation where the law is constitutional.[2] As that string of hypotheticals suggests, that claim is bound to fail.[3]

---

[2] True, Texas's law describes what the displays look like, how big they are, and where they must sit. TEX. EDUC. CODE ANN. § 1.0041(a)-(c). And true, the displays have gone into effect in non-enjoined districts. *See* Press Release, Attorney General of Texas, Attorney General Ken Paxton Instructs Texas Schools to Display the Ten Commandments in Accordance with Texas Law (August 25, 2025), https://perma.cc/WR7C-5P96. But none of that changes the fact that the plaintiffs in this suit challenged what were then non-existent, hypothetical displays. The record before this court is devoid of information about the signs that will purportedly injure the plaintiffs—unsurprising given that no such signs exist. That dearth of information shows why courts have rarely countenanced and upheld facial, pre-enforcement challenges like this one.

[3] Such issues bleed into a third potential problem with the plaintiff's claims: ripeness. We recently explained that a challenge to a similar law in Louisiana was unripe. *See Roake v. Brumley*, No. 24-30706, ___ F.4th ___, ___, 2026 WL 482555, at *4 (5th Cir. Feb. 20, 2026) (en banc). Ripeness "focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993). If offended observers are not really injured in the first place, we need not intervene to protect their rights. *Ibid.* And if these plaintiffs have never even seen the signs they hope to challenge, there is every indication

No. 25-50695

\*

Plaintiffs have no basis to invoke the federal judicial power merely because they are offended by a holy text that is a cornerstone of Western civilization. Fourteen members of the en banc court disagree with my justiciability concerns, however. And if we have jurisdiction as my esteemed colleagues find, then I agree wholeheartedly with Judge Duncan on the merits and join all but Part III of the majority opinion. Perhaps one day the Supreme Court will clarify that offended observer standing has no place in our constitutional order. But until that day, I suppose there is some solace in the fact that parents and students of *all* stripes can invoke the powers of federal courts to combat ideological indoctrination in schools. *Cf. Mahmoud v. Taylor*, 606 U.S. 522, 544 (2025).

---

their claims are not ripe, either. *See Roake*, 2026 WL 482555, at \*4.

No. 25-50695

Irma Carrillo Ramirez, *Circuit Judge*, joined by Stewart, Richman, Haynes, Graves, Higginson, and Douglas, *Circuit Judges*, dissenting:[*]

The Supreme Court long ago held that a statute nearly identical to S.B. 10 violates the Establishment Clause. But apart from that established precedent, which only it can overrule, the Supreme Court has long emphasized "the heightened concerns with protecting freedom of conscience from subtle coercive pressure" in public schools, where classroom requirements that threaten to coerce students "to support or participate in religion" implicate a "foremost hallmark of religious establishment." It has also held that the Free Exercise Clause protects against classroom requirements that threaten to "impose upon children a set of values and beliefs that are hostile to their parents' religious beliefs" and "pressure" children to "conform." Because legislation requiring the permanent fixture of religious rules in public-school classrooms, with no "educational function," violates these most basic First Amendment principles, I respectfully dissent.

## I.    The Establishment Clause

The Establishment Clause "was intended to erect 'a wall of separation between Church and State.'" *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 16 (1947) (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878)). It ordains that no federal or state government "can pass laws which aid one religion, aid all religions, or prefer one religion over another." *Id*. at 15.

---

[*] Judge Richman joins Part I of this opinion with the exception of footnote 6 and Part I.B.2. Judge Haynes joins Part I.A of this opinion.

No. 25-50695

The Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987). That vigilance must be exercised with prescribed "care and restraint" because public education is primarily in the hands of the States. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see also Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State."). Still, "a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by . . . the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." *Yoder*, 406 U.S. at 214.

The protections afforded to schoolchildren by the Establishment Clause unquestionably "implicate basic constitutional values." *Epperson*, 393 U.S. at 104. As the Supreme Court has previously explained:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools . . . ."

*Edwards*, 482 U.S. at 584 (citation modified) (alterations in original) (quoting *Ill. ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 231 (1948)). That is why a

64

religious practice may be deemed unconstitutional in the "special context of the public elementary and secondary school system," but deemed constitutional elsewhere. *See id.* at 583.

### A.　*Stone v. Graham* directly controls.

The Supreme Court's decision in *Stone v. Graham*, 449 U.S. 39 (1980), is a model of its "vigilan[ce] in monitoring compliance with the Establishment Clause in [public] schools." *See id.* at 583–84. In *Stone*, the Court struck down a Kentucky statute that required all "public elementary and secondary school[s]" to post "durable, permanent cop[ies] of the Ten Commandments," measuring "sixteen (16) inches wide by twenty (20) inches high," in every classroom. 449 U.S. at 39–40, 39 n.1 (quoting Ky. Rev. Stat. § 158.178(1) (1980)). The statute also required each display to feature "a notation concerning" its purportedly secular purpose. *Id.* at 39 n.1 (quoting Ky. Rev. Stat. § 158.178(2) (1980)).

In evaluating the plaintiffs' Establishment Clause challenge to the statute, the Supreme Court looked to the then-applicable test derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Id.* at 40. Under the *Lemon* test, (1) the challenged statute "must have a secular legislative purpose," (2) the statute's "principal or primary effect must be one that neither advances nor inhibits religion," and (3) "the statute must not foster an excessive government entanglement with religion." *Id.* (citation modified) (quoting *Lemon*, 403 U.S. at 612–613).

The Supreme Court held that, under *Lemon*'s first prong, the secular purpose described in the Kentucky statute was "not sufficient to avoid conflict with the First Amendment." *Id.* at 41.

> The *pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature*. The Ten Commandments are undeniably a sacred text in the Jewish and

Christian faiths, and *no legislative recitation of a supposed secular purpose can blind us to that fact*. The Commandments do not confine themselves to arguably secular matters . . . . Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.

*Id.* at 41–42 (emphasis added). The Court also emphasized the Kentucky statute's coercive effect:

This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like. Posting of religious texts on the wall serves no such educational function. If the posted copies of the Ten Commandments *are to have any effect at all*, it will be *to induce* the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments.

*Id.* at 42 (citation modified) (emphasis added).

It was not "significant that the Bible verses involved in [*Stone* were] merely posted on the wall, rather than read aloud." *Id.* (distinguishing *Abington School District v. Schempp*, 374 U.S. 203 (1963), and *Engel v. Vitale*, 370 U.S. 421 (1962), both of which held that policies requiring prayer readings in public schools violated the Establishment Clause). Nor did it "matter that the posted copies of the Ten Commandments [were] financed by voluntary private contributions," because "the mere posting" of the Ten Commandments "under the auspices of the legislature provides the 'official support of the State . . . Government' that the Establishment Clause prohibits." *Id.* (quoting *Schempp*, 374 U.S. at 222). As a result, the Supreme Court "conclude[d] that [the Kentucky statute] violate[d] the first part of the *Lemon* . . . test, and thus the Establishment Clause." *Id.* at 42–43.

The Kentucky statute in *Stone* and S.B. 10 are substantively identical. Both require that the Ten Commandments be permanently displayed in every public elementary and secondary school classroom in the state using comparable minimum size requirements, and that the displays be financed by private donations. *Compare* Tex. Educ. Code § 1.0041, *with* Ky. Rev. Stat. § 158.178 (1980). Although, unlike the Kentucky statute, S.B. 10 does not require any accompanying notation about the display's purpose, this is not significant to the analysis under *Stone*. It held the Kentucky statute violated the Establishment Clause *despite* the notation—not *because* of it. *See Stone*, 449 U.S. at 42. And, as with the Kentucky statute, S.B. 10 does not require that the Ten Commandments be "integrated into the school curriculum." *See id. Stone* is on all fours with this case, and under *Stone*, S.B. 10 violates the Establishment Clause.

### 1.    *The Supreme Court has not overruled* Stone.

No Supreme Court decision has overturned *Stone*. It is well-established that it is the "[Supreme] Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (citation modified); *see also Lefebure v. D'Aquilla*, 15 F.4th 650, 660 (5th Cir. 2021) ("[T]he only court that can overturn a Supreme Court precedent is the Supreme Court itself."). It "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Rather, "the Supreme Court abrogates its cases with a bang." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 405–06 (5th Cir. 2020) ("Because *McDonald* has direct application in this case, the Court of Appeals should follow it, leaving to the High Court the prerogative of overruling its own decisions." (citation modified)).

"If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions,

the Court of Appeals should follow the case which directly controls . . . ." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Inferior courts also "should [not] conclude [the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (criticizing a lower court for treating a Supreme Court decision as being "implicitly overruled," as lower courts should follow controlling precedent even if it "is in tension with some other line of decisions" (citation modified)).

This court regularly abides by these principles. *See, e.g., United States v. Hernandez*, 159 F.4th 425, 427 n.1 (5th Cir. 2025) (per curiam) ("[W]e lack the authority to recognize 'implicit' overruling by the [Supreme] Court of its precedent."); *Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (en banc) ("[E]ven if . . . we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it . . . ."); *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549–50 (5th Cir. 2020) (per curiam) ("[T]he factual underpinning of the controlling Supreme Court decision has changed, but that does not grant a court of appeals license to disregard or overrule that precedent.").[1] Even when governing Supreme Court cases "heavily rel[y] on cases" that have since been "overruled" or had "their reasoning" "seriously called . . . into question," those governing cases "remain controlling law." *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 755 (5th Cir. 2021). Put simply, "[o]ur job, as an inferior court, is to

---

[1] *See also United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014) (noting that this court "may not blaze a new constitutional trail simply" because certain "authorities impliedly undermine" binding Supreme Court authority (citation modified)); *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 474 n.2 (5th Cir. 2001) (JOLLY, J., dissenting on the question of standing) (observing that, under *Rodriguez de Quijas*, "we cannot blithely assume . . . the [Supreme] Court['s] inten[t]").

No. 25-50695

adhere strictly to Supreme Court precedent, whether or not we think a precedent's best days are behind it." *United States v. Vargas*, 74 F.4th 673, 683 (5th Cir. 2023).

Without any case demonstrating that the Supreme Court has exercised its lone "prerogative" to overturn *Stone*, *Bosse*, 580 U.S. at 3, this court continues to be bound by that case even if it "is in tension with some other line of decisions," *Mallory*, 600 U.S. at 136, and even if, as Defendants argue, "more recent cases" may appear to "overrule" *Stone* "by implication." *See Agostini*, 521 U.S. at 237.

### 2. *The Supreme Court has continued to recognize* Stone*'s viability even while sidestepping* Lemon.

Following *Stone*, the Supreme Court applied *Lemon* variably in Establishment Clause cases. *Compare McCreary Cnty. v. ACLU*, 545 U.S. 844, 881 (2005) (applying *Lemon* and finding an Establishment Clause violation where the Ten Commandments were displayed in Kentucky courthouses), *with Van Orden v. Perry*, 545 U.S. 677, 692 (2005) (plurality opinion) (declining to apply *Lemon* and finding no Establishment Clause violation where the Ten Commandments were displayed at the Texas State Capitol). In *Van Orden*, a plurality of the Court cast doubt on *Lemon*. *See* 545 U.S. at 685–86 ("Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds."). It opted to instead apply an analysis "driven . . . by our Nation's history." *See id.*[2]

---

[2] JUSTICE BREYER took a similar approach in his controlling concurring opinion. *Van Orden*, 545 U.S. at 700 (BREYER, J., concurring in the judgment). Rather than apply *Lemon*, he concluded the display was constitutional based on "consideration of the basic purposes of the First Amendment's Religion Clauses themselves." *Id.* at 703–04.

No. 25-50695

In *Van Orden*, despite applying a historical approach instead of *Lemon*, the plurality cited *Stone* as a "limit[] to the display of religious messages or symbols" and "an example" of the Court's "vigilan[ce] in monitoring compliance with the Establishment Clause in . . . schools." *Id.* at 690–91.[3] "The placement of the Ten Commandments monument on the Texas State Capitol grounds," *Van Orden* explained, is "*a far more passive use of those texts* than was the case in *Stone*." *Id.* at 691 (emphasis added). This is because "[t]he display [was] not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." *Id.* at 703 (Breyer, J., concurring in the judgment) (citing *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *Stone*, 449 U.S. 39). And, unlike in *Van Orden*, "the text" of the Ten Commandments in *Stone* "confronted elementary school students *every day*." *Id.* at 691 (plurality opinion) (emphasis added).

*Van Orden* recognized *Stone*'s viability, notwithstanding *Lemon*, given the special "concerns that arise in the context of public elementary and secondary schools." *Id.* (quoting *Edwards*, 482 U.S. at 585).[4]

---

[3] Members of the Supreme Court have often observed the distinct operation of the Establishment Clause in the *Stone* context. *See, e.g.*, *McCreary*, 545 U.S. at 908 (Scalia, J., dissenting) ("If, as discussed above, the Commandments have a proper place in our civic history, even placing them by themselves can be civically motivated—especially when they are placed, *not in a school* (as they were in the *Stone* case upon which the Court places such reliance), but in a courthouse." (emphasis added)); *City of Elkhart v. Books*, 532 U.S. 1058, 1060–61, (2001) (Rehnquist, C.J., dissenting) ("We have been particularly vigilant in monitoring compliance with the Establishment Clause in [the *Stone*] context, where the State exerts great authority and coercive power over students through mandatory attendance requirements." (citation modified)).

[4] *See also* Ira C. Lupu & Robert W. Tuttle, *The Ten Commandments in Louisiana Public Schools: A Study in the Survival of Establishment Norms*, 100 Chi.-Kent L. Rev. 601, 615 (2025) (observing that, "[s]ignificantly, the *Van Orden* plurality distinguished *Stone v. Graham* on grounds that speak directly to the" context of state legislation requiring

No. 25-50695

### 3.     *Kennedy v. Bremerton School District did not overturn* Stone.

Despite the fact that no Supreme Court decision has expressly overturned *Stone*, Defendants assert that it is no longer good law because *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), "abandoned" *Lemon*.

In *Kennedy*, a high school football coach "lost his job . . . because he knelt at midfield after games to offer a quiet prayer of thanks." 597 U.S. at 512–13. The coach argued that the school district's actions violated the First Amendment's Free Speech and Free Exercise Clauses. *Id.* at 520.

The Supreme Court initially concluded that the coach's speech was protected under the First Amendment. *Id.* at 524–31. The burden therefore shifted to the school district to show that its actions were nevertheless warranted. *Id.* at 531–32. To meet its burden, the school district maintained that "its suspension of Mr. Kennedy was essential to avoid a violation of the Establishment Clause" because, under "*Lemon* and its progeny," a "reasonable observer could conclude that the government ha[d] endorsed religion." *Id.* at 532–34 (citation modified). The Supreme Court disagreed, explaining that it "long ago abandoned *Lemon* and its endorsement test offshoot." *Id.* at 534. As in *Van Orden*, it instead applied a history-based approach to the Establishment Clause:

> In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by "reference to historical practices and understandings." "[T]he line" that courts and governments "must draw between the permissible and the impermissible" has to "accor[d] with history and faithfully reflec[t] the

---

Ten Commandments displays in classrooms).

No. 25-50695

         understanding of the Founding Fathers." An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some "exception" within the "Court's Establishment Clause jurisprudence."

*Id.* at 535–36 (citation modified) (alterations in original) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 575–77 (2014)).

        Applying this framework, the Court explained that the "government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'" *Id.* at 537 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). Nor may it "coerce anyone to attend church," *id.* (citation modified), or "force citizens to engage in 'a formal religious exercise.'" *Id.* (quoting *Lee*, 505 U.S. at 589). The Court also held that "*coercion along these lines* was among the *foremost hallmarks of religious establishments* the framers sought to prohibit when they adopted the First Amendment." *Id.* (emphasis added). Because the coach's actions in *Kennedy* did not involve this kind of "problematic[] coerci[on]," the Court concluded the Establishment Clause was not implicated. *Id.* at 539–42.

        Although *Kennedy* "abandoned *Lemon* and its endorsement test offshoot," it did not cite, much less purport to "abandon" or overturn, *Stone*—despite the opportunity to do so. *See id.* at 534.[5] This court must follow Supreme Court precedent even if that "precedent . . . appears to rest

---

[5] The Court has spoken with clarity in other contexts. *Compare Kennedy*, 597 U.S. at 534 (stating only that the Supreme Court had "long ago abandoned *Lemon*"), *with W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("The decision of this Court in *Minersville School District v. Gobitis* and the holdings of those few per curiam decisions which preceded and foreshadowed it are overruled . . . ."), *and Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist.*, 411 U.S. 345, 350 n.8 (1973) ("Insofar as former decisions . . . may indicate a narrower reading of the custody requirement, they may no longer be deemed controlling.").

No. 25-50695

on reasons rejected in some other line of decisions." *Rodriguez de Quijas*, 490 U.S. at 484. As a result, this court is bound by *Stone* regardless of whether it applied *Lemon*—i.e., "appears to rest on reasons rejected in" *Kennedy*—because *Stone* "has direct application in" this case. *See id.*[6]

Nor did *Kennedy* purport to overturn the full extent of *Lemon*'s "progeny."[7] In fact, *Kennedy* itself relied on *Lemon*'s progeny. *See id.* at 541–42. It distinguished the factual circumstances in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). *Id. Santa Fe* held, in accordance with *Lemon*, that a school policy of prayer before football games violated the Establishment Clause because "the simple enactment of this policy, with the *purpose* and *perception of school endorsement* of student prayer, was a constitutional violation." 530 U.S. at 314–16 (emphasis added). *Kennedy* also distinguished *Lee v. Weisman*, in which the Court explicitly rejected the invitation to "reconsider" *Lemon. Lee*, 505 U.S. at 587. Similar to *Santa Fe*, *Lee* held that a school policy that permitted clergy members to recite prayers at school graduations was unconstitutional. *Id.* at 586–87.

Although *Kennedy* characterized *Santa Fe* and *Lee* as cases where the Supreme Court found state action "to be problematically coercive," it did

---

[6] Notably, *Stone* also relied on *Schempp* and *Engel*, two cases that pre-dated *Lemon* by several years. *See Stone*, 449 U.S. at 41–42. And as JUDGE DENNIS has explained, *Schempp*'s "foundational principle"—that "a law must have a secular legislative purpose to withstand the strictures of the Establishment Clause"—continues to "bind[] us" because *Kennedy* did not address *Schempp* or "the secular-purpose requirement." *Roake v. Brumley*, 170 F.4th 292, 307 (5th Cir. 2026) (DENNIS, J., dissenting); *see also* Lupu & Tuttle, *supra* note 4, at 619–20 (observing *Stone*'s continued vitality because, among other things, the "requirements pertaining to purpose and effects do not originate with *Lemon*").

[7] The only direct reference to *Lemon*'s "progeny" in *Kennedy* is its recognition that that the school district and Ninth Circuit had "relied on *Lemon* and its progeny." 597 U.S. at 534. *Groff v. DeJoy* also did not speak to *Lemon*'s progeny—it simply acknowledged that *Lemon* had been "abrogated." 600 U.S. 447, 460 (2023).

not purport to provide an exhaustive list of *Lemon*-era cases that fall under that category. *See Kennedy*, 597 U.S. at 541. Notably, *Stone* too rested on problematic coercion: it held that "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to *induce* the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments."[8] *Stone*, 449 U.S. at 42 (emphasis added); *see also* Lupu & Tuttle, *supra* note 4, at 620 (noting that *Stone*, like the school prayer cases, "hinged to a concern about state-sponsored religious indoctrination of young, impressionable, and captive audiences"). *Kennedy* did not directly overrule *Stone*, and "we lack the authority to recognize [an] 'implicit' overruling" of all of *Lemon*'s "progeny," especially where the Supreme Court itself continues to rely on those cases. *See Hernandez*, 159 F.4th at 427 n.1; *see also Pizza Hut L.L.C. v. Pandya*, 79 F.4th 535, 542 (5th Cir. 2023) ("[T]he Supreme Court has been careful to instruct lower courts not to read new pronouncements as overruling any related precedent.").

Even accepting Defendants' position that *Kennedy*'s critique of *Lemon* indicates *Stone*'s eventual downfall, they essentially invite this court to "get ahead of the Supreme Court and read tea leaves to predict where it might end up." *See United States v. Mecham*, 950 F.3d 257, 265 (5th Cir. 2020). But we are to "follow [the Supreme Court's] precedents even when," as Defendants suggest, "we don't expect the Court itself to do so." *United States v. Cockerham*, 162 F.4th 500, 510 (5th Cir. 2025) (Ho, J., concurring).[9]

---

[8] To "induce" is "to move by persuasion or influence." *Induce*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/QEX7-7QGJ.

[9] Defendants argue that, even if *Stone* remains good law, it does not control the outcome of this case because, unlike *Stone*, the "legislative history demonstrates that the Texas Legislature had numerous secular purposes in passing S.B.10." This court need not delve into the purpose behind S.B. 10. The Supreme Court has already held that "[t]he *pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in*

No. 25-50695

\*    \*    \*

Whatever the fate of *Stone* may be, "as an inferior court," we must "adhere strictly to" it until the Supreme Court says otherwise. *See Vargas*, 74 F.4th at 683. And under *Stone*, S.B. 10 is unconstitutional.[10]

### B.    S.B. 10 is also unconstitutional under *Kennedy*'s history-based approach.

*Stone* is dispositive. But even if it was not, S.B. 10 independently violates the Establishment Clause under *Kennedy*.

#### 1.    Kennedy *reaffirmed that the Establishment Clause prohibits religious coercion.*

Defendants assert that, under *Kennedy*, there "are six identified 'hallmarks' of religious establishments that the Establishment Clause was adopted to prohibit," and if a challenged practice does not "resemble" one

---

*nature*. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and *no legislative recitation of a supposed secular purpose can blind us to that fact.*" *Stone*, 449 U.S. at 41 (emphasis added). Defendants also assert that holding that S.B. 10 violates the Establishment Clause results in a rule of law that disfavors religion and religious expression. As the Supreme Court has explained, "[n]othing . . . could be more wrong." *Engel*, 370 U.S. at 433–35. "It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Id.* at 435.

[10] In addition to the district court in this case, every other district court to independently consider whether statutes requiring the permanent display of the Ten Commandments in public schools are constitutional has concluded that *Stone* remains binding and dispositive. *See Stinson v. Fayetteville Sch. Dist. No. 1*, No. 5:25-Cv-5127, 2026 WL 736964, at \*7 (W.D. Ark. Mar. 16, 2026) (permanently enjoining enforcement of an Arkansas statute similar to S.B. 10); *Ringer v. Comal Indep. Sch. Dist.*, 809 F. Supp. 3d 672, 681 (W.D. Tex. 2025) (preliminarily enjoining enforcement of S.B. 10 as to numerous Texas school districts); *Roake v. Brumley*, 756 F. Supp. 3d 93, 116–17 (M.D. La. 2024) (preliminarily enjoining enforcement of a Louisiana statute similar to S.B. 10), *aff'd*, 141 F.4th 614 (5th Cir. 2025), *rev'd en banc*, 170 F.4th 292 (5th Cir. 2026) (concluding only that the dispute was not ripe).

of these hallmarks, there is no constitutional violation. Plaintiffs assert that *Kennedy* only held that the Establishment Clause prohibits religious coercion, and that it did not adopt six particular hallmarks.

*Kennedy* made clear that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings'" and that the analysis must "focus[] on original meaning and history." 597 U.S. at 535–36 (quoting *Galloway*, 572 U.S. at 576). Under that history-based approach, the Court held "*coercion . . .* was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537 (emphasis added).

*Kennedy* specifically placed "coercion along the[] lines" of that found in *Lee* among those "foremost hallmarks." *See Kennedy*, 597 U.S. at 537. *Lee*, which undisputedly remains binding, concerned an Establishment Clause challenge to a school district policy that "permitted" principals to "invite" clergy members to recite prayers at graduations. 505 U.S. at 580. Attendance at graduation was "voluntary" and not "a condition for receipt of [a] diploma." *Id.* at 583, 586. Participation in the "prayer" was also a "choice" for attendees. *Id.* at 591. In the context of a school graduation—which the Court found is "analogous to the classroom setting" and carries a "heightened" risk of "subtle coercive pressure"—*Lee* concluded the policy inflicted "public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the [prayers]." *Id.* at 592–93, 596. "This pressure, though subtle and indirect, [could] be as real as any overt compulsion." *Id.* The policy, therefore, "put school-age children who objected" to the prayers "in an untenable position." *Id.* at 590. They were placed "in the dilemma of participating [in the prayers], with all that implies, or protesting." *Id.* at 593. *Lee* held "the State may not, consistent with the Establishment Clause, place primary and secondary school children

in this position," because the "government may not coerce anyone to support or participate in religion or its exercise." *Id*. at 587, 593.

*Kennedy* and *Lee* are consistent with a long line of cases that have "observed" the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *See id.* at 592 (collecting cases); *see also Galloway*, 572 U.S. at 590 (distinguishing cases arising in the public-school context from cases concerning "mature adults"); *Mahmoud v. Taylor*, 606 U.S. 522, 554–55 (2025) ("[W]e have recognized the potentially coercive nature of classroom instruction of this kind. . . . Young children . . . are often impressionable and implicitly trust their teachers." (citation modified)); *Edwards*, 482 U.S. at 583–84 ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. . . . Students in such institutions are impressionable and their attendance is involuntary."). The threat of "indirect coercion," the Court has explained, "may not be limited to the context of schools, *but it is most pronounced there*." *Lee*, 505 U.S. at 592 (emphasis added). "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Id.* This is because, in the public-school context, the "State exerts great authority and *coercive power* through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards*, 482 U.S. at 584 (emphasis added).

The Supreme Court has focused on these precise features, which are unique to the "classroom context," *Van Orden*, 545 U.S. at 690 (plurality opinion), to distinguish the display of the Ten Commandments on public grounds from their display "on the grounds of a public school." *See id.* at 703

(BREYER, J., concurring in the judgment). It has likewise highlighted the "[i]nherent differences between the public school system and a session of a state legislature"—the "influence and force" in the school context is "far greater." *Lee*, 505 U.S. at 596–97. In short, the Supreme Court's "decisions . . . require [this court] to distinguish the public school context" when evaluating Establishment Clause claims. *Id*. at 597.[11]

### 2. Kennedy *did not cabin the Establishment Clause to six exclusive "hallmarks."*

Defendants assert that *Kennedy* adopted an exclusive "hallmarks" test based on JUSTICE GORSUCH's concurrence in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), and that S.B. 10 is constitutional because it does not implicate any of these specific hallmarks.

In a footnote, *Kennedy* cited, among other opinions and authorities, a portion of JUSTICE GORSUCH's *Shurtleff* concurrence "discussing coercion and certain other historical hallmarks of an established religion." *Kennedy*, 597 U.S. at 537 n.5 (citing *Shurtleff*, 596 U.S. at 285–86 (GORSUCH, J., concurring in the judgment)). The hallmarks discussed by JUSTICE GORSUCH are: the government (1) "exerted control over the doctrine and personnel of the established church"; (2) "mandated attendance in the established church and punished people for failing to participate"; (3) "punished dissenting churches and individuals for their religious exercise"; (4) "restricted political participation by dissenters"; (5) "provided financial support for the established church, often in a way that

---

[11] Unlike other government buildings where the Ten Commandments are displayed, like the Supreme Court and National Archives, school is an "inherently . . . instructional setting," where "students' emulation of teachers as role models and . . . susceptibility to peer pressure . . . raise[s] special concerns regarding state interference." *See Lee*, 505 U.S. at 643 (SCALIA, J., dissenting).

No. 25-50695

preferred the established denomination over other churches"; and (6) "used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Shurtleff*, 596 U.S. at 286 (GORSUCH, J., concurring in the judgment).[12]

The Supreme Court, however, did not directly quote or apply the six specific hallmarks outlined in the non-binding *Shurtleff* opinion, much less adopt them as the exclusive Establishment Clause test.[13] Instead, the Court cited the *Shurtleff* concurrence only to help illustrate that "*coercion . . . was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.*" *Kennedy*, 597 U.S. at 537 (emphasis added).[14]

---

[12] Notably, JUSTICE GORSUCH emphasized that "[m]ost of these hallmarks reflect forms of 'coerc[ion]' regarding 'religion or its exercise.'" *Shurtleff*, 596 U.S. at 286 (GORSUCH, J., concurring in the judgment) (alterations in original) (quoting *Lee*, 505 U.S. at 587).

[13] No other circuit has held that the hallmarks from JUSTICE GORSUCH's *Shurtleff* concurrence represent the exclusive Establishment Clause test. In *Firewalker-Fields v. Lee*, the Fourth Circuit declined to undertake the Establishment Clause analysis in the first place, instead remanding the issue so that the district court could "take the first pass at addressing the new [*Kennedy*] framework." 58 F.4th 104, 121–22 (4th Cir. 2023). And although the Third Circuit in *Hilsenrath on behalf of C.H. v. School District of Chathams* evaluated an Establishment Clause claim by referencing the hallmarks, it also acknowledged that "*Shurtleff* did not enumerate an exhaustive list" of Establishment Clause violations. 136 F.4th 484, 491 & n.54 (3d Cir. 2025). Notably, consistent with *Kennedy*, its analysis largely focused on *coercion*. *See id.* at 491–92.

[14] As one scholar put it, under *Kennedy*, "[c]ourts reviewing state Ten Commandments mandates should . . . ask whether the challenged law shares the coercive structure of historical religious establishments," such as whether the practice "confront[s] a captive audience," compels those with sincere religious beliefs "to respond in a manner that reveals those beliefs," and "occur[s] in a setting where social consequences might attach to dissent." Paul E. McGreal, *Ten Commandments Cases: Learning from Reformation Coercion*, 124 MICH. L. REV. ONLINE 69, 83 (2026); *see also* NATHAN S. CHAPMAN & MICHAEL W. MCCONNELL, AGREEING TO DISAGREE: HOW THE ESTABLISHMENT CLAUSE PROTECTS RELIGIOUS DIVERSITY AND FREEDOM

No. 25-50695

### 3.      *S.B. 10 is "problematically coercive."*

Here, S.B. 10 requires the permanent display of the Ten Commandments in all public-school classrooms. These displays—required to be visible to students "from anywhere in the classroom"—are not passive. *See* Tex. Educ. Code § 1.0041(b)(1). The Supreme Court has already explained that if they "are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone*, 449 U.S. at 42. To argue otherwise ignores the unique context of placing religious scripture in public-school classrooms where, "given the impressionability of the young, government must exercise particular care in separating church and state." *See Van Orden*, 545 U.S. at 703 (Breyer, J., concurring in the judgment); *see also Lee*, 505 U.S. at 597 ("Our decisions . . . require us to distinguish the public school context."); Chapman & McConnell, Agreeing to Disagree, *supra* note 14, at 145 ("Schools are an inherently coercive environment. Attendance is compulsory, alternatives are costly, and the atmosphere is one of obedience."). It also ignores the self-evident nature of the Ten Commandments: they "command" the reader to follow certain directives. Those directives are largely religious in nature.[15] "[I]mpressionable" schoolchildren, who are subject to the State of Texas's "great authority and coercive power" and who often "emulate[e] [their] teachers as role models," *Edwards*, 482 U.S. at 584, will undoubtedly read these Commandments and

---

of Conscience 156 (2023) [hereinafter Chapman & McConnell, Agreeing to Disagree] (noting *Kennedy* "did not greenlight acts that have coercive effect, and it left in full force the principles of [the school prayer cases]").

[15] For example, the version of the Ten Commandments required by S.B. 10 states: "Thou shalt have no other gods before me"; "Thou shalt not make to thyself any graven images"; "Thou shalt not take the Name of the Lord thy God in vain"; and "Remember the Sabbath day, to keep it holy." Tex. Educ. Code § 1.0041(c).

feel—at the least—"subtle coercive pressure" to venerate or obey them. *See Lee*, 505 U.S. at 592.

The "subtle coercive pressure" Texas students will feel is precisely the type that *Lee* identified and that *Kennedy* labeled "problematic[]" under the Establishment Clause. *See Kennedy*, 597 U.S. at 541. And S.B. 10 implicates a far greater risk of putting students "who object[]" to the Ten Commandments "in an untenable position." *See Lee*, 505 U.S. at 590. Unlike *Lee*, which concerned prayer only at a graduation ceremony that students were not required to attend or participate in, students' attendance at school is mandatory, and they will be subjected to religious scripture *all day every day*—with no educational function. As "commandments," that religious scripture is also inherently coercive, more so than the "nonsectarian" invocations and benedictions in *Lee* that focused on "inclusiveness and sensitivity." *See id.* at 581–82 (citation modified).[16]

"[T]he State may not, consistent with the Establishment Clause, place primary and secondary school children in [the] position" of reading and venerating the Ten Commandments, "with all that implies," or "protesting." *See id.* at 593.[17] To avoid this "dilemma," *id.*, parent-Plaintiffs will be forced

---

[16] Requiring the permanent fixture of the Ten Commandments in classrooms is also far different, and far more coercive, than requiring students to recite the Pledge of Allegiance, which includes the phrase "under God." To begin, Texas students are permitted to opt out of reciting the Pledge—uttered only once per day, *see* TEX. EDUC. CODE § 25.082(c), whereas S.B. 10 does not allow students to opt out of confronting the Ten Commandments—day in and day out. And, as this court has described it, the Pledge is "nonsectarian" and "patriotic," with a "minimal" "religious component." *See Croft v. Perry*, 624 F.3d 157, 164–66, 170 (5th Cir. 2010) (concerning the Pledge to the Texas flag, which includes a reference to "God" that "was designed to mirror the [one] found in the [P]ledge of [A]llegiance to the United States flag"). S.B. 10's Protestant—i.e., sectarian—version of the Ten Commandments, by contrast, is plainly religious scripture untethered to educational or patriotic function.

[17] For example, "a Catholic student viewing the Protestant version of the Ten

to incur the costs of sending their children to private school, or avoid school altogether and risk fines and prosecution under Texas's compulsory attendance laws. *See* TEX. EDUC. CODE §§ 25.085, 25.093.[18] But "[p]ublic education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their [First Amendment rights]." *Mahmoud*, 606 U.S. at 530 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). If the graduation prayer in *Lee* is "problematically coercive," it cannot follow that the permanent fixture of the Ten *Commandments* in all public-school classrooms is not. *See Kennedy*, 597 U.S. at 541.

The coercive impact of S.B. 10 is also in no way mitigated by the fact that Texas students will *read* the scripture rather than *hear* it. *See Stone*, 449 U.S. at 42 ("Nor is it significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud . . . ."). To argue otherwise is to suggest that the students in *Schempp* and *Lee* could simply cover their ears during the prayer recitations to avoid a constitutional issue. But just as *Schempp* held that a school-prayer statute violated the Establishment Clause notwithstanding students' ability to "absent" themselves, 374 U.S. at 207, and just as *Lee* acknowledged that, despite the *appearance* of voluntariness, "participation in the state-sponsored religious activity [was] in a fair and real sense obligatory," 505 U.S. at 586, S.B. 10 is not absolved of coercive effect simply because the displays are silent and students can supposedly look away.[19] Importantly, forced recitation of religious scripture is not the mark of

---

Commandments faces the . . . dilemma" of "acquiesc[ing] to" what they sincerely believe is "theological error or speak[ing] up and mark[ing] themselves as different." McGreal, *supra* note 14, at 78.

[18] In this way, S.B. 10 also implicates the *Shurtleff* hallmarks by "punish[ing] dissent[ers]." *See Shurtleff*, 596 U.S. at 286 (GORSUCH, J., concurring in the judgment).

[19] *See* McGreal, *supra* note 14, at 79–80 (observing that, because students objecting

No. 25-50695

an Establishment Clause violation. *See, e.g.*, *id.* at 591 (finding an Establishment Clause violation even where students' participation in prayer was a "choice").[20] It is whether the challenged state action carries the "risk" of "coerc[ing] anyone to support or participate in religion or its exercise." *See id.* at 587, 592; *see also Shurtleff*, 596 U.S. at 286 (GORSUCH, J., concurring in the judgment) (observing that "coercion regarding religion or its exercise" encompasses "founding-era religious establishments" (citation modified)). It does not matter whether this threatened coercion is "overt." *Lee*, 505 U.S. at 593. Especially in the distinct public-school context, "subtle and indirect" pressure "can be as real as any overt compulsion." *Id.*[21]

\*    \*    \*

Because Plaintiffs "will be . . . induce[d] . . . to read, meditate upon, [and] perhaps to venerate and obey, the Commandments," *Stone*, 449 U.S.

---

to the Ten Commandments based on sincerely held religious beliefs "view the display as communicating religious error," to "suggest[] students merely 'look away' asks them to affirm a false teaching that the government has presented as religious truth").

[20] *See also* Lupu & Tuttle, *supra* note 4, at 636 ("A legal requirement that students recite the Ten Commandments is unnecessary to show a violation. Repetitive and conspicuous exposure to a sacred text, at the state's insistence, is enough.").

[21] Because S.B. 10 violates the Establishment Clause under *Stone* and *Kennedy*, whether the statute also implicates unconstitutional denominational preference is not substantively addressed here. But, as JUDGE HIGGINSON explained in his dissenting opinion in *Roake*, and as expanded upon in his dissenting opinion in this case, "the Supreme Court has been especially vigilant against denominational discrimination inside the schoolhouse gate." *Roake*, 170 F.4th at 309 (HIGGINSON, J., dissenting). And legislation requiring the permanent fixture of a state-selected Protestant version of the Ten Commandments in all public schools "risks pitting religions against each other—an evil the Framers sought to protect against when they wrote into the original Constitution the No Religious Test Clause disestablishment imperative." *Id.* at 310–11, 311 n.10 (explaining that "the No Religious Test Clause's fundamental purpose was to put all sects on the same footing" (citation modified)).

at 42, which implicates a "foremost hallmark[] of religious establishment," *Kennedy*, 597 U.S. at 537, S.B. 10 facially violates the Establishment Clause.[22]

## II.   THE FREE EXERCISE CLAUSE

"The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice . . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). The Supreme Court has also "long recognized the rights of parents to direct the religious upbringing of their children," which—under the Free Exercise Clause—is "violated by

---

[22] Nor does "history show" that requiring the Ten Commandments to be posted in all public-school classrooms "is permitted" under the Establishment Clause, or that this practice "could coexist with the principles of disestablishment and religious freedom." *See Galloway*, 572 U.S. at 577–78 (citation modified); *cf. Yoder*, 406 U.S. at 232 (observing instead that "[t]he history and culture of Western civilization reflect a strong tradition of *parental* concern for the nurture and [religious] upbringing of their children," which is "established beyond debate as an enduring American tradition" (emphasis added)). After all, "[p]ublic education was virtually nonexistent at the time the Constitution was adopted." *Edwards*, 482 U.S. at 583 n.4; *see also Schempp*, 374 U.S. at 238 (BRENNAN, J., concurring) ("[T]he structure of American education has greatly changed since the First Amendment was adopted. In the context of our modern emphasis upon public education available to all citizens, any views of the eighteenth century as to whether the exercises at bar are an 'establishment' offer little aid to decision."); *Morse v. Frederick*, 551 U.S. 393, 411 (2007) (THOMAS, J., concurring) (noting "public education" did not "proliferate[]" until "the early 1800's" (citing WILLIAM J. REESE, AMERICA'S PUBLIC SCHOOLS: FROM THE COMMON SCHOOL TO "NO CHILD LEFT BEHIND" 11–12 (2005))). And, as Plaintiffs allege and the record evidence supports, there is no longstanding tradition of permanently displaying the Ten Commandments in public-school classrooms, nor were they otherwise a historically prominent part of early American public education. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25 n.6 (2022) ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *Yoder*, 406 U.S. at 209 (relying on expert testimony by "scholars on religion and education" in a religious liberty case). Because—in addition to being problematically coercive under *Kennedy*—the permanent posting of the Ten Commandments in public-school classrooms does not fit within a broader founding-era tradition, S.B. 10 violates the Establishment Clause.

government policies that substantially interfere with the religious development of children." *Mahmoud*, 660 U.S. at 546 (citation modified).

The government, however, "is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Id.* at 564. Where a "burden on religious exercise is found," courts generally ask two questions. *Id.* First, is "the burdensome policy . . . neutral and generally applicable[?]" *Id.* Second, if the policy is not neutral, can the policy survive strict scrutiny? *Id.* Notably, courts can bypass the first question and proceed directly to the strict scrutiny analysis where the policies "'substantially interfer[e] with the religious development' of the parents' children" and "pose 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill in their children." *See id.* at 564–65 (alteration in original) (quoting *Yoder*, 406 U.S. at 218).

In *Mahmoud*, a school board approved five "'LGBTQ+-inclusive' texts for use in the . . . curriculum" for elementary school students. 606 U.S. at 533. The board did not permit students to opt out, causing several parents to challenge the "no-opt-out policy" under the Free Exercise Clause. *Id.* at 537–39, 543. The Supreme Court held that the policy "substantially interfere[d] with the religious development of [the plaintiffs'] children" because the books were "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 550. According to the Court, the books' contents "impose[d] upon children a set of values and beliefs that [were] 'hostile' to their parents' religious beliefs" and pressured children to conform. *Id.* at 554 (quoting *Yoder*, 406 U.S. at 211). The "danger to the free exercise of religion" presented by the books was "exacerbated by the fact that [they] would] be presented to young children by authority figures in elementary school classrooms." *Id.* at 554 (citation modified).

No. 25-50695

Given the "character" of the burden, *Mahmoud* proceeded directly to the strict scrutiny inquiry—bypassing the question of whether the board's policy was neutral and generally applicable. *Id.* at 565. Although the Court credited the board's assertion of a compelling interest—avoiding classroom disruptions—it found that the "no-opt-out policy" was not "necessary to serve that interest." *Id.* at 566. Because the policy could not survive strict scrutiny, the Supreme Court granted a preliminary injunction requiring the board to allow opt-outs. *Id.* at 569.

### A.     S.B. 10 substantially burdens Plaintiffs' religious exercise.

S.B. 10 requires the permanent display of religious scripture in every classroom. The displays implore specific *religious* directives—e.g., "[t]hou shalt have no other gods before me"—that, as in *Mahmoud*, are "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *See id.* at 550. The displays also "carry with them a very real threat of undermining the religious beliefs that the parents wish to instill in their children" because they "impose upon children a set of values and beliefs that are hostile to their parents'." *See id.* at 553–54 (citation modified). And, as *commandments*, the displays clearly "exert upon children a psychological pressure to conform to [the displays'] specific viewpoints." *See id.* at 554 (citation modified). As a result, the displays mandated by S.B. 10 substantially burden Plaintiffs' religious exercise because they "interfere with [the] student[s'] religious upbringing[s]." *See id.* at 547.

This burden is not diminished simply because S.B. 10 does not require the Ten Commandments to be integrated into the curriculum. Significantly, the books in *Mahmoud* were not overtly religious—they were about "sexuality and gender." *See id.* at 529. As a result, their mere presence on a shelf *could not* reasonably conflict with the plaintiffs' sincerely held religious

86

beliefs—the issue was necessarily how the books were integrated into instruction. By contrast, the Ten Commandments are plainly religious, and their contents are—by their very nature—plainly instructive. As the Supreme Court put it, "[i]f the posted copies of the Ten Commandments are to have *any effect at all*, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone*, 449 U.S. at 42 (emphasis added). "Only by air-brushing the record can [Defendants] claim that the [Commandments] . . . are just about exposure . . . ." *See Mahmoud*, 660 U.S. at 556. In any event, "[w]hether or not a requirement or curriculum could be characterized as 'exposure' is not the touchstone for determining whether" a Free Exercise Clause violation has occurred. *See id.* "The question . . . is whether the educational requirement or curriculum at issue would substantially interfere with the religious development of the child or pose a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Id.* (citation modified). As discussed, S.B. 10's requirements clear that threshold.

Nor is it significant that Plaintiffs are not only seeking to "opt out" of a particular educational requirement. *Mahmoud* does not limit the Free Exercise Clause to that kind of relief. And importantly, S.B. 10 provides no practicable means for students to opt out. The Ten Commandments are required to be posted in every classroom of every public school during every hour of every day of the school year. The scripture will either be posted (in accordance with S.B. 10) or not (in violation of S.B. 10). As a result, there is no meaningful way for a student to opt out, as there was in *Mahmoud*, other than to "forgo" the "public benefit" of public school or face consequences under compulsory attendance laws. *See id.* at 561. But, as discussed, "the government cannot condition" the "availability" of public school "on

parents' willingness to accept a burden on their religious exercise." *Id.* (citation modified).

### B.    Defendants have not satisfied strict scrutiny.

Because the "character" of the burden that S.B. 10 imposes is "of the same character as that imposed in" *Mahmoud*, the next step is to apply strict scrutiny regardless of whether the statute is neutral and generally applicable. *See id.* at 564. Under strict scrutiny, "the government must demonstrate that 'its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest.'" *Id.* (quoting *Kennedy*, 597 U.S. at 525).

Defendants do not even attempt to articulate a compelling government interest to satisfy strict scrutiny. But even if they had advanced a compelling interest, such as education or history, Defendants would fail strict scrutiny under the narrow tailoring prong. As the Supreme Court has already found, "[p]osting of religious texts on the wall serves no such educational function." *Stone*, 449 U.S. at 42. And "[t]his is not a case" where, for instance, "the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *See id.* (citing *Schempp*, 374 U.S. at 225).

\*    \*    \*

The displays required by S.B. 10 threaten to "undermin[e] the religious beliefs that parents wish to instill in their children" and "pressure" students "to conform," and Defendants have not satisfied strict scrutiny. *See Mahmoud*, 660 U.S. at 553–54 (citation modified). As a result, Plaintiffs have established a Free Exercise Clause violation.

## III.  Conclusion

Because S.B. 10 is facially unconstitutional under the Establishment and Free Exercise Clauses, I would affirm the district court's entry of a preliminary injunction and denial of Defendants' motion to dismiss. I respectfully dissent.

No. 25-50695

Leslie H. Southwick, *Circuit Judge*, joined by Richman, Graves, Higginson, Douglas and Ramirez, *Circuit Judges*, dissenting:[*]

Despite the thoroughness and erudition of the majority opinion, I disagree with it. The dissents by my colleagues, Judges Higginson and Ramirez, also deserve commendation, but I find myself unable to join either in full. Thus, I write separately to explain my reasons for dissenting.

What is not part of my dissent is a rejection of the importance of searching for faith. Religion, though, is a matter of the mind and the heart. Faith cannot flourish when it is forced. A poem voices my concern and, I humbly offer, that of the First Amendment:

> The livid lightnings flashed in the clouds;
> The leaden thunders crashed.
> A worshipper raised his arm.
> "Hearken! hearken! The voice of God!"
>
> "Not so," said a man.
> "The voice of God whispers in the heart
> So softly
> That the soul pauses,
> Making no noise,
> And strives for these melodies,
> Distant, sighing, like faintest breath,
> And all the being is still to hear."

Stephen Crane, *The Black Riders and Other Lines*, Lines xxxix (1895), *reprinted in* The Collected Poems of Stephen Crane 41, 41 (Wilson Follett ed., 1930). Like any effective poetry, these lines can give different meaning to different readers at different times. In this opinion, they

---

[*] Judges Higginson, Douglas, and Ramirez join Parts I and II of this opinion. Judges Richman and Graves join Part II B.

capture for me that government promotion of religion in every classroom is simulated lightning and thunder, compulsorily seen and heard.

Despite my opening commentary, I have not forgotten that this is a judicial opinion. Poems and sentiments about faith do not control. Precedents and constitutional text do. My principal objection to the majority opinion is that it finds a recent Supreme Court precedent to be more sweeping in its discard of prior precedent than I do, that precedent being *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022). The *Kennedy* opinion made clear that we no longer apply a test from one earlier precedent, the appropriately named *Lemon* test that I will discuss momentarily. The difficulty is that the *Lemon* test was a fusion of First Amendment caselaw, binding together the holdings of several lines of cases to create a definitive test for Establishment Clause cases. In my view, the test was disassembled, and one part discarded — but other parts of what had been fused remain usable.

My objective here is to sift through the Establishment Clause jurisprudence left by *Kennedy* and determine what still applies. The sifting leads me to conclude that, under still-binding Supreme Court precedent, the Texas statute here is violative of the Establishment Clause. The Supreme Court may change the law further, but it has not done so yet. This inferior-court judge concludes we are doing so. That is not our role.

I.    Pre-Lemon *Principles of the Establishment Clause*

One source of ambiguity is that the Supreme Court did not clearly and in one decision formally bury *Lemon v. Kurtzman*, 403 U.S. 602 (1971). It was more like a death by a thousand — or at least numerous — slowly administered cuts. Finally, the Supreme Court declared that it "long ago abandoned *Lemon* and its endorsement test offshoot." *Kennedy*, 142 S. Ct. at 2427 (citing *American Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2079–

81 (2019) (plurality opinion)).  The Court did reaffirm the precedents that had "instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  *Id.* at 2428 (quotation marks omitted) (first quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014); and then citing *American Legion*, 139 S. Ct. at 2079–81 (plurality opinion)).  Other than requiring the use of history, *Kennedy* did not specify how it left the law after abrogating *Lemon*.  In my view, the best reading of the case is that it abandoned *Lemon*'s "grand unified theory" and overruled the endorsement test, but it left standing the rest of the Court's Establishment Clause caselaw and the command to let history guide the inquiry.  *See id.* at 2427–28 (quoting *American Legion*, 139 S. Ct. at 2101 (GORSUCH, J., concurring in judgment)).

Of importance in understanding what remains from prior caselaw, the Court portrayed its holding in *Kennedy* as consistent with its recent (and some not so recent) opinions, recognizing its gradual overruling of the good-intentions-gone-astray *Lemon* precedent.  *Kennedy*, 142 S. Ct. at 2428 n.4 ("In the last two decades, this Court has often criticized or ignored *Lemon* and its endorsement test variation.").  In this sense, the Court did not create a new test but insisted it was formally abandoning a derelict precedent for the test that had functionally replaced it in the last few decades.

Now, a close look at *Lemon*.  That opinion is best understood as the glue that bound together several different principles in a failed experiment to form one test for Establishment Clause cases.  *See Lemon*, 403 U.S. at 612–13; *see Kennedy*, 142 S. Ct. at 2427.  *Kennedy*, though, dissolved that glue and replaced *Lemon* with history as one lodestar, but it never discarded the principles that *Lemon* bound together.  *See Kennedy*, 142 S. Ct. at 2427–29 (explicitly abolishing only the endorsement test).  Certainly, *Kennedy* overruled *Lemon* and any progeny that rested on the unified *Lemon* test.  My disagreement with the majority comes from the fact that a directly-on-point

precedent about the Ten Commandments did not principally rely on *Lemon*'s uniform-test progeny, but on its progenitors. *See Stone v. Graham*, 449 U.S. 39, 41–43 (1980). *Kennedy* said nothing about the cases that predated *Lemon*, and I find no indication in *Kennedy* that the Court was discarding the entirety of its Establishment Clause law when it said that one opinion and its offspring had been "long ago abandoned." *Kennedy*, 142 S. Ct. at 2427.

The school prayer cases — which I see as largely resolving the case before us and on which *Stone* primarily relied — are still good law. The *Kennedy* majority cites *American Legion* for the proposition that *Lemon* has been abandoned over time. *Id.* The majority here recognizes *American Legion* as good law but fails to mention that *American Legion* did not cast doubt on the secular purpose requirement that stems from the school prayer cases. In its opinion, the *American Legion* Court engaged with the facts on terms of secular purpose. *American Legion*, 139 S. Ct. at 2080–85. It held that a 32-foot-tall Latin cross in Bladensburg, Maryland, constructed in 1925 to honor local service-members who had died in what was then known as the Great War, had accrued a sufficiently secular meaning over the years to defeat an Establishment Clause challenge. *Id.* at 2077, 2080–85. The Court distinguished between "established" displays and "new" displays, reasoning that established displays become more secular in purpose the more embedded they are in a community, whereas new displays retain their religious character. *See id.* at 2085. Importantly, the majority sought to show that the Bladensburg Cross did not violate the Establishment Clause because that specific cross had gained substantial secular meaning, not that it was defensible *as* a religious symbol. *Id.* at 2082–85.

Further, the Court in *American Legion* divided its Establishment Clause cases into six categories; the majority's reasoning was largely confined to the category of "religious references or imagery in public monuments." *Id.* at 2081 n.16. For the fourth, and much different, category,

"religious expression in public schools," the Court cited two of the school prayer cases as paradigmatic examples. *Id.* (first citing *School Dist. of Abbington Twp. v. Schempp*, 374 U.S. 203 (1963); and then citing *Lee v. Weisman*, 505 U.S. 577 (1992)). *Schempp* is the quintessential secular purpose case. *Schempp*, 374 U.S. at 222. The Court did not engage with the school prayer cases other than according them a place in its taxonomy, recognizing a secular purpose case's continuing status as good law. *See American Legion*, 139 S. Ct. at 2080. The Court's engaging in a sort of "secular purpose" reasoning, citing to *Schempp*, and leaving the school prayer cases otherwise alone all show that the Supreme Court did not mean to dismantle all its other Establishment Clause precedents even while it deposed *Lemon*. *Id.* at 2080–81 & n.16.

In the other case the *Kennedy* majority cites as an exemplar of its historical approach, the Court held that any legitimate Establishment Clause test "must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 572 U.S. at 577. The Court relied heavily on prior precedent holding that Nebraska's longstanding and unbroken practice of opening legislative sessions with a religious invocation did not run afoul of the Establishment Clause. *Id.* at 575–85 (discussing *Marsh v. Chambers*, 463 U.S. 783 (1983)). The Court in its *Town of Greece* opinion held that the brief prayer at issue had a "permissible ceremonial purpose," as its "purpose and effect [were] to acknowledge religious leaders and the institutions they represent rather than to exclude or coerce nonbelievers." *Id.* at 591 (plurality opinion). The "principal audience" of the invocations was the "lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id.* at 587.

The historical pedigree of legislative prayer was certainly the focus of *Town of Greece*, but the Court nonetheless observed that a showing of "a

pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose" could potentially "establish a constitutional violation" in a legislative prayer case. *Id.* at 585 (majority). The Court thus examined the purpose of the town's policy and found it to be an acceptable one, demonstrating that conduct with its origin in religion can find a place in public life and even further the community's civic values. *See id.* at 591 (plurality opinion).

Aside from one cursory reference, the *Kennedy* Court did not refer to the principles contained within *Lemon*. *See Kennedy*, 142 S. Ct. at 2427. This is easy to explain. There was simply no occasion to engage with them. The Court determined that Kennedy was a private citizen performing a private prayer, so there was scant need to contend with any threat of excessive entanglement with religion. *Id.* at 2429. Similarly, a non-secular purpose is perfectly proper for a private citizen, and there was no need to determine whether a primary effect of the prayer was to further religion because, again, Kennedy's prayers were silent and private. *See id.*

I will summarize. *Kennedy* stated that *Lemon*'s "'ambitiou[s],' abstract, and ahistorical approach to the Establishment Clause" had been abandoned by the Court long ago, with *Kennedy* being the first time a majority of the Court declared abandonment in one opinion. *Id.* at 2427–28 (quoting *American Legion*, 139 S. Ct. at 2080 (plurality opinion)). *Kennedy* relied on prior Supreme Court cases in determining whether the school district's permitting Kennedy's conduct was constitutional under the Establishment Clause. *See id.* at 2430–32. Those cases that discarded *Lemon*, then, acknowledged and left alive the secular purpose requirement — indeed, they reinforced its vitality.

My understanding of this caselaw is that the Supreme Court has not overruled decades of precedent predating *Lemon*, but rather has dictated that

*both* our history of religious expression and the Court's precedents matter. Here, the historical evidence is, at best, inconclusive about these types of religious displays in public schools. There is hardly the same quantum or quality of evidence here as there was in *Marsh*, *Town of Greece*, or *American Legion*. This dearth of historical evidence does not allow us to ignore still-effective Supreme Court precedent and construct a new jurisprudence of the Establishment Clause from the ground up based on what we see as the best understanding of what an establishment of religion meant historically.[1]

I now explain what I find remains of prior precedent after the Supreme Court disassembled the unitary *Lemon* approach.

## II.    *Applying the Doctrine*

### a.  *Secular Purpose*

The requirement that laws have a secular purpose is deeply embedded in Establishment Clause precedent. *See Schempp*, 374 U.S. at 222; *see also Town of Greece*, 572 U.S. at 585 (suggesting that, without actions that "betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation"); *id.* at 587, 590–91 (plurality opinion) (explaining that remarks possessed a "permissible ceremonial purpose" of setting lawmakers' "mind[s] to a higher purpose," which "thereby eases the task of governing," at least when the audience is composed of "mature adults"); *American Legion*, 139 S. Ct.

---

[1] When considering historical evidence helpful to interpreting the Second Amendment, the Supreme Court mentioned scholarly uncertainty as to whether the relevant history was from the Founding era when the amendment was written and ratified or from the Reconstruction era when the Fourteenth Amendment was written and ratified. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 (2022). The Court found no need to resolve the question in light of the similarity of the evidence from both periods. *Id.* In my analysis, the specific time period here is also irrelevant but for different reasons.

at 2082–85 (explaining the purpose and meaning of the Bladensburg Cross monument had become sufficiently secular over time).

In essence, the school prayer cases established that state action with the purpose of "the advancement or inhibition of religion . . . exceeds the scope of legislative power as circumscribed by the Constitution." *Schempp*, 374 U.S. at 222. This does not mean, though, that religious motivation may not be part of the reason for a governmental decision if a secular purpose dominates. *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985). The Supreme Court has instructed us to be "particularly vigilant in monitoring compliance with the Establishment Clause" in the primary and secondary school context. *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality opinion) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987)). This is because of the considerable influence schools exert over impressionable young minds and the "involuntary[iness]" of their attendance. *Aguillard*, 482 U.S. at 584.

The precedent most clearly on point is *Stone v. Graham*, 449 U.S. 39 (1980). In *Stone*, Kentucky passed a materially similar law to the one before us, though one that had a stronger claim to a secular purpose, requiring that every public school classroom contain a Ten Commandments display above a context statement that invoked the Commandments' "secular application" as the "fundamental legal code of Western Civilization and the Common Law of the United States." *See id.* at 39 n.1 (citation omitted). Texas's law, by contrast, forbids any context statement, and it requires that the Commandments be "legible to a person with average vision from anywhere in the classroom." TEX. EDUC. CODE § 1.0041(b)(1).

Texas contends that *Kennedy* overruled *Stone* by overruling *Lemon*. Even though *Stone* cited *Lemon*, the question of *Stone*'s validity turns on whether it depended on *Lemon* for its holding or if it applied the secular purpose principle despite its references to *Lemon*. *See Stone*, 449 U.S. at 40,

43 (citing *Lemon*, 403 U.S. 602, 612–13 (1971)).  Outside of quoting the *Lemon* test — the then-operative "grand unified theory" of Establishment Clause law, *Kennedy*, 142 S. Ct. at 2427 (citation omitted) — the *Stone* majority opinion's sole reference to *Lemon* clarified that the Kentucky statute "violate[d] the first part of the *Lemon* . . . test," *i.e.*, the secular purpose requirement.  *Stone*, 449 U.S. at 43.  Texas makes no persuasive argument that this is an application of the abandoned *Lemon* test in its own right, nor can it.  As I explain above, the individual pieces of the Supreme Court's Establishment Clause jurisprudence have not been discarded, only the endorsement test and the *Lemon* test's aggregation of principles.  The mere fact that the Court cited the broader test to apply the narrower principle does not doom *Stone*.  The Court's citation to *Lemon* was rote — the reasoning for *why* the Kentucky law violated the Establishment Clause rested entirely on *Schempp* and *Engel v. Vitale*, 370 U.S. 421 (1962).  *Stone*, 449 U.S. at 41–42; *see Van Orden*, 545 U.S. at 690–91 (plurality opinion) (describing *Stone*'s "almost exclusive reliance upon two . . . school prayer cases").  Because *Stone* rested on good law, it was not abrogated along with *Lemon*.

Since I believe *Stone* has outlived *Lemon*, I apply it here.  The Supreme Court has twice held violative of the Establishment Clause "a text of the Commandments as distinct from any traditionally symbolic representation, [standing] alone."  *McCreary County v. Am. C.L. Union of Ky.*, 545 U.S. 844, 868 (2005).  If the displays in *Stone* and *McCreary* were not even "arguably secular," Texas cannot support a secular purpose here.  *See id.*  The displays, by Texas's own admission, are not a part of an educational program, nor will they serve any specific curricular purpose.  *See Schempp*, 374 U.S. at 225.  Texas's only evidence of a secular purpose comes from several statements from individual legislators.  The Court in *Stone*, however, did not hold that the displays violated the secular purpose requirement because legislators had made comments that revealed the religious motivations behind the statute;

rather, the Court emphasized that the "pre-eminent purpose for posting the Ten Commandments on schoolroom walls is," on its face, "plainly religious in nature." *Stone*, 449 U.S. at 41. In fact, the Court stated that "no legislative recitation of a supposed secular purpose c[ould] blind [it] to that fact," given the imperative and distinctly religious nature of the prefatory phrase and the first four Commandments in particular. *Id.* at 41–42; *McCreary*, 545 U.S. at 869 (holding that a "religious object is unmistakable" when the text comprises of a "religious statement dealing with religious obligations and morality subject to religious sanction").

This led the Court to the conclusion that, if "the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone*, 449 U.S. at 42. Under binding Supreme Court precedent, that purpose is not "a permissible state objective under the Establishment Clause." *Id.* Absent an abandonment not just of *Lemon* but also of the secular purpose standard that predated it, I would hold that *Stone* by itself or other precedents that insist on a secular purpose dispose of this case.

### b. *Coercion similar to school prayer*

The following is an alternative but related reason to find S.B. 10 unconstitutional. The Supreme Court has held that public-school-sponsored prayers, or prayers at events where attendance is mandatory or quasi-mandatory, violate the Establishment Clause.[2] Of course, posting the Ten Commandments on classroom walls is not identical to prayer, but the same

---

[2] *Engel v. Vitale*, 370 U.S. 421, 430–31 (1962); *Schempp*, 374 U.S. at 222–23; *Lee v. Weisman*, 505 U.S. 577, 586–87 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311–313 (2000).

analysis applies if similar coercion results both from the display and from a school-sponsored prayer.

The school prayer cases not only establish that "there must be a secular legislative purpose" for our laws, but also that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Schempp*, 374 U.S. at 221–22 (quoting *Engel v. Vitale*, 370 U.S. 421, 431 (1962)).

There certainly is "disagree[ment] on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause" in the Supreme Court's caselaw. *Kennedy*, 142 S. Ct. at 2429. As the majority in the present case states, there is no question that the Supreme Court left untouched two of its more recent school prayer cases. Because these cases have not been overruled or abandoned, we are obligated to determine whether posting the Ten Commandments involves more or less coercion than in those — we are not free to disregard the type of coercion the Court has viewed as problematic in favor of a narrower understanding of coercion. *See Lee*, 505 U.S. at 593; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311–13 (2000).

The *Kennedy* Court's coercion analysis did not undermine, but indeed reinforced, the longstanding view of coercion: The Court held that there was no coercion because Kennedy's prayers were private and silent, unlike in *Lee* and *Santa Fe*, where student participation was mandatory or practically so, and students were a "captive audience."[3] *Kennedy*, 142 S. Ct. at 2431–32.

─────────────────

[3] The *Town of Greece* Court engaged in a similar coercion analysis. *Town of Greece*, 572 U.S. at 586–90 (plurality opinion). A plurality distinguished two school prayer cases, *Lee* and *Santa Fe*, emphasizing that those cases require a close reading of the facts and paying attention to the fact that the town board meetings largely involved "mature adults,

No. 25-50695

I apply the guidance from this caselaw to determine whether this schoolroom display is coercive. A variety of factors have been identified for this fact-sensitive inquiry. The "State exerts great authority and coercive power through mandatory attendance requirements," amplified by "children's susceptibility to peer pressure" in the school environment and their perception of school figures as role models. *Aguillard*, 482 U.S. at 584; *Santa Fe*, 530 U.S. at 311–12. In the school context, the state may not exert "coercive pressure" on students to conform with state-approved religious views, even if that pressure is "subtle and indirect." *Lee*, 505 U.S. at 592–93. Both "public pressure" and "peer pressure" are considered, as the "government may no more use social pressure to enforce orthodoxy than it may use more direct means." *Id.* at 592–94 (citing school prayer cases).

Here, there is coercion in the sense described by the school prayer cases. States are selective with the instructions they require to be posted in classrooms — they do so only when the state wants those instructions followed. Brief for Baptist Joint Committee for Religious Liberty et al. as Amici Curiae in Support of Plaintiffs-Appellees at 22, *Roake v. Brumley*, No. 24-30706, 2026 WL 482555 (2026). One *amicus* argues students "will be confronted with the State's religious instruction every minute of every day and cannot 'opt out' from this pervasive messaging," which is "*more* pervasive than the limited amounts of prayer found unconstitutional" in the school prayer cases, lasting "a few minutes or less." *Id.* at 23. Maybe not continuously "confronted," but students will have the display visible all day in every classroom. The *Lee* Court recognized that requiring students to stand and be silent at a graduation worked a "subtle and indirect" coercion,

---

who 'presumably' are 'not readily susceptible to religious indoctrination or peer pressure.'" *Id.* at 590 (quoting *Marsh*, 463 U.S. at 792).

that was "as real as any overt compulsion." *Lee*, 505 U.S. at 593. What the Texas statute requires here is at least as coercive.

Texas argues that, to be improper, the coercion must pressure students to engage in a "formal religious exercise," and here there is no compulsion of this sort. Texas's understanding of the coercion test, though, overlooks the *Kennedy* Court's nod to *Santa Fe*, in which there was no coercion actually to pray, just a prayer broadcast "'over the public address system' before each football game."[4] *Kennedy*, 142 S. Ct. at 2431–32 (quoting *Santa Fe*, 530 U.S. at 294). A broadcast prayer for which no active participation is required is comparable on the coercion axis from posted religious commandments.[5] Indeed, the Court in *Santa Fe* urged that "[l]aw reaches past formalism," finding a coercive effect for students whose

---

[4] In *Santa Fe*, the Court observed that there was coercion in being seen as participating in group prayer, an "act of religious worship." 530 U.S. at 312. Yet, the reason why that specific "act of religious worship" was unconstitutional is because it attempted to "exact religious conformity" and "enforce a religious orthodoxy" using the "machinery of the State." *Id.* (alteration in original) (quoting *Lee*, 505 U.S. at 592). In this sense, the fact that a formal religious exercise was involved was just the means by which "orthodoxy" was enforced in that case.

[5] A useful contrast is to one of this court's opinions analyzing a pledge of allegiance. *See Croft v. Perry*, 624 F.3d 157, 170 (5th Cir. 2010). In that case, JUDGE E. GRADY JOLLY for the court wrote that adding "under God" to the Texas pledge of allegiance did not result in coercion because a pledge of allegiance is not a "prototypical religious activity" — rather, "the pledge's effect remain[ed]" essentially "patriotic," as its "religious component [was] minimal and, when contextualized, clearly understandable as an acknowledgement of the state's religious heritage." *Id.* The reading of the Commandments, though, is such a "prototypical religious activity." The Commandments come from scripture and are without question — and indeed, much more forceful and significant because they are — religious in character. Posting the Commandments on the classroom wall does not have a patriotic effect in the same way that an "acknowledgement of the state's religious heritage" in a pledge does. *Id.* The Commandments' effect, rather, will be "to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone v. Graham*, 449 U.S. 39, 42 (1980).

presence was not formally compelled and who would merely be forced to listen to, and be seen to respect, a prayer from the public announcement system. *Santa Fe*, 530 U.S. at 310–312 (quoting *Lee*, 505 U.S. at 595).

These principles, the Supreme Court's command to be alert to coercion in the public-school setting, and the Court's acknowledgement of the existence of coercion when a religious display in the classroom "confront[s] elementary school students every day," all convince me that coercion arises from the posted Ten Commandments in every classroom. *Van Orden*, 545 U.S. at 691 (plurality opinion). CHIEF JUSTICE REHNQUIST, in the *Van Orden* plurality opinion, had no difficulty distinguishing the schoolroom setting from the grounds of a state capitol. *Id.* at 691-92. That passive use outdoors, adjacent to a state capitol, did not require anyone to view the Biblical Commandments other than fleetingly, much different than requiring school children every school day in every classroom to view them.

To my eyes and ears, if a prayer heard but ignored can be coercive, then the posting of explicitly religious text in a place where it can be seen in every classroom is more coercive. *See* TEX. EDUC. CODE § 1.0041(b)(1). Indeed, the Court has rejected the argument that merely ignoring religious expression is a sufficient cure for an Establishment Clause violation. *Lee*, 505 U.S. at 592–93. Because we are bound by Supreme Court precedent until further indication, and S.B. 10 bears the same degree of coercive effect as the school prayer cases, I would hold that the school prayer cases resolve this case on coercion grounds.

Lastly, the majority invokes *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), asserting that S.B. 10 requires no compulsion or forced act rising to a violation of the First Amendment, only the passive presence of the display in the classroom. The majority elides the crystalline

core of *Barnette*: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642. When Texas places a copy of the Ten Commandments in prime position in every public classroom across the state, it edges precariously close to creating a religious orthodoxy in the classroom.

The particular need for enforcing the Establishment Clause in the school context is that "[f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict" with the parents' or children's religious beliefs. *Aguillard*, 482 U.S. at 584. By placing the "power, prestige[,] and financial support of the government . . . behind a particular religious belief," Texas exerts an "indirect coercive pressure" on students to conform and not to stray. *Engel*, 370 U.S. at 430–31. Regardless of whether "to most believers" this "may seem nothing more than a reasonable request," it is nevertheless improper for Texas "to employ the machinery of the State to enforce a religious orthodoxy." *Lee*, 505 U.S. at 592.

I would hold that, under current caselaw, the displays are improperly coercive in violation of the Establishment Clause. I respectfully dissent.

No. 25-50695

HAYNES, *Circuit Judge*, dissenting:

I dissent from the majority opinion.  I agree with Judge Ramirez's dissent section 1.A that addresses the Establishment Clause via the case of *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam).  Because that case clearly makes S.B. 10 an unconstitutional statute, I simply stop there.  We must follow the Supreme Court, and that is what the opinion *Stone* shows.

No. 25-50695

Stephen A. Higginson, *Circuit Judge*, joined by Richman, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

The Framers intended disestablishment of religion, above all to prevent large religious sects from using political power to impose their religion on others. Yet Texas, like Louisiana, seeks to do just that, legislating that specific, politically chosen scripture be installed in every public-school classroom. Our court accommodates their unconstitutional request, supplanting decades of Supreme Court precedent merely because of a single decision the majority deems outdated. In doing so, the majority defies foundational First Amendment concepts, ignores the harms students will face, and usurps parents' rights to determine the religious beliefs they wish to instill in their own children.

I wrote earlier, in the companion case from Louisiana, that the Constitution prohibits religious orthodoxy in public schools. *See Roake v. Brumley*, 170 F.4th 292, 307–11 (5th Cir. 2026) (Higginson, J., dissenting). My opposition to a state taking on the role of faith leader applies with the same force for Texas. I write today to respond further and to emphasize three constitutional priorities: non-discrimination among religions, the Supreme Court's constitutional solicitude for students, and, above all, the right of parents to control the faith guidance of their children.[1]

\* \* \*

As I understand our country's history, many forebears fled government religious persecution. *See Sch. Dist. of Abington Twp. v. Schempp*,

---

[1] I gratefully join the principal dissent by Judge Ramirez, as well as the aligning dissent by Judge Southwick. Both make fundamental points against religious coercion in classrooms, prohibited by Supreme Court precedent we should, and indeed must, respect.

374 U.S. 203, 214 (1963) ("Nothing but the most telling of personal experiences in religious persecution suffered by our forebears could have planted our belief in liberty of religious opinion any more deeply in our heritage." (citation omitted)).   In turn, the Framers prohibited political religious commands, both in the original Constitution through the No Religious Test Clause, and then doubly in the Bill of Rights through the First Amendment, mandating non-establishment and equal treatment for different faiths.   The Supreme Court has guarded this First Amendment genius, fostering religious liberty and freedom of conscience for centuries, without societal discord, because of our collective understanding that public schools cannot indoctrinate children with religious views that a political majority favors. *See Stone v. Graham*, 449 U.S. 39, 42 (1980) ("If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments.   However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.").

Nonetheless, according to the majority, Texas's open promotion of one religion must stand because courts do not issue "theological judgment[s]."   That is true but courts *do* issue constitutional ones.[2]   Because the Constitution prohibits any branch of government, state or federal, from issuing a theological judgment, a court's function is to adjudicate that violation of our founding principles.   When a political branch overreaches to

---

[2] In fact, this was the Supreme Court's reminder, just last year.   In *Mahmoud v. Taylor*, the Court said that we should not "confuse our country with those in which laws enacted by a parliament or another legislative body cannot be challenged in court. . . . Here, the Bill of Rights and the doctrine of judicial review protect individuals who cannot obtain legislative change. The First Amendment protects the parents' religious liberty, and they had every right to file suit to protect that right."   606 U.S. 522, 563 (2025).

establish religion and constrain liberty of conscience, courts have the power—and, more importantly, the duty—to say no.

On the majority's theory, state legislatures may make their own theological decisions—commanding reverence to biblical scripture they select—without any guardrails because courts are disempowered from discharging our constitutional duty to protect individuals from governmental intrusion into religion. The majority reasons that the Establishment Clause only prohibits a government "burden" or "benefit" to a chosen faith but does not extend to government selection of preferred religious "language or symbolism."[3] Thus, according to the majority, when the government speaks or displays, but avoids a benefit or burden, it apparently may inculcate. *Contra Schempp*, 374 U.S. at 221–22 (discussing the "wholesome neutrality" of government sentiment towards religion that the Establishment Clause demands, which forbids the government from "all[ying] itself with one particular form of religion").

"The clearest command of the Establishment Clause is that the government may not officially prefer one religious denomination over another." *Cath. Charities*, 605 U.S. at 247 (internal quotation marks omitted and alteration adopted) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). The majority's reduced Establishment Clause would allow state governments to evangelize by affixing a crucifix—or a mezuzah, or a statue of Buddha, etcetera, to the exclusion of other symbols—purchased with state funds, in every classroom. This proposition runs counter to history and

---

[3] The majority crafts this benefit/burden distinction to avoid recent, unanimous, and binding caselaw. *See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025). In doing so, the majority necessarily ignores the obvious benefit that Texas confers on religions that adhere to the King James Version of the Ten Commandments, now displayed in every classroom across Texas.

precedent. For example, in *Illinois ex rel. McCollum v. Board of Education*, the Supreme Court explained that the division between church and state as applied to school funding has been long and widely understood, as "strikingly illustrated by the fact that every State admitted into the Union since 1876 was compelled by Congress to write into its constitution a requirement that it maintain a school system 'free from sectarian control.'" 333 U.S. 203, 220 (1948) (opinion of FRANKFURTER, J.) (citation omitted).

And with political "language" exempt, public officials and teachers apparently may proselytize so that non-adherents—like Jewish children, Muslim children, Hindu children, Buddhist children, or Native American children with different belief systems, or non-believers altogether[4]—receive Protestant scripture, the very fear that inter-faith groups, in amici consensus, have cogently voiced. *See* En Banc Br. of Nat'l Council of Jewish Women et al. as Amici Curiae, at 5–7, 13–22 (No. 25-50695). The Framers shared Plaintiffs' and amici's fear of government elevating a single denomination. As Thomas Jefferson wrote, "[t]he bill for establishing religious freedom" was meant to provide "universal" protection for people of all faiths, as evidenced by an attempt to insert a reference to Jesus Christ that "was rejected by a great majority, in proof that they meant to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and the M[uslim], the H[indu], and [the non-believer] of every denomination." Thomas Jefferson, *Autobiography* (1821), *in* 5 THE FOUNDERS' CONSTITUTION 85, 85 (Philip B. Kurland & Ralph Lerner eds., 1987) (terms updated but denominations maintained from original). Throughout our history, the Supreme Court has consistently enforced the First Amendment's "prohibition on denominational preferences" because "the

---

[4] This list is clearly not exhaustive, and my concerns extend to any parent and child who do not venerate the King James Version of the Ten Commandments.

fullest realization of true religious liberty requires that government refrain from favoritism among sects." *Cath. Charities*, 605 U.S. at 248 (internal quotation marks omitted) (quoting *Larson*, 456 U.S. at 245–46); *see also McCollum*, 333 U.S. at 212 (opinion of the Court) ("For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere.").

These concerns have special prominence in the public-school context. The Supreme Court has guarded against the discriminatory and coercive effects that result from government-authorized religion most strictly when it enters the schoolhouse door. Despite the majority's characterization, *Lemon* and *Stone* were neither the beginning nor the end of Supreme Court law against government attempts to infuse religion in our nation's classrooms.

For example, in 1948, the Supreme Court held that the First and Fourteenth Amendments prohibit states from "utiliz[ing] its tax-supported public school system in aid of religious instruction." *McCollum*, 333 U.S. at 204–05. In a concurring opinion, four Justices specifically recognized the threat that Establishment Clause violations pose to the sanctity of schools, because "[t]he modern public school derived from a philosophy of freedom reflected in the First Amendment."[5] *Id.* at 214 (opinion of Frankfurter, J.). The Justices further articulated a principle that is as true today as it was then: "The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny." *Id.* at 231. Accordingly, there is "no activity of the State" in which it is "more vital to keep out divisive forces than in its schools, to avoid confusing, not to say

---

[5] *See also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction.").

fusing, what the Constitution sought to keep strictly apart." *Id.* Thus, the Supreme Court saw in 1948 what the Framers saw at our country's founding; society writ large, and schools most especially, cannot foster a democratic society without respecting its "heterogenous" makeup. *Id.* at 216. In observing that public schools' secular education reflected "a recognition of the need of a democratic society to educate its children . . . in an atmosphere free from pressures," the concurring Justices also honored schools as "the most powerful agency for promoting cohesion among a heterogeneous democratic people," making it all the more important to keep "entanglement in the strife of sects" away. *Id.* at 216–17; *see also Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("One timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people.").

In the decades that followed, the Supreme Court time and again has explicitly affirmed what the majority seeks to deny: schools are places where coercion permeates easily, and, as such, there are "heightened concerns" for protecting students' "freedom of conscience from subtle coercive pressure." *Lee*, 505 U.S. at 592; *see also Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("The State exerts great authority and coercive power through" public schools "because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure."). Last year, in *Mahmoud v. Taylor*, the Court again reiterated this truth. Schools, and the educators within them, are entrusted with a most special duty, one that is dissimilar from other governmental operations, because schools "implicate[] direct, coercive interactions between the State and its young residents." *Mahmoud*, 606 U.S. at 557.

The majority denies the inherently coercive pressure of posting Texas's chosen scripture in every classroom. With no answer to this

government interference with students' and parents' First Amendment rights, the majority diverts to examples that are utterly dissimilar. For one, it is baffling that the "[m]ost dramatic" consequence, to the majority, is what would happen to the pledge of allegiance should Plaintiffs prevail. To me, the most serious consequences are the harm to students made to feel different or pressured to venerate scripture they do not believe in and the infringement on their parents' rights to direct their faith upbringing. I am happy to reassure the majority that the pledge is not imperiled. The pledge is not a set of biblical commandments. The pledge is not said in every minute of every day of every class. A nondenominational reference to God in the pledge is more similar to the mention of God in the Declaration of Independence. It is at once an expression of humility and a reflection of hope that mankind fulfills a higher purpose.[6] Moving from the sublime to the ridiculous, the majority also seems fearful that "religious placenames" that dot our country, like St. Louis, might be in jeopardy. Twenty years ago, CHIEF JUSTICE REHNQUIST recognized that elementary school students cannot be "confronted" by the Ten Commandments every day, whereas a monument of the Commandments on government property "is a far more passive use of the text." *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality opinion). Schools are unique, and we are fortunate that the Supreme Court gives them distinctive First Amendment protection, forbidding any denominational preferences that intrude on students' and parents' rights.

---

[6] *See Engel v. Vitale*, 370 U.S. 421, 435 n.21 (1962) ("There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State [] has sponsored in this instance.").

No. 25-50695

\*    \*    \*

The compulsory public-school setting magnifies the harm of a government choosing, elevating, and even empowering one religion over others. Texas's installment of the King James Version of the Ten Commandments in every classroom harms impressionable students and deprives parents of their fundamental right to govern their children's religious upbringing.

First, with the injection of religion at every turn in their learning environment, students will face real consequences. The majority has no answer to the distress children will face, as expressed by Plaintiffs and amici alike. *See, e.g.*, En Banc Br. of Tex. Freedom Network et al. as Amici Curiae, at 13–18 (25-50695). Instead, the majority declares no fewer than six times, but never with supporting caselaw, that there must be punishment for there to be a First Amendment violation. *Contra Schempp*, 374 U.S. at 225 ("The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.'" (quoting James Madison, *Memorial and Remonstrance Against Religious Assessments*, as quoted in *Everson v. Bd. of Educ.*, 330 U.S. 1, 65 (1947))). Thankfully, the Supreme Court, unlike our court, recognizes the consequences that lie waiting when students of all backgrounds, and all religions, are confronted with the reminder that they are different—so different that they are not included in the sole religion their school and government celebrate. *See Engel*, 370 U.S. at 431 ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain."); *Edwards*, 482 U.S. at 584 ("Students in such institutions are impressionable and their attendance is involuntary."); *Lee*, 505 U.S. at 592 ("What to most believers may seem nothing more than a reasonable request that the

nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy."); *id.* at 593 ("Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention.").

Thus, similar to the harm from school prayers, students in Texas will be reminded that the "conspicuous"[7] religious text following them from math class to theater class is different from religious sentiments they hear at home or in a sacred place of worship.[8] *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000) ("School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring))).[9]

---

[7] Tex. Educ. Code Ann. § 1.0041(a) (West 2025).

[8] Scholars often make points with more background and eloquence than I do. Relating to this issue, Professor Paul McGreal has observed, "When a student sincerely objects to a Ten Commandments display, they are not simply objecting to an aesthetically displeasing poster or a problematic political message. Instead, they confront a government message that endorses particular religious teachings as worthy of permanent display. Every day they enter the schoolhouse, they must choose between their religious conscience and full participation in the classroom." Paul E. McGreal, *Ten Commandments Cases: Learning from Reformation Coercion*, 124 Mich. L. Rev. Online 69, 80 (2026).

[9] Justice Gorsuch has been perceptively protective too, recognizing the weight and consequence of making students feel they are outsiders. In *Haaland v. Brackeen*, he discussed the historical example of governmental support of "Indian boarding schools," which targeted "destroying tribal identity and assimilating Indians into broader society," and "prohibited children from . . . engaging in customary cultural or religious practices."

No. 25-50695

Second, the school environment amplifies state action. The majority deflects from binding Supreme Court precedent by claiming students are not being "taught to adopt" the Ten Commandments. Yet, it simultaneously offers no imagination of what Texas is doing by imposing a religious text in classrooms. The obvious truth, which we know as well as students do, is that the purpose of public schools is education. School materials, including displays, are intentionally placed in school for their enrichment value, meant to shape our nation's youth.

The Supreme Court has emphasized that not all challenges related to school classrooms are created equal, and that courts must "consider the specific context in which the instruction or materials at issue are presented." *Mahmoud*, 606 U.S. at 550. Here, there is no curricular context to explain the posting of this chosen scripture.[10] One logical question then follows: what is the purpose of mandating that every public-school classroom across Texas display Protestant scripture? School materials—whether on the walls or on the bookshelves—convey a message. *See, e.g.*, *Mahmoud*, 606 U.S. at 550 ("Like many books targeted at young children, the books are unmistakably normative. They are clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be

---

599 U.S. 255, 298–300 (2023) (GORSUCH, J., concurring).

[10] Notably, as JUDGE HARDIMAN wrote, in a decision favorably citing *Stone*, an introductory lesson on Islam in a world cultures course was permissible because it was "presented in an academic rather than devotional context." *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 493 (3d Cir.), *cert. denied*, 146 S. Ct. 885 (2025). Here, the Ten Commandments is not being presented in the context of a social studies class "to introduce students to the fundamental tenets of a major world religion." *Id.* at 492 (citing *Stone*, 449 U.S. at 42). Instead, Texas's chosen religious text, representative of only a narrow group of religious sects' beliefs, will confront students with its scriptural force in every classroom from chemistry to yearbook, and in every grade, for as long as students are under Texas's instruction.

rejected."). A religious text "confront[ing] [] school students every day," *Van Orden*, 545 U.S. at 691, is an even more obvious religious infringement than the books *Mahmoud* considered. The materials at issue in *Mahmoud* were "'LGBTQ+-inclusive' storybooks," which did not directly convey a religious message, but instead included messages that contradicted parents' asserted religious views. *Mahmoud*, 606 U.S. at 533. The purpose of placing the King James Version of the Ten Commandments in every classroom is its religious directive, irreconcilable with the First Amendment.[11]

Classrooms are critical places of learning and enrichment. If placed in every classroom, the scripture becomes part of that learning, as intended by Texas's government.[12] Texas children will naturally examine these posters and be left to reflect on the fact that one religion—different from the one they observe in their home, their synagogue, their mosque, or other place of worship—was selected to be in their school as a representation of what? An expectation of a model student? A good citizen? A properly devout person? The majority insists that students will not be "catechized," but forgets their curiosity. Surrounded by the Ten Commandments displays, students will wonder about "the LORD"; they will wonder about "other gods"; they will wonder about "graven images"; they will wonder about "kill[ing]"; they will wonder about "adultery"; they will wonder about "covet[ing]" a neighbor's

---

[11] Regardless, the Supreme Court has prohibited similar pervasive use of biblical text in schools because "the place of the Bible as an instrument of religion cannot be gainsaid." *Schempp*, 374 U.S. at 224; *see also* Ira C. Lupu & Robert W. Tuttle, *The Ten Commandments in Louisiana Public Schools: A Study in the Survival of Establishment Norms*, 100 Chi.-Kent L. Rev. 601, 620 (2025) ("[T]he character of the Commandments, combined with the prominence of the text in the posting, puts a far greater burden on the state to undo the obvious inference that they are being displayed for religious reasons.").

[12] *See, e.g.*, En Banc Br. of Tex. Freedom Network et al., at 11–13, 21–22 (quoting legislators discussing S.B. 10); En Banc Br. of Nat'l Council of Jewish Women et al., at 26–28 (same).

wife. TEX. EDUC. CODE ANN. § 1.0041(c); *Exodus* 20:2–17 (King James). Teachers inevitably will be asked to answer these questions, but Texas parents did not entrust public-school teachers with the spiritual education of their children. It is a parent's right to have these conversations—not inside the classroom, absent their input, but with their children, present at home.

*    *    *

Texas's defiance of the First Amendment displaces parents. Parents, not politicians, have the right to lead their children's religious development.[13] Yet the majority now gives Texas that choice and command. Here again, the Supreme Court understands what our court does not. It is "the liberty of parents and guardians to direct the upbringing and education of children under their control"—"rights guaranteed by the Constitution." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *see also Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (explaining that government-authorized religious infringements pose "a very real threat of undermining" the religious beliefs that parents hope to instill in their children and, likewise, of undermining parents' rights); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753–54 (2020) ("[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school.").

In my opinion, there is irony in the majority's contention that Plaintiffs here ask our court to go beyond *Mahmoud*, when in fact, it is the majority today that goes beyond. In *Mahmoud*, the school materials at issue were non-religious books that parents deemed contradictory to their values;

---

[13] As President Grant said, "Leave the matter of religion to the family altar, the church, and the private school, supported entirely by private contributions." *The President's Speech at Des Moines*, 22 CATH. WORLD 433, 435 (1876).

here, the material is the exact text of the King James Version of the Ten Commandments. 606 U.S. at 533–35. In *Mahmoud*, the disputed books were, at most, to be referenced in a classroom lesson; here, the Ten Commandments are to be conspicuously displayed in every classroom, every hour of the school day. *Id.* at 535–36. Most striking, in *Mahmoud*, the Supreme Court still allowed parents to pull their children out of the lesson; yet, here, our court offers no relief at all—parents must simply abide. *Id.* at 569. Texas's new law requires the compulsory observance the Supreme Court prohibits. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536–37 (2022) ("To be sure, this Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'" (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952))); *Lee*, 505 U.S. at 596 ("It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice.").

Many parents "have no choice but to send their children to a public school." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (ALITO, J., concurring). Until today, this reality never meant that parents also have no choice but to accept government-chosen religious scripture that will surround their children. Stated simply, "the right of parents 'to direct the religious upbringing of their' children would be an empty promise if it did not follow those children into the public school classroom." *Mahmoud*, 505 U.S. at 547. If schools across Texas must display this scripture, then today our court ordains that empty promise.